# PART III
# HISTORIC TOWN LAND DEVELOPMENT CODE[1]

## ARTICLE I. GENERAL PROVISIONS

### Sec. 1.00. Title.

This Code shall be entitled the "Historic Town of McIntosh Land Development Code" and may be referred to herein as the "LDC."

(Ord. No. 94-112, exh. A(1.00), 1-18-1994)

### Sec. 1.01. Authority.

This LDC is enacted pursuant to the requirements and authority of F.S. § 163.3202, the Local Government Comprehensive Planning and Land Development Regulation Act, the town Charter, and the general powers in F.S. ch. 166.

(Ord. No. 94-112, exh. A(1.01), 1-18-1994)

### Sec. 1.02. Applicability.

Except as specifically provided, the provisions of this LDC shall apply to all development in the town, and no development shall be undertaken without prior authorization pursuant to this LDC.

(Ord. No. 94-112, exh. A(1.02), 1-18-1994)

### Sec. 1.03. The integration of land development regulations.

This integrated LDC was enacted to replace the land development regulations that had been adopted piecemeal over the years. These scattered regulations lacked coordination and were difficult to find, administer and understand. The replacement of these scattered regulations with an integrated land development code should greatly enhance the efficiency and effectiveness of land development regulation by the town.

(Ord. No. 94-112, exh. A(1.03), 1-18-1994)

### Sec. 1.04. Findings.

1.04.01. *General findings.*

---

[1]State law reference(s)—Local Government Comprehensive Planning and Land Development Regulation Act, F.S. § 163.3151 et seq.

McIntosh, Florida, Code of Ordinances
(Supp. No. 7)

Created: 2022-09-16 13:47:38 [EST]

Page 1 of 85

    a.    *Statutory requirement.* F.S. ch. 163 requires each state local government to enact a single land development code which implements and is consistent with the local comprehensive plan, and which contains all land development regulations for the town.

    b.    *General public need.* Controlling the location, design and construction of development within the town is necessary to maintain and improve the quality of life in the town.

1.04.02. *Specific findings relating to the various subject areas of this Code.* Where provided, specific findings relating to the various subject areas of this LDC are found within each of the LDC articles and sections.

(Ord. No. 94-112, exh. A(1.04), 1-18-1994)

## Sec. 1.05. Intent.

1.05.01. *General intent.* With regard to this LDC in general, it's provisions shall be construed and implemented to achieve the following intentions and purposes of the town council to:

    a.    Establish the regulations, procedures and standards for review and approval of all proposed development in the town.

    b.    Foster and preserve public health, safety, comfort and welfare, and to aid in the harmonious, orderly, aesthetically pleasing and socially beneficial development of the town in accordance with the comprehensive plan.

    c.    Adopt a development review process that is:

        1.    Effective, in terms of time and expense;

        2.    Effective, in terms of addressing the natural resource and public facility implications of proposed development; and

        3.    Equitable, in terms of consistency with established regulations and procedures, respect for the rights of property owners, and consideration of the interests of the citizens of the town.

    d.    To implement the town comprehensive plan as required by the Local Government Comprehensive Planning and Land Development Regulation Act.

    e.    To provide specific procedures to ensure that development orders and permits are conditioned on the availability of public facilities and services that meet the level of service requirements.

1.05.02. *Specific intent relating to the various subject areas of this Code.* Where provided, specific intent relating to the various subject areas of this Code are found within each of the LDC articles and sections.

(Ord. No. 94-112, exh. A(1.05), 1-18-1994)

## Sec. 1.06. Incorporation by reference.

1.06.01. *Town public works manual.* The provisions of the current town public works manual, a copy of which shall be maintained in the office of the town clerk, are hereby adopted and incorporated by reference and made a part of the town's LDC as if set forth in full herein. Two copies of said public works manual shall be on file with the town clerk and one shall be available for public inspection at the town hall. All plans and specifications submitted to the administrative official shall not be approved nor a permit issued, unless the permit applicant and the plans and specifications comply with all applicable provisions of the town public works manual.

(Ord. No. 94-112, exh. A(1.06.01), 1-18-1994)

## Sec. 1.07. Rules of interpretation.

1.07.01. *Generally.* In the interpretation and application of this LDC all provisions shall be liberally construed in favor of the towns' objectives and purposes, it shall also be deemed to neither limit nor repeal any other powers granted under state statutes.

1.07.02. *Computation of time.* The time within which an act is to be done shall be computed by excluding the first and including the last day, if the last day is a Saturday, Sunday or legal holiday, that day shall be excluded.

1.07.03. *Delegation of authority.* Whenever a provision appears requiring the town clerk to do some act or perform some duty, it is to be construed to authorize delegation by resolution of the town council to subordinates or appointed citizens to perform the required act or duty, unless the terms of the provision or section specify otherwise.

1.07.04. *Gender.* Words importing gender shall be construed to include the masculine, feminine and neuter.

1.07.05. *Number.* Except where the context clearly indicates otherwise, words in the singular shall include the plural and words in the plural shall include the singular.

1.07.06. *Shall, may.* The word "shall" is mandatory; the word "may" is permissive.

1.07.07. *Written* or *in writing.* The term "written" or "in writing" shall be construed to mean and include any representation of words, letters or figures, whether by printing or otherwise.

1.07.08. *Year.* The word "year" means a calendar year, unless otherwise indicated.

1.07.09. *Day.* The word "day" means a working day, unless a calendar day is indicated.

1.07.10. *Rules for interpretation of district boundaries.* Where uncertainty exists as to the boundaries shown on the official zoning map, the following rules shall apply:

  a. Boundaries shown as following or approximately following any street shall be construed as following the centerline of the street.

  b. Boundaries shown as following or approximately following section lines, half-section lines, or quarter-section lines shall be construed as following such lines.

  c. Boundaries shown as following or approximately following natural features shall be construed as following such features.

  d. Boundaries indicated as approximately following platted lot lines shall be construed as following such lines.

  e. Boundaries indicated as approximately following city limits shall be construed as following such city limits.

  f. Boundaries indicated as approximately following railroad rights-of-way shall be construed to follow the centerline of such rights-of-way.

  g. Boundaries indicated as following shore lines shall be construed to follow such shore lines, and in the event of change in the shore line shall be construed as moving with the actual shore line; boundaries indicated as following the centerlines of streams, lakes, or other bodies of water shall be construed to follow such centerlines.

  h. Boundaries indicated as parallel to or extensions of features indicated in subsections a. through f. of this section shall be so construed. Distances not specifically indicated on the official zoning map shall be determined by the scale of the map.

Created: 2022-09-16 13:47:37 [EST]

i.   Where physical or cultural features existing on the ground are at variance with those shown on the official zoning map, or in other circumstances not covered by subsections (1) through (5) of this section, the board of adjustment shall interpret the district boundaries.

j   Where a district boundary line divides a lot which was in single ownership at the time of passage of this LDC, the board of adjustment may permit, as a special exception, the extension of the regulations for either portion of the lot not to exceed 50 feet beyond the district line into the remaining portion of the lot.

1.07.11.  *Relationship of specific to general provisions.* More specific provisions of this LDC shall be followed in lieu of more general provisions that may be more lenient than or in conflict with the more specific provision.

1.07.12.  *Provisions of LDC declared to be minimum requirements.* In their interpretation and application, the provisions of this LDC shall be held to be minimum requirements, adopted for the promotion of the public health, safety, morals, or general welfare. Wherever the requirements of this LDC are at variance with the requirements of any other lawfully adopted rules, regulations, ordinances, deed restrictions, or covenants, the most restrictive, or that imposing the highest standard shall apply.

(Ord. No. 94-112, exh. A(1.07), 1-18-1994)


## Sec. 1.08. Definitions.

Generally, words used in the present tense include the future tense, words in the singular number include the plural, and words in the plural number include the singular. The word "shall" is always mandatory and not merely directory; the word "may" is permissive. The word "building" includes the word "structure." The word "used" or "occupied" include the words "intended, designed, or arranged to be used or occupied." The word "lot" includes the words "plot" and "parcel." The following words, terms and phrases, when used in this LDC, shall have the meanings ascribed to them in this section, except where the context clearly indicates a different meaning:

*Accessory building* or*structure* means a subordinate and clearly incidental building or structure on the same tract with, or a part of, the main building which is occupied by, or devoted to, an accessory use.

*Accessory use* and*structure* means a use or structure on the same lot with, and of a nature clearly subordinate and customarily incidental to, the principal use or structure.

*Alteration* means any change in size, shape, character, occupancy, or use of a building or structure.

*Apartment house* means the same as multiple-family dwelling.

*Automobile wrecking* means the dismantling or disassembling of two or more used motor vehicles or trailers, or the storage, sale, or dumping of dismantled, partially dismantled, obsolete, or wrecked vehicles or their parts.

*Buildable area* means the portion of a lot remaining after required yards have been provided.

*Building* means any structure, either permanent or temporary, having a roof, and used or built for the shelter or enclosure of persons, animals, chattels, or property of any kind.

*Building permit* means a valid permit issued by appropriate authority under the provisions of the county building code.

*Club, private* means an association or organization of a fraternal or social character, not operated or maintained for profit. The term "private club" shall not include casinos, nightclubs, or other institutions operated as businesses.

*Commercial vehicle* means any vehicle designed, intended, or used for transportation of people, goods, or things, other than private passenger vehicles and trailers for private nonprofit transport of goods and boats.

*Completely enclosed building* means a building separated on all sides from adjacent open space, or from other buildings or other structures, by a permanent roof and by exterior walls or party walls, pierced only by windows and normal entrance and exit doors.

*Concurrency* means a condition where specified facilities and services have or will have the necessary capacity to meet the adopted level of service standard at the time of impact of the development project.

*Coverage* means the percentage of tract area covered by buildings or roofed portions of structures.

*Dangerous wildlife* means wildlife the possession of which requires a permit from the Florida Fish and Wildlife Conservation Commission pursuant to F.A.C. 68A-6.022.

*Due public notice* means publication of the time, place, and purpose of a public hearing as required by the state statutes.

*Dwelling* or *dwellingunit* means any building, or part thereof, occupied in whole or in part, or intended or designed to be occupied, as the residence or living quarters of one or more persons, permanently or temporarily, with independent cooking and sleeping facilities.

*Dwelling, multiple-family,* means a residential building, other than a manufactured or mobile home, designed for three or more families, with the number of families occupying the building not exceeding the number of dwelling units provided.

*Dwelling, single-family, manufactured,* means a detached residential manufactured housing unit designed for and occupied by one family only.

*Dwelling, single-family, mobile home,* means a detached residential mobile home designed for and occupied by one family only. A travel trailer is not to be considered a mobile home.

*Dwelling, single-family, site-built,* means a detached residential dwelling unit, other than a manufactured or mobile home, designed for and occupied by one family only.

*Dwelling, two-family,* means a detached residential building, other than a manufactured or mobile home, designed for and occupied by two families only.

*F.A.C.* The abbreviation "F.A.C." means the latest edition of the Florida Administrative Code, as supplemented or amended in the future.

*Family* means:

(1)   An individual or group of two or more persons related by blood, marriage or adoption, together with foster and step children and servants or the principal occupants, with not more than one additional unrelated person, who are domiciled together as a single, domestic, housekeeping unit in a dwelling unit; or

(2)   A collective number of individuals domiciled together in one dwelling unit whose relationship is of a continuing nontransient domestic character and who are cooking and living as a single nonprofit housekeeping unit. The term "family" does not mean and include any society, club, fraternity, sorority, association, lodge, coterie, organization, or group of students or other individuals whose domestic relationship is of a transitory or seasonal nature or for an anticipated limited duration of a school term or other similar determinable period.

*Filling station* means a building, or any part thereof, where gasoline, oil, tires, and the like are dispensed at retail and where minor automotive servicing is provided. A filling station is not a repair garage or a body shop and permissible uses at a filling station do not include major automotive repairs such as major mechanical and body work, straightening of body parts, painting, welding, storage of automobiles not in operating condition, or other work involving noise, fumes, glare, smoke, or other characteristics to an extent greater than normally found in filling stations where the primary purpose of the use is the sale of gasoline at retail.

*Final development order* means any development order which approved the development of land for a particular use or uses at a specified density of use and which allowed development activity to commence on the land for which the development order was issued.

*Fish camp* means a use combining a marina and a travel trailer park and/or rental units.

*F.S.* The abbreviation "F.S." means the latest edition of the Florida Statutes, as supplemented or amended in the future.

*Harmful to minors* means:

(1) With regard to sign content, any description or representation, in whatever form, of nudity, sexual conduct, or sexual excitement, when it:

   a. Predominately appeals to the prurient, shameful, or morbid interest of minors in sex;

   b. Is patently offensive to contemporary standards in the adult community as a whole with respect to what is suitable sexual material for minors; and

   c. Taken as a whole, lacks serious literary, artistic, political, or scientific value.

(2) And includes any nonerotic word or picture when it:

   a. Is patently offensive to contemporary standards in the adult community as a whole with respect to what is suitable for viewing by minors; and

   b. Taken as a whole, lacks serious literary, artistic, political, or scientific value.

*Height of building* means the vertical distance from the established grade at the center of the front of the building to the highest point of the roof surface for a flat roof or a "Bermuda" roof, to the deck line for a mansard roof, and the mean height level between eaves and ridge for gable, hip, and gambrel roofs.

*Home occupation* means a lawful and licensed occupation or activity which may be compatibly conducted as a business within a dwelling unit by a member of the family residing on the premises.

*Household pet* means an animal commonly and customarily kept in a dwelling unit or on property used for residential purposes solely for the enjoyment of the owners or the property, such as caged birds, dogs, cats, fish, rabbits, and the like. Household pets shall not be considered to include livestock, poultry, or other animals normally raised commercially or for food.

*Livestock* means any domesticated quadrupeds held as property.

*Lot* means a parcel of land of at least sufficient size to meet minimum zoning requirements for use, coverage, and area, and to provide yards and other open spaces as are herein required. A lot may consist of:

(1) A single lot of record.

(2) A portion of a lot of record.

(3) A combination of complete lots of record, portions of lots of record, or complete lots of record and portions of lots of record.

(4) A portion of land described by metes and bounds.

*Lot depth* means the mean horizontal distance between the street and rear lot lines, measured in the median direction of the side lot lines.

*Lot frontage* means all portions of a lot adjacent to a street or avenue right-of-way.

*Lot width* means the distance between the side lot lines measured along the rear of the required front yard, provided that the width between the side lot lines where they intersect the street shall not be less than 80 percent of the required lot width.

Created: 2022-09-16 13:47:37 [EST]

*Manufactured building* means a building which is mass-produced in a factory, designed and constructed for transportation to a site for installation and use when connected to required utilities, and is either an independent, individual building or a module for combination with other elements to form a building on the site.

*Manufactured housing* means a manufactured building or portion of a building designed for long-term residential use.

*Marina* means premises, or portion of a premises, where covered or uncovered boat slips, dry storage facilities, marine fuel, lubricants, food, drink, and/or sundry items are provided. Marinas include minor repair and maintenance of boats and boat motors and include the provision of small boat hauling or launching facilities.

*Mobile home* means a single-family dwelling unit designed for long-term occupancy and manifestly designed for transportation on streets or highways on its own wheels to arrive at the site where it is to be occupied, ready for occupancy except for minor assembly operations.

*Mobile home park* means a parcel of land where lots are offered for rent for the parking and accommodation of mobile homes.

*Motel* means a building, or part thereof, in which sleeping and/or living accommodations are provided to the public primarily on a short term or transient basis, with access to the individual units from the exterior of the building and parking facilities for the use of guests near their quarters.

*Nonconformity, nonconforming use,* or *nonconforming structure* means a use or structure which was lawful prior to the adoption, revision or amendment of this Code, but which fails, by reason of such adoption, revision or amendment, to conform to the present requirements of this LDC.

*Own* means to hold legal or equitable title to real property as evidenced by an instrument of lawful conveyance.

*Owner* means the person which holds legal or equitable title to a tract of real property as evidenced by an instrument of legal conveyance.

*Parking* means the temporary, transient storage of vehicles while their owners are engaged in other activities.

*Poultry* means any chickens, turkeys, ducks, or geese.

*Repeat violation* means a violation of a provision of the LDC by a person who has been previously found through a code enforcement board or any other quasi-judicial or judicial process, to have violated or who has admitted violating the same provision within five years prior to the violation, notwithstanding the violations occur at different locations.

*Restaurant* means a building or room where food is prepared and served for pay for consumption on the premises.

*Road.* See *Street.*

*Setback* means the minimum distance between the street line or base building line and the front line or side line or side line of the building and any projections thereof.

*Sign* means any device designed to inform or attract the attention of persons not on the premises upon which the sign is located.

*Sign, off-site,* means a sign other than an on-site sign.

*Sign, on-site,* means a sign relating in its subject matter to the premises upon which it is located, or to products, accommodations, services, or activities located on the premises.

*Special exception* means a use which would not be appropriate generally or without restriction throughout the particular zoning district or classification but which, if controlled as to number, area, location, or relation to the

Created: 2022-09-16 13:47:37 [EST]

(Supp. No. 7)

neighborhood would not adversely affect the public health, safety, comfort, good order, appearance, convenience, morals, and the general welfare.

*Street* means a right-of-way for vehicular traffic, regardless of size or designation, but excluding accessways.

*Structure* means anything constructed or erected with a fixed location on the ground, or attached to something having a fixed location on the ground.

*Substantial development* means all required permits necessary to commence and continue the development have been obtained, permitted clearing and grading has commenced on a significant portion of the development, and the actual construction of roads and the stormwater management system on that portion of the development is complete or is progressing in a manner that significantly moves the entire development toward completion.

*Travel trailer or recreational vehicle* means a vehicular, portable structure built on a chassis, designed to be used as a temporary dwelling for travel and recreational purposes and having a width no greater than eight feet.

*Travel trailer park or recreational vehicle park* means an area on which sites for the parking of five or more travel trailers used for sleeping or living purposes, whether permanently or temporarily, are set aside and offered by any person with or without charge.

*Use* means the purpose for which land or a structure thereon is designated, arranged, or intended to be occupied or utilized, or for which it is occupied and maintained.

*Variance* means a modification of the zoning ordinance regulations when such variance will not be contrary to the public interest and when, owing to conditions peculiar to the property and not the result of the actions of the applicant, a literal enforcement of the ordinance would result in unnecessary and undue hardship. As used in this LDC, a variance is allowed only for height, area, and size of a structure, or for the size of yards and open spaces.

*Yard* means a required open space unoccupied and unobstructed by any structure or portion of a structure from 30 inches above the general ground level of the graded lot upward, provided however that fences, walls, poles, posts, and other customary yard accessories, ornaments, and furniture may be permitted in any yard, subject to height limitations and regulations limiting obstruction of visibility.

(Ord. No. 94-112, exh. A(glossary), 1-18-1994)

## Sec. 1.09. Abrogation.

This Code is not intended to repeal, abrogate or interfere with any existing easements, covenants, or deed restrictions duly recorded in the public records of the town.

(Ord. No. 94-112, exh. A(1.09), 1-18-1994)

## Sec. 1.10. Severability.

If any section, subsection, paragraph, sentence, clause, or phrase of this LDC is for any reason held by any court of competent jurisdiction to be unconstitutional or otherwise invalid, the validity of the remaining portions of this LDC shall continue in full force and effect.

(Ord. No. 94-112, exh. A(1.10), 1-18-1994)

# ARTICLE II. PERMITTED USES

## Sec. 2.00. Relationship to land use categories in comprehensive plan.

| Land Use/Zoning Matrix | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Land Use Categories | Zoning Districts | | | | | | | | | | | |
| | AC | R-1 | R-2 | R-3 | R-4 | MHP | HC | C-1 | C-2 | GU | CO | PF |
| Agricultural | X | | | | | | | | | | | |
| Low density residential | | X | X | | | | | | | | | |
| Lakefront residential | | X | | | X | | | | | | | |
| High density residential | | | X | | X | | | | | | | |
| Historic commercial | | | | | | | X | | | | | |
| Lakefront commercial | | | | | | | | | X | | | |
| Commercial | | | | | | | | X | | | | |
| Public facilities recreation facilities | X | X | X | X | | X | | X | X | X | | X |
| Conservation/open space | | | | | | | | | | | X | |

(Ord. No. 94-112, exh. A(2.00), 1-18-1994; Ord. No. 00-136, exh. A(2.00), 1-11-2001)

## Sec. 2.01. Establishment of zoning districts.

2.01.01. *Districts established.* For the purposes of this LDC in regulating the use of land, buildings, height, bulk, population, density, and open spaces, the town is hereby divided into the following zones, or districts:

(1)   AC—Agricultural conservation district.

(2)   Residential districts.

    a.   R-1—Single-family residential district.

    b.   R-2—Mixed single-family residential district.

    c.   R-3—Multiple-family residential district.

    d.   R-4—Lakefront residential zone.

(3)   MHP—Mobile home park district.

(4)   Historic preservation/conservation district.

    a.   C-1—Commercial business district.

    b.   C-2—Commercial lake district.

    c.   HC—Historical commercial.

    d.   CO—Conservation open space.

(5)     GU—Government use district.

(6)     PF—Public facilities recreation.

2.01.02. *Official zoning map.*

(a)     The official zoning map, together with all explanatory material thereon, is hereby adopted by reference and declared to be a part of this LDC. The official zoning map shall be identified by the signature of the mayor, attested by the town clerk, and bearing the seal of the town under the following words: "This is to certify that this is the official zoning map referred to in section 2.01.02 of the Land Development Code of the Town of McIntosh, Florida," together with the date of the adoption of the LDC.

(b)     If, in accordance with the provisions of this LDC and F.S. ch. 166, changes are made in district boundaries or other matter portrayed on the official zoning map, such changes shall be entered on the official zoning map promptly after the amendment has been approved by the town council, with an entry on the official zoning map as follows: "On [date], by official action of the town council, the following changes were made in the official zoning map [brief description of changes]," which entry shall be signed by the mayor and attested by the town clerk. No amendment to this LDC which involves matter portrayed on the official zoning map shall become effective until such change and entry has been made on said map.

(c)     No changes of any nature shall be made in the official zoning map or matter shown thereon, except in conformity with the procedures set forth in this LDC. Any unauthorized change of whatever kind by any person shall be considered a violation of this LDC and shall be punishable as provided in section 8.06.

(d)     Regardless of the existence of purported copies of the official zoning map which may from time to time be made or published, the official zoning map which shall be located in the office of the town clerk shall be the final authority as to the current zoning status of land and water areas, buildings, and other structures in the town.

2.01.03. *Replacement of the official zoning map.*

(a)     In the event that the official zoning map becomes damaged, destroyed lost, or difficult to interpret because of the nature or number of changes and additions, the town council may by resolution adopt a new official zoning map which shall supersede the prior official zoning map. The new official zoning map may correct drafting or other errors or omissions in the original official zoning map, but no such correction shall have the effect of amending the original official zoning map or any subsequent amendments thereof. The new official zoning map shall be identified by the signature of the mayor attested by the town clerk, and bearing the seal of the town under the following words: "This is to certify that this official zoning map supersedes and replaces the official zoning map adopted [date of adoption of map being replaced] as part of Ordinance No. 9401 of the Town of McIntosh, Florida."

(b)     Unless the prior official zoning map has been lost or totally destroyed, the prior map or any significant parts thereof remaining shall be preserved, together with all available records pertaining to its adoption or amendment.

2.01.04. *Application of district boundaries.* The regulations set by this LDC within each district shall be minimum regulations and shall apply uniformly to each class or kind of structure or land, as follows:

a.     *Zoning affects use or occupancy.* No building, structure, or land shall hereafter be used or occupied, and no building or structure or part thereof shall hereafter be erected, constructed, reconstructed, moved, or structurally altered, except in conformance with all the regulations herein specified for the district in which it is located.

b.     *Zoning affects height of structures, population density, lot coverage, yards, and open spaces.* No building or structure shall hereafter be erected or altered to:

Created: 2022-09-16 13:47:37 [EST]

    1.    Exceed the height or bulk.

    2.    Accommodate or house a greater number of families.

    3.    Occupy a greater percentage of lot area.

    4.    Have narrower or smaller rear yards, front yards, side yards, or other open spaces.

    5.    Provide lesser separation between buildings or structures or portions of buildings or structures; than herein required in article 6; or in any other manner contrary to the provisions of this LDC.

c.    *Annexation of territory.* All territory which shall hereafter be annexed to the town shall be regulated in accord with applicable state law.

2.01.05.  *District regulations.*

a.    *Agricultural conservation district (AC).* These districts are intended to be a mixture of agricultural and residential uses at a maximum density of one unit per ten acres and to serve two purposes. First, they are intended to protect land presently or prospectively used primarily for agriculture from incompatible commercial, industrial, and residential land uses. Second, in instances where the proper future development of these lands is uncertain, and while a more restrictive zoning classification would be premature and unreasonable at this time, these zones will serve as a holding classification. Where these zones function as a holding classification, it is the intention of this LDC that such lands not be rezoned for more intensive uses without assurances that:

    (1)    A clear public need exists for such rezoning;

    (2)    Necessary public services are sufficiently available to meet the needs of the more intensive use proposed; and

    (3)    The proposed development will not result in any undue financial burden on the citizens of the town.

b.    *Single-family residential zone (R-1).* These districts are intended to be low density residential areas composed of site-built single-family dwellings at a maximum density of two units per acre. Certain structures and uses designed to serve governmental, educational, religious, recreational and other needs of these areas are permitted or are permissible as special exceptions, subject to restrictions and requirements necessary to protect the residential character of these areas.

c.    *Mixed single-family residential district (R-2).* These districts are intended to be low density residential districts, with a mixture of site-built, manufactured, and mobile home single-family residences, duplexes and town houses at a maximum density of two units per acre. District regulations are designed to preserve the single-family residential character of the areas. Certain nonresidential uses designed to serve the governmental, educational, religious, noncommercial recreational, and other needs of these areas are permitted or are permissible as special exceptions, subject to restrictions and requirements necessary to protect the single-family character of these areas.

d.    *Multiple-family residential zone (R-3).* These districts are intended to be medium density residential areas composed of site-built single-family, two-family, mobile homes and multiple-family dwellings at a maximum density of six units per acre. District regulations are designed to preserve the residential character of the areas. Certain nonresidential uses designed to serve the governmental, educational, religious, noncommercial recreational, and other needs of these areas are permitted or are permissible as special exceptions, subject to restrictions and requirements necessary to protect the residential character of these districts.

e.    *Lakefront residential zone (R-4).* These districts are intended to be low density residential areas composed of site-built, manufactured, and mobile home single-family dwellings at a maximum density of two units per acre. Certain structures and uses designed to serve governmental, educational,

religious, recreational and other needs of these areas are permitted or are permissible as special exceptions, subject to restrictions and requirements necessary to protect the residential character of these areas.

f.   *Mobile home park district (MHP).* This district is intended to be a high density mobile home park, composed of mobile homes and on individual sites at a maximum density of six units per acre. It is intended to create an environment of residential character, permitting only those uses and services which are compatible with the residential environment mobile home parks are also subject to the specific provisions of section 2.03, supplementary district regulations.

g.   *Historical commercial (HC).* This district allows personal service and limited retail businesses which are conducive to the town's historic nature.

h.   *Community business district (C-1).* This district is intended primarily for commercial activity, to serve the town's retail and service needs, and to enhance rather than detract from the surrounding residential areas. In keeping with the character of the town as a predominantly residential community, residential uses are also permitted in this zone. Certain other uses are permissible as special exceptions.

i.   *Commercial lake district (C-2).* This zone is intended to be a compatible mix of commercial and residential land uses, it is anticipated that commercial uses located in this district will be of a water-dependent or water-related nature. Although this district is primarily intended for such water-dependent and water-related commercial uses, site-built, manufactured, and mobile home single-family dwellings are also permitted.

j.   *Government use district (GU).* These districts are intended to be lands where national, state, or local government activities are located and where the government holds a lease or title to such lands.

k.   *Public facilities recreation (PF).* This district is intended to permit recreational and open spaces, governmental uses, utility sites and stormwater facilities.

l.   *Conservation open space (CO).* This district is for the protection and enhancement of wetlands, waterbodies, streambeds, creeks, and environmentally sensitive areas.

(Ord. No. 94-112, exh. A(2.01), 1-18-1994; Ord. No. 2007-161, attach. A(2.01), 7-12-2007)


## Sec. 2.02. Permitted uses, accessory uses and uses permitted by special exception.

2.02.01.   *Permitted principal uses and structures.* Only the principal uses and structures indicated by a "P" in table 2.02.05 are permitted.

2.02.02.   *Permitted accessory uses and structures.* Only the accessory uses and structures indicated in table 2.02.06 are permitted.

2.02.03.   *Prohibited uses and structures.* All uses not specifically, provisionally, or by reasonable implication permitted herein or permissible by special exception are prohibited. The listed permitted or permissible uses contained in table 2.02.05 do not include the following, which are mentioned as specifically prohibited in district the agricultural conservative district for emphasis only:

a.   Commercial, industrial, or manufacturing establishments, except as specifically provided.

b.   Junk yards or automobile wrecking yards.

c.   Wholesale warehouse or storage establishments, except as specifically provided.

d.   Slaughterhouses for livestock or poultry.

e.   All uses not listed as permitted or permissible uses.

  f. All mining.

2.02.04. *Special exceptions.* The uses indicated by an "SE" in table 2.02.05 are permitted only as special exceptions.

2.02.05. *Permitted use, structure or activity and uses permitted by special exception table.*

| Use, Structure or Activity | Zoning District | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | A-C | R-1 | R-2 | R-3 | R-4 | MHP | HC | C-1 | C-2 | G-U | PF | CO |
| Agricultural uses[1] | P | | | | | | | | | | | |
| Banks | | | | | | | P | P | | | | |
| Barbershops | | | | | | | P | P | | | | |
| Beauty shops | | | | | | | P | P | | | | |
| Churches | P | P | P | P | P | | P | | | | | |
| Clubs, private | | SE | P | P | SE | | P | | | | | |
| Community residential homes with six or fewer residents as required by F.S. § 419.001 | P | P | P | P | P | P | P | P | | | | |
| Community residential homes with seven to 14 residents as required by F.S. § 419.001 | | | | P | | | P | | | | | |
| Docks; commercial and noncommercial | | | | | | | | | P | | | |
| Family day care homes as required by F.S. § 166.0445 | P | P | P | P | P | P | P | P | | | | |
| Financial institutions | | | | | | | P | P | | | | |
| Fish camps | | | | | | | | | P | | | |
| Government activity[2] | | | | | | | P | | | P | | |
| Government service buildings | | SE | SE | SE | SE | | P | | | | | |
| Government buildings[3] | | P | P | P | P | | P | | | P | | |
| Greenhouses, commercial | P | | | | | | | | | | | |
| Home occupations | P | P | P | P | P | | P | P | P | | | |
| Houses of worship | P | P | P | P | P | | P | | | | | |
| Libraries | | P | P | P | P | | P | | | | | |
| Marinas; commercial and noncommercial | | | | | | | | | P | | | |
| Mobile home | | | P[4] | | P[5] | P[6] | | | | | | |

Created: 2022-09-16 13:47:37 [EST]

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Mobile home park (enclosed storage)[7] | | | | | | P | | | | | |
| Mobile home park (enclosed garage facilities)[7] | | | | | | P | | | | | |
| Mobile home park (laundry facilities) | | | | | | P | | | | | |
| Mobile home park (maintenance facilities) | | | | | | P | | | | | |
| Mobile home park—(recreation area, including center court for games, swimming pools, and the like) | | | | | | P | | | | | |
| Mobile home park (offices) | | | | | | P | | | | | |
| Motels and cabin rentals | | | | | | | | | SE | | |
| Multiple-family dwellings | | | | P | | | | | | | |
| Offices, business | | | | | | | P | P | | | |
| Offices, professional | | | | | | | P | P | | | |
| Packing houses; commercial[8] | SE | | | | | | | SE | | | |
| Parks, public | P | P | P | P | P | | P | | | | |
| Parks, private noncommercial[9] | | | P | P | | | SE | | | | |
| Piers, commercial and noncommercial | | | | | | | | | P | | |
| Playgrounds, public | | P | P | P | P | | P | | | | |
| Produce stands, roadside[10] | P | | | | | | | | | | |
| Public utility substations necessary to serve surrounding neighborhoods[11] | SE | SE | SE | SE | SE | SE | | SE | SE | | |
| Recreation areas, public | P | | P | P | | | P | | | | |
| Recreation areas; commercial and private[12] | SE | | | | | | SE | | SE | | |

Created: 2022-09-16 13:47:37 [EST]

(Supp. No. 7)

| Use | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Recreational facilities; private | | | P | P | | SE | | | | | |
| Restaurants | | | | | | P | | P | | | |
| Retail establishments[13] | | | | | | P | P | | | | |
| Schools, public or private | P | | | | | P | | | | | |
| Service establishments[14] | | | | | | SE | P | | | | |
| Single-family dwellings as permitted in R-2 districts | | | | | | | | P | | | |
| Single-family dwellings, site-built | P | P | P | P | P | | P | | | | |
| Single-family dwellings, manufactured on individual lots | | | P | | | | | | | | |
| Single-family dwellings, more than four unrelated inhabitants | SE | SE | SE | SE | SE | SE | | | | | |
| Tackle shops | | | | | | P | | P | | | |
| Temporary revival and gospel establishments | P | | | | | | | | | | |
| Transmitting towers; microwave, radio, television, or amateur operator[15] | SE | | | | | | | | | | |
| Travel trailer parks[16] | | | | | | | | SE | | | |
| Two-family dwellings | | | | P | | | | | | | |
| Two-family and multiple-family dwellings, site-built[17] | | | | | | | | SE | | | |
| Warehouses for the storage of agricultural products | P | | | | | | | | | | |
| Wholesale warehouse or storage use[18] | | | | | | | SE | | | | |

;le=2;[1] This includes structures and uses accessory to agricultural activity.

;le=2;[2] Any lawful governmental activity.

;le=2;[3] In keeping with residential character of the area.

Created: 2022-09-16 13:47:37 [EST]

;le=2;[4] On individual lots, subject to subsection 2.03.03, supplementary district regulations.

;le=2;[5] On individual lots, subject to subsection 2.03.03, supplementary district regulations.

;le=2;[6] One single-family mobile home per mobile home site; subject also to section 2.03.03, supplementary district regulations.

;le=2;[7] Use limited to park residents only.

;le=2;[8] For fruits and vegetables, but not including, plants for the production of citrus concentrate or similar products.

;le=2;[9] Such as tennis courts, racquetball courts, swimming pools, and the like.

;le=2;[10] For the sale only of agricultural products produced on the premises.

;le=2;[11] Such facilities shall be designed, sited, and landscaped to ensure compatibility with residential neighborhoods.

;le=2;[12] Such as golf courses, recreational vehicle parks, or riding stables.

;le=2;[13] Establishments for the sale of goods and products at retail, but no manufacturing.

;le=2;[14] Such as, automotive service stations, restaurants, and similar activities.

;le=2;[15] Which shall be located in such a manner and on a parcel of sufficient size to contain the entire structure in event of a collapse.

;le=2;[16] Subject to the provisions of subsection 2.03.06, supplementary district regulations.

;le=2;[17] Which shall meet the requirements applicable to the R-3 zone as to minimum lot size, maximum lot coverage, minimum yards, and maximum height.

;le=2;[18] Not including bulk storage of hazardous or flammable materials.

2.02.06. *Permitted accessory uses and structures table.*

| Zoning District | Permitted Accessory Uses and Structures | |
|---|---|---|
| AC | Only the following accessory uses and structures are permitted: | |
| | Uses which are customarily accessory and clearly incidental to permitted or permissible uses. | |
| R-1 R-2 R-3 R-4 | Only the following accessory uses and structures are permitted. Uses and structures which are: | |
| | (1)  Customarily accessory and clearly incidental to permitted or permissible uses and structures. | |
| | (2)  Do not involve the conduct of business, except for home occupations, on the premises. | |
| | (3)  Are located on the same lot as the permitted or permissible principal use or structure, or on a contiguous lot in the same ownership. | |
| | (4)  Are not of a nature likely to attract visitors in larger numbers than would normally be expected in a residential neighborhood. | |
| | (5)  Do not involve operations or structures not in keeping with the character of a single-family residential neighborhood. | |
| | Only the following accessory uses and structures are permitted within this district: (1) Animals,[19] (2) Children's play areas and play equipment; (3) Garden sheds; (4) Garden work centers; (5) Gardens; (6) Greenhouses, noncommercial; (7) Living accommodations for persons employed in the household; (8) Plant nurseries, noncommercial; (9) Private barbecue pits; (10) Private garages; (11) Private swimming pools; and, (12) Tool houses. | |
| MHP | Only the following accessory uses and structures are permitted. Uses and structures which: | |
| | (1)  Are customarily accessory and clearly incidental to permitted or permissible uses and structures. | |

| | | |
|---|---|---|
| | | (2)  Do not involve the conduct of business, except for home occupations, on the individual sites. |
| | | (3)  Are located on the same lot or parcel as the mobile home park. |
| | | (4)  Are not of a nature likely to attract visitors in larger numbers than would normally be expected in a mobile home park. |
| | | (5)  Do not involve operations or structures not in keeping with the character of a mobile home park. |
| HC | The following accessory uses and structures only are permitted. Uses and structures which: | |
| | | (1)  Are customarily accessory and clearly incidental to permitted or permissible uses and structures. |
| | | (2)  Are located on the same lot or parcel as the permitted or permissible use or structure or on a contiguous lot in the same ownership. |
| | | (3)  Do not involve operations or structures not in keeping with the character of the district. |
| C-1 | The following accessory uses and structures only are permitted. Uses and structures which: | |
| | | (1) Are customarily accessory and clearly incidental to permitted or permissible uses and structures. |
| | | (2) Are located on the same lot or parcel as the permitted or permissible use or structure or on a contiguous lot in the same ownership. |
| | | (3) Do not involve operations or structures not in keeping with the character of the district. |
| | | (4) Are located on a lot or parcel that is within 100 feet or less from the lot or parcel with the permitted or permissible use and is only separated by public property from the lot or parcel with the permitted or permissible use. Additionally, the following site requirements and/or considerations must meet the satisfaction of the administrative official: |
| | | a.  Pedestrian and traffic safety, such as cross-walks and driveway access; |
| | | b.  Adequate parking for the proposed use; and |
| | | c.  Buffers (vegetative, fences or walls) shall be installed in order to preserve the character of any adjacent residential districts. |
| C-2 | The following accessory uses and structures only are permitted. Uses and structures which: | |
| | | (1)  Are customarily accessory and clearly incidental to permitted or permissible uses and structures. |
| | | (2)  Are located on the same lot or parcel as the permitted or permissible use or structure or on a contiguous lot in the same ownership. |
| | | (3)  Do not involve operations or structures not in keeping with the character of the district. |
| GU | Uses and structures which are customarily accessory and clearly incidental to permitted uses are permitted in these districts. | |
| PF | | |
| CO | | |

;le=2;[19] The keeping of animals is permitted as an accessory use, subject to the regulations in subsection 2.03.02, supplementary district regulations.

(Ord. No. 94-112, exh. A(2.02), 1-18-1994; Ord. No. 00-136, exh. A(2.02), 1-11-2001; Ord. No. 2011-182, § 1, 9-15-2011; Ord. No. 2011-181, § 1, 12-8-2011)

## Sec. 2.03. Supplementary district regulations.

2.03.01. *General provisions.* The following general provisions shall apply in all applicable districts:

a.  *Visibility at intersections in residential areas.* On a corner lot in any residential area, nothing shall be erected, placed, planted, or allowed to grow in such a manner as materially to impede vision between a height of 2½ feet and ten feet above the centerline grades of the intersecting streets in the area bounded by the street lines of such corner lots and a line joining points along said street lines 50 feet from the point of the intersection.

b.  *Use of required yards.* No accessory building shall be erected in any required yard, however any required yard may be used for a required septic tank field.

c.  *Accessory buildings.* No separate accessory building shall be erected within five feet of any other building.

d.  *Erection of more than one principal structure on a lot.* In any district, more than one structure housing a permitted or permissible use may be erected on a single lot, provided that yard and other requirements of this LDC shall be met for each structure as though it were on a single lot.

e.  *Structures to have access.* Every building hereafter erected or moved shall be on a lot adjacent to a public street, and all structures shall be so located on lots as to provide safe and convenient access for servicing, fire protection, and required off-street parking.

f.  *Parking and storage of certain vehicles.* Automotive vehicles or trailers of any kind or type without current license plates shall not be parked or stored on any residentially zoned property other than in completely enclosed buildings.

g.  *Travel trailers used as temporary housing in residential areas.* Travel trailers or recreational vehicles may be used as temporary housing in residential districts for residents or guests of the property on which they are located. However such vehicles shall not be used for such purpose for a period longer than three consecutive weeks.

h.  *Parking regulations for commercial motor vehicles.*

    1.  A commercial motor vehicle is a vehicle as defined in F.S. § 320.01 and as amended hereinafter.

    2.  Parking of commercial motor vehicles for more than one hour in any twenty-four-hour period is prohibited, except one commercial motor vehicle not exceeding 20,000 pounds gross weight may be parked off the street and on the property of the vehicle's owner or custodian provided that, once parked, it is not moved or operated at any time for any profit-making business or professional enterprise. Between the hours of 7:00 p.m. and 5:00 a.m., no commercial motor vehicle shall be operated, nor its engine run for any purpose whatsoever, nor be driven from its parked location.

    3.  Notwithstanding the above provisions, any commercial motor vehicle may be parked on a residential street for more than one hour while actually being loaded or unloaded or while the custodian of the vehicle is actively performing services as long as the residence is not that of the custodian of the vehicle.

2.03.02.  *Keeping of animals.* The keeping of animals shall be subject to the following regulations:

a.  *Household pets.* Those animals customarily kept as household pets shall be permitted in all districts, in conformance with the county animal control ordinance adopted in chapter 8.

b.  *Livestock and poultry.* In keeping with the rural character of the town, livestock and poultry shall be permitted as an accessory use in R-1, R-2, R-3, R-4, and C-2 districts subject to the following regulations:

    1.  Livestock or poultry shall be raised for the sole use and enjoyment of the owners of the property on which they are kept and shall not be kept on a commercial basis or on a scale reasonably objectionable to adjoining property owners.

2. The raising of livestock shall be permitted only on parcels of land at least one acre in area. Land used for the raising of livestock shall not be used for any principal structure or use otherwise permitted in the district, but shall be devoted solely to the raising of livestock. Livestock may be raised according to the following schedule:

   (a) One, horse per acre;

   (b) One, cow per acre;

   (c) Two, goats per acre; or

   (d) Two, sheep per acre.

3. The raising of poultry shall be permitted only on parcels of land at least one-half acre in area. Land used for the raising of poultry shall not be used for any principal structure or use otherwise permitted in the district, but shall be devoted solely to the raising of poultry. A maximum of ten animals may be kept on each such half acre parcel.

4. Land used for the keeping of livestock or poultry shall not be used for any other accessory use which would otherwise be permitted in the district.

5. Offspring of permitted animals shall be considered separate animals for the purpose of these regulations when they become capable of sustaining life independently. Such offspring shall be disposed of within 30 days of the time they become considered separate animals, unless the land on which they are kept is capable of sustaining additional animals according to the provisions of this section.

6. Any barn, stable, pen, or other building or enclosure for the purpose of confinement of any permitted livestock or poultry shall be set back at least 50 feet from any property line. This provision shall not be construed to apply to fences.

7. Any property on which livestock or poultry are kept shall be completely enclosed with a fence sufficient to contain the number of animals raised on the property in conformance with the terms of this LDC.

8. Nonconforming animals shall be allowed to remain until they die or are otherwise disposed of. Where nonconforming animals are being kept, no additional animals shall be added so as to increase the nonconformity.

c. *Dangerous wildlife.* The keeping of dangerous wildlife shall be prohibited in all districts.

2.03.03. *Mobile homes and mobile home parks.* Mobile home shall be subject to the following regulations:

a. *Mobile homes used for residential purposes.* No mobile home shall be used for sleeping, dwelling, or residential purposes, except in conformance with the following provisions:

   1. A mobile home shall not be considered permissible as an accessory use.

   2. No person shall park or store a mobile home in a residential district which does not permit mobile homes, except in a completely enclosed structure.

   3. Mobile homes shall not be permitted in a residential zone for living purposes, unless provided herein, except:

      (a) In a mobile home park approved by the appropriate regulatory agencies and meeting other applicable regulations.

      (b) In a zone which permits mobile homes.

4.      Unoccupied mobile homes shall be permitted in districts permitting mobile homes and shall be subject to the same setback, lot and yard requirements as occupied mobile homes.

5.      As of the effective date of the regulations from which this LDC is derived, there are mobile homes used for dwelling purposes in the town which do not meet the requirements of these regulations. Whenever a mobile home is removed from such a site for a period of 90 days or longer, the site shall not again be used for the purposes of locating a mobile home, except in conformance with these regulations, however this provision shall not apply to sites in mobile home parks.

6.      Those mobile homes not in conformance with these requirements at the effective date of the ordinance from which this LDC is derived shall become nonconforming uses and shall be permitted to continue, subject to the provisions of section 7.01, however this provision shall not apply to mobile homes in mobile home parks.

7.      No mobile home shall be installed or used for dwelling purposes until permits have been secured for its installation from the proper officials, including a building permit and a septic tank permit where applicable, and until all applicable requirements of law prerequisite to the issuance of such a permit have been met.

8.      No mobile home hereafter installed in any district shall be used as a residence, unless such mobile home contains structurally sound flooring, heating and air conditioning which comply with all appropriate codes, and which meets all appropriate local, state, and federal regulations relating to tie downs, blocking, electrical, plumbing, and construction standards, unless otherwise so indicated. Each mobile home shall have a separate water meter for connection to the town water system.

b.   *Mobile homes in R-2 and R-4 districts.* In addition to subsection a. of this section, mobile homes permitted in R-2 and R-4 districts shall be subject to the following regulations. These regulations are intended to ensure a compatible mixture of site built, manufactured, and mobile home single-family dwellings by encouraging acceptable similarity in the exterior appearances of the different types of dwellings.

1.      Underskirting shall be required on all mobile homes. Such underskirting shall be installed within 90 days of occupancy.

2.      Attached carports, 12 feet by 24 feet minimum, shall be required on all mobile homes, such carports shall be installed within 90 days of occupancy.

3.      All mobile homes shall have utility rooms or storage sheds, eght feet by eight feet minimum. Such utility rooms or storage sheds shall be installed within 90 days of occupancy.

4.      Underskirting, carports, and utility rooms shall be compatible with the design and type of mobile home to which they are attached or accessory to and shall comply with the county building code.

5.      No converted buses, truck campers, camper trailers, travel trailers, recreation units, single-unit mobile homes less than 12 feet in width, or tents shall be allowed in the R-2 or R-4 zones for residential purposes.

c.   *Mobile homes in mobile home parks.* In addition to the regulations in section 2.03.03.a, mobile homes in mobile home parks shall be subject to the following regulations:

1.      Underskirting shall be required on all mobile homes. Such underskirting shall be installed within 90 days of occupancy.

2.      Where a mobile home park boundary abuts a public street or is directly adjacent to property on which single-family residences are permitted, each mobile home shall be set back at least 25 feet from the park boundary.

3. All streets in mobile home parks shall have a minimum right-of-way width of 35 feet.

d. *Nonconforming uses.* Mobile home parks in existence at the effective date of the ordinance from which this LDC was derived, which are not in compliance with the provisions of this LDC shall become nonconforming uses and shall be permitted to continue, unless the operation of the mobile home park ceases for a period of more than one year. The addition of mobile home sites to nonconforming mobile home parks shall necessitate compliance with this LDC for the additional sites only.

e. *Nonresidential uses of mobile homes.* Upon approval by the administrative official and issuance of a permit therefor, a mobile home or travel trailer may be used as a temporary office, security shelter, or shelter for material or tools incident to construction or development of the premises upon which the mobile home or travel trailer is located. In no event shall the use continue for longer than six months without the further approval of the administrative official and he shall give such approval only upon showing of good cause.

2.03.04. *Home occupations.* Home occupations may be conducted in all districts subject to the following provisions:

a. *General provisions.*

1. There shall be no display of goods or advertising visible from the street, except one nonilluminated name plate shall be permitted. Such name plate shall:

(a) Not exceed two square feet in area;

(b) Be either a ground sign or a wall sign; and

(c) State only the name of the residents of the dwelling unit and the nature of the home occupation conducted therein.

2. No home occupation shall be conducted in an accessory building, but shall be conducted in the dwelling unit of the proprietor.

3. Only members of the immediate family living in the dwelling unit shall work in the home occupation.

4. No home occupation shall occupy more than 30 percent of the gross floor area of the dwelling unit in which it is conducted.

5. No home occupation shall entail the use of motors, chemicals, or equipment that may create or cause to be created objectionable noise, noxious odors, or hazards dangerous to the public health, safety, or welfare.

6. All motors and equipment used in home occupations shall be shielded so as not to cause interference with radio or television transmissions.

7. Outdoor storage of materials shall not be permitted.

8. No home occupation shall increase the traffic in the neighborhood in which the home occupation is located by a volume greater than two vehicles at a time.

b. *Permits required.* Any person who desires to conduct a home occupation shall first apply to the administrative official for a home occupation permit. At a minimum, the application shall include:

1. Name of the applicant.

2. Location of the dwelling unit wherein the home occupation will be conducted, if approved.

3. Gross floor area of the dwelling unit.

4. Area of the room or rooms to be utilized in the conduct of the home occupation.

5.   A sketch showing the floor plan of the dwelling unit and the area to be used in the conduct of the home occupation.

6.   The nature of home occupation for which approval is sought.

The administration official shall act on the application within 30 days and shall issue the home occupation permit if the information requested in subsections a. through e. of this subsection have been fully provided and is in conformance with the provisions of section 2.03.04.a.

c.   *Objections.* Any resident of the town may object to the issuance of a home occupation permit and shall have the right to request a hearing before the board of adjustment. The board of adjustment shall have the right to revoke the home occupation permit if, after hearing, they determine that the operation of such home occupation is contrary to the standards set forth in section 2.03.04.a.

d.   *Home occupations being conducted as of the effective date of the ordinance from which this LDC is derived.* The proprietor of any home occupation being conducted as of the effective date of the ordinance from which this LDC is derived shall file an application for a home occupation permit with the administrative official within 90 days of the effective date of the ordinance from which this LDC is derived. Failure to file such an application shall be considered a violation of these regulations and shall be punishable under section 8.06 of these regulations.

2.03.05. *Travel trailer parks.* Travel trailer parks shall be subject to the following provisions:

a.   Each travel trailer site shall have a minimum area of 1,500 square feet.

b.   The following minimum setbacks from site lot lines shall be observed:

1.   Front; five feet.

2.   Side; five feet.

3.   Rear; five feet.

c.   No travel trailer shall be parked closer than 15 feet to any property abutting the travel trailer park.

d.   Roadways within a travel trailer park shall have a width of not less than 25 feet. A minimum roadway width of 18 feet shall be surfaced with a hard, impervious material.

e.   In each travel trailer park, there shall be at least one recreation area which shall be easily accessible from all sites. Such area shall be not less than five percent of the gross site area or 2,000 square feet, whichever is greater.

f.   Sanitary and supporting facilities in all travel trailer parks shall be installed and maintained in conformance with the applicable rules of the state department of environmental protection and the state department of health or shall comply with such other standards as the board of adjustment shall hereafter specify. Assurance of compliance with such standards shall be a condition for approval of a travel trailer park as a special exception by the board of adjustment.

2.03.06. *Public facilities.* The following public facilities shall be allowed in all land use classifications excluding conservation, open space, and recreation:

(1)   Governmental facilities;

(2)   Water plants;

(3)   Educational facilities;

(4)   Llibraries; and

(5)   Churches.

2.03.07. *Community residential facilities.* Group homes, congregate living facilities and similar uses shall be permitted in accordance with the requirements of F.S. ch. 419.

(Ord. No. 94-112, exh. A(2.03), 1-18-1994; Ord. No. 00-136, exh. A(2.03), 1-11-2001; Ord. No. 2013-188, § 1, 9-5-2013)

# ARTICLE III. OVERLAY ZONE

## Sec. 3.00. Purpose.

The purpose of this article is to describe an overlay zone used to impose special development restrictions on identified areas. The location of overlay zones is established by the town council based on the need for special protective measures in that area. The underlying uses in the area, as determined in article II of this LDC, remain undisturbed by the creation of the overlay zone. The overlay zone merely imposes additional or different development standards than those that would otherwise apply.

(Ord. No. 94-112, exh. A(3.00), 1-18-1994; Ord. No. 2007-161, attach. A(3.00), 7-12-2007)

## Sec. 3.01. Historic districts and landmarks.

3.01.01. *General provisions.*

a. *Purpose.* The purpose of this section is to promote the educational, cultural, economic, and general welfare of the community by:

(1) Providing a mechanism of identifying and preserving the distinctive historic and architectural characteristics and resources of the town which represent elements of the town's cultural, social, economic, political, and architectural history.

(2) Fostering civic pride in the beauty and noble accomplishments of the past as represented in the town's historic structures and districts.

(3) Conserving and improving the value of property, both within historic districts and throughout the remainder of the town.

(4) Protecting and enhancing the attractiveness of the town to home buyers, tourists, and visitors, and thereby supporting and promoting business and commerce, and providing economic benefit to the town.

(5) Fostering and encouraging preservation, restoration, and rehabilitation of structures, areas, and neighborhoods and thereby conserving the existing housing stock.

b. *Definitions.* The following words, terms and phrases, when used in this section, shall have the meanings ascribed to them in this section, except where the context clearly indicates a different meaning:

*Alteration* means any act or process that changes one or more of the exterior architectural features of a structure including, but not limited to, the construction, reconstruction, or removal of any structure.

*Board* means the McIntosh Preservation Board established by article VIII of this LDC.

*Building* means a structure created to shelter any form of human activity.

*Certificate of appropriateness* means the permit which is required to be issued by the board prior to action as set forth in subsection 3.01.03 b.1.(h). of this LDC.

Created: 2022-09-16 13:47:38 [EST]

*Demolition* means the tearing down or razing of 25 percent or more of a structure's existing exterior walls.

*District* means a geographically defined area possessing a significant concentration of buildings or structures which are linked by association, history, architectural style, or aesthetic effect.

*Material alteration* means any construction or change in the material appearance of the exterior. For buildings and structures, material alteration shall include, but shall not be limited to the:

(1) Changing of roofing or siding substances; and

(2) Eliminating or adding doors, door frames, windows, window frames, shutters, fences, railings, porches, balconies, or other ornamentation.

The term "material alteration" does not mean or include ordinary maintenance, repair, or repainting.

*McIntosh register of historic places* describes a means of identifying and classifying various buildings, structures, sites, and districts as architecturally and/or historically significant.

*Ordinary maintenance* means work done to repair damage or to prevent deterioration or decay of a building or structure or of any part thereof by restoring the building or structure or part thereof as nearly as practicable to its condition prior to such damage, deterioration, or decay.

*Site* means the location of a significant event, activity, building, structure, or archeological resource where the significance of the location and any archeological remains outweighs the significance of any existing structures.

*Structure* means anything constructed or erected with a fixed location on the ground, or attached to something having a fixed location on the ground.

3.01.02. *Historic preservation/conservation district established.* The historic preservation/conservation district is hereby established. This district is intended to promote the economic, cultural, educational, aesthetic, and general welfare of the public by protecting and preserving the historical significance and character of the town historic district. The town historic district, officially designated and listed on the National Register of Historic Places, is an outstanding example of rural Victorian architecture. The purpose of the historic preservation/conservation district is to ensure that this irreplaceable heritage survives, so it may serve as a remainder of the town's past and thus enrich the knowledge of future generations. The historic preservation/conservation district is an overlay district. When the historic preservation/conservation district overlay is applied to any property, the underlying zoning district categories are neither abandoned nor repealed. The existing, underlying regulations remain in effect and are further restricted in the manner specified herein. A petition for rezoning to the historic preservation/conservation classification shall be processed as any other proposed amendment pertaining to a change in the zoning classification of land, according to section 8.04.01.

3.01.03. *McIntosh register of historic places.* The following shall be the town register of historic places:

a.   *Creation.* The McIntosh Register of Historic Places is hereby created as a means of identifying and classifying various buildings, structures, sites, and districts as architecturally and/or historically significant. The register will be kept by the town clerk.

b.   *Initiation of placement on the local register.* Placement of individual properties or districts on the register may be initiated by the town council. Placement on the town register of historic places shall only occur after:

(1)   An individual or district nomination form is completed by the applicant and submitted to the town preservation board at a duly called meeting. Such nomination forms shall be available in the office of the town clerk.

Created: 2022-09-16 13:47:38 [EST]

(2)   A review and written recommendation indicating suitability of listing the property on the register is completed by the town preservation board. Upon receipt of a completed nomination form by the town preservation board at a duly called meeting, the town preservation board shall have 90 days in which to review the form and write a recommendation indicating the suitability of listing the property, structure, site or district on the town register of historic places. The town preservation board shall review the completed nomination form at a public meeting. Notice of such public meeting shall be furnished to the public at large and to the property owner. In conducting the review, the town preservation board shall evaluate the nominated property, structure, site, or district, specifically considering its:

a.   Character, interest, or value as part of the development, heritage, or cultural characteristics of the town, county, or state.

b.   Location as a site of local, county or state events.

c.   Identification with a person or persons who significantly contributed to the development of the town, county, or state.

d.   Embodiment of distinguishing characteristics of an architectural style valuable for the study of a period, type, method or construction, or use of indigenous materials.

e.   Identification as the work of a builder, architect, or designer whose individual work has influenced the development of the town, county, or state.

f.   Embodiment of elements of design, detailing, materials, or craftsmanship that render it architecturally significant.

g.   Unique location or singular physical characteristics that make it an established or familiar visual feature.

h.   Suitability for preservation or restoration.

i.   Archaeological significance.

Following the public meeting, the town preservation board shall write the recommendation indicating the suitability of the property for listing on the town register of historic places. In its recommendation, the town preservation board shall include a factual statement of the property owner's objections, if any, to the listing. Failure to review and write a recommendation within 90 days after the public meeting shall be deemed a recommendation approving listing on the town register of historic places, unless the 90 day time limit is extended by the mutual written consent of the town preservation board and the applicant.

c.   *The nomination form* and *the town preservation board recommendation shall be sent to the planning commission.* The nomination shall then be treated as a proposed amendment pertaining to a change in the zoning classification of land and the procedure set forth in section 8.04.01.

3.01.04.   *Historic places listing.* The effect of a town register of historic places listing shall be as follows:

a.   *Certificate of historical significance.* The town council shall issue a certificate of historical significance to the owners of properties or structures listed separately on the town register of historic places, or to the owners of properties or structures judged as contributing to the significance of districts listed on the register.

b.   *Modification of existing zoning regulations.* The listing of a building, structure, site, or district on the town register of historic places shall modify the regulations and procedures set forth in this LDC, to the extent stated in this section. The remainder of the requirements, regulations, and procedures set forth in this LDC shall remain applicable.

c.  *Issuance of building and demolition permits.* No building or demolition permit shall be issued for any of the actions specified in subsections (1) through (6) of this section without the issuance of a certificate of appropriateness from the town preservation board or a written statement from the town preservation board to the administrative official stating that no certificate of appropriateness is required. A certificate of appropriateness shall be required to:

(1)  Materially alter the exterior appearance of a building or structure listed individually on the register or of a building in a district listed on the register and classified as significant to that district;

(2)  Demolish a building or structure listed individually on the register or to demolish a building in a district listed on the register and classified as significant to that district;

(3)  Erect an addition to a building or structure listed individually on the register or to a building in a district listed on the register and classified as significant to that district;

(4)  Erect a new building within a district listed on the register;

(5)  Relocate a building or structure listed individually on the register or to relocate a building located in a district listed on the register and classified as significant to that district.

(6)  Undertake any action that will substantially alter the existing characteristics of a site, including clearing, alteration of the topography, or new construction.

In reviewing all applications for certificates of appropriateness, the town preservation board shall be aware of the importance of finding a means of meeting the current needs of the property owner. The town preservation board shall also recognize the importance of approving plans which will be reasonable for the property owner to carry out.

d.  *Issuance; material alteration.* The following shall be the criteria doe issuance of a certificate of appropriateness for material alteration of change in exterior appearance, erection of new building or structures, or additions to existing buildings or structures:

(1)  When considering an application for a certificate of appropriateness for:

a.  The material alteration or change in exterior appearance;

b.  Erection of new buildings or structures; or

c.  Additions to existing building or structures,

the town preservation board shall be guided by the Secretary of the Interior's standard for rehabilitation and guidelines for rehabilitating historic buildings.

(2)  In addition to subsection 1. of this subsection, the town preservation board shall consider the following guidelines:

a.  *Height.* Height shall be visually compatible with that of the adjacent buildings.

b.  *Scale.* The size of the building or structure and the building mass of the structure in relationship to open space, door openings, windows, porches, and balconies shall be visually compatible with buildings and places to which it is visually related.

c.  *Rhythm of openings.* The relationship of the width of the windows to the height of the windows in a building or structure shall be visually compatible with buildings and places to which it is visually related.

d.  *Setback.* The relationship of the building or structure to open space between it and other buildings and structures shall be visually compatible with buildings and places to which it is related.

e.   *Entry.* The relationship of entrances and projections to the required yards of a building shall be visually compatible with the buildings and places to which it is visually related.

f.   *Materials.* The relationship of the materials, color, and texture of the facade of a building shall be visually compatible with the material used in buildings to which it is visually related.

g.   *Roof shape.* The roof shape of the building or structure shall be visually compatible with buildings and places to which it is visually related.

h.   *Directional expression.* In its directional character, a building or structure shall be visually compatible with the buildings and places to which it is visually related.

e.   *Demolition.* Criteria for the issuance of a certificate of appropriateness for demolition. When approving or denying an application for a certificate of appropriateness for demolition of a building or structure, the town preservation board shall consider:

1.   The historical and architectural significance of the building or structure;

2.   The importance of the building or structure to the ambiance of a district;

3.   The difficulty or impossibility of reproducing such a building or structure because of its design, material, detail, or unique location;

4.   Whether the building or structure is one of the last remaining examples of its kind in the neighborhood, town, county, or region;

5.   Whether there are definite plans for refuse of the property if the proposed demolition is carried out and what the effect of those plans would be on the surrounding area;

6.   Whether reasonable measures can be taken to save the building or structure from collapse; and

7.   Whether the building or structure is capable of earning a reasonable economic return on its value.

f.   *Relocation.* Criteria for the issuance of a certificate of appropriateness for relocation. When approving or denying an application for a certificate of appropriateness for the relocation of a building or structure, the town preservation board shall consider:

1.   The historic character and aesthetic interest of the building or structure in its present setting.

2.   Whether there are definite plans for the area to be vacated and the effect of those plans on the surrounding area.

3.   Whether the building or structure can be moved without significant damage to its physical integrity.

4.   Whether the proposed relocation area is compatible with the historic and architectural character of the building or structure.

g.   *Alteration of site.* Criteria for the issuance of a certificate of appropriateness for alteration of a site. When approving or denying an application for a certificate of appropriateness for the alteration of a site, the town preservation board shall consider:

1.   The historical and/or archaeological significance of the site;

2.   Whether the site is one of the last remaining examples of its kind in the neighborhood, town, county, or region;

3.   Whether there are definite plans for reuse of the property if the alteration is carried out and what the effect of those plans would be on the surrounding area;

4.  Whether reasonable measures can be taken to allow the alteration while preserving the historical and/or archaeological value of the site;

5.  Whether the site is capable of earning a reasonable economic return on its value if the alteration is not allowed; and

6.  If the alteration is allowed to proceed, has an appropriate investigation and exploration of the site been undertaken.

h.  *Procedures.* Upon receipt of any application for a building permit or demolition permit, the town clerk shall determine whether a certificate of appropriateness may be required, based on the following guidelines:

1.  If the application for a permit involves the alteration of, demolition of, relocation of, or addition to a structure not listed on the register and not located in a district listed on the register and classified as significant to that district, then the applicant shall not be required to complete an application for a certificate of appropriateness.

2.  If the application for a permit involves the erection of a new building on property not located within a district listed on the register and classified as significant to that district, then the applicant shall not be required to complete an application for a certificate of appropriateness.

3.  In all other cases, the clerk shall provide the applicant with an application for a certificate of appropriateness.

4.  If the town clerk determines that guideline subsections (1) or (2) of this section apply, he shall note this fact on the application for a permit. Such notation shall relieve the applicant of any obligation to seek a certificate of appropriateness for the specific work authorized by the permit.

5.  If the town clerk determines that subsection 3. of this subsection applies, when the town clerk receives both the completed application for a building permit or demolition permit and the completed application for a certificate of appropriateness, he shall transmit the applications to the secretary of the town preservation board within seven days. No building or demolition permit shall be issued until a required certificate of appropriateness has been issued by the town preservation board.

6.  When a certificate of appropriateness is required under subsection (c) of this section, but no building or demolition permit is required for the proposed action, an application for a certificate of appropriateness shall be filed at the office of the town clerk. When the town clerk receives the completed application for a certificate of appropriateness, he shall transmit the application to the secretary of the town preservation board within seven days.

7.  An application for certificate of appropriateness shall include such plans, designs, photographs, reports, and other exhibits as the town preservation board may require.

(i)  *Determination by the town preservation board.* When a completed application is received by the town preservation board, the chairman shall set a date for consideration of the application. The date set shall be within 30 days of receipt of the application. Notice shall be sent to the applicant and to all persons or organizations filing written requests for such notices with the chairman.

1.  The town preservation board shall review the application for a certificate of appropriateness at a public meeting, after giving due public notice of the meeting in a matter permitted by the state statutes.

2.  The town preservation board shall determine whether a certificate of appropriateness is required for the desired action. If no certificate of appropriateness is required, the town preservation board shall provide the town clerk and the applicant with written notice of this determination

within five days after the public meeting. If a certificate of appropriateness is required, the board shall determine whether to issue or deny the certificate of appropriateness at the public meeting or within 45 days after the meeting. Such approval or denial shall be based upon review of the application according to the appropriate criteria in subsections d. through g. of this section. Written notice of approval or denial shall be provided to the applicant and to the town clerk within seven days of the determination and shall be accompanied by the certificate of appropriateness in the case of approval.

3.   A denial of a certificate of appropriateness shall be accompanied by a statement of the reasons for denial. The town preservation board shall make recommendations to the applicant concerning changes, if any, in the proposed action that would cause the board to reconsider its denial. The town preservation board shall confer with the applicant. The applicant may submit an amended application for a certificate of appropriateness at any time.

4.   Failure of the town preservation board to act within the time limits established shall be deemed an approval of the application, and upon request of the applicant, the town clerk shall issue any permit dependent upon a certificate of appropriateness.

(j)   *Appeals.* Any person aggrieved by a decision of the town preservation board may appeal the decision to a court of competent jurisdiction within 30 days from the date the decision is reduced to writing and delivered to him.

(k)   *Penalties.* Any person failing to comply with this section shall be subject to a $100.00 fine. In addition, a stop work order shall be issued in any case where work has commenced which requires a certificate of appropriateness and where no certificate has been obtained. The stop work order shall remain in full force until a certificate of appropriateness has been obtained or until the town preservation board determines that no certificate of appropriateness is required.

(Ord. No. 94-112, exh. A(3.01), 1-18-1994; Ord. No. 2007-161, attach. A(3.01.03(a)—(k)), 7-12-2007)

# ARTICLE IV. CONCURRENCY MANAGEMENT DETERMINATIONS[2]

## Sec. 4.00. Generally.

4.00.01. *Purpose.* The purpose of the town's concurrency management system is to ensure that development does not result in the degradation of any service below the level of service standards mandated in the comprehensive plan. It is the view of the town that even temporary violations of level of service standards must not be condoned.

(Ord. No. 94-112, exh. A(4000.01), 1-18-1994)

## Sec. 4.01. System for the management of concurrency.

4.01.01. *Generally.* The following are the guidelines to effect the town's concurrency management system. Upon adoption of this plan, these guidelines will become the required procedures for town officials. The guidelines are designed to ensure that the issuance of a final development order will not result in a degradation of the adopted levels of service for specified public facilities and services. This section contains a monitoring system for determination of the availability of adequate capacity of public facilities and services to meet the adopted

---

[2]State law reference(s)—Concurrency, F.S. § 163.3180.

level of service standards. No town official, board, or committee shall permit any development which will reduce service below the established service standards. If these conditions could be prevented by expanding the capacity of one or more public facilities, the full cost of those capacity expansions must be borne by the developer and the capacity expansions must be completed before there is additional demand on town services due to the development. In such cases, a development order or permit may be issued, if and only if, there is a binding, executed contract between the town and the developer stipulating that the required capacity expansions be completed before the development draws on the affected services. These requirements apply to all levels of service standards in the comprehensive plan, including those relating to roads, potable water, sanitary sewer, solid waste, drainage, parks and recreation.

4.01.02. *Development classes established.* To distinguish between developments likely to result in significant impacts on service levels and those likely to have minimal impacts, the following three development classes are defined:

    a.    *Class 1 development.* Any development involving one or more of the following:

        1.    The construction or alteration of more than one housing unit;

        2.    More than one acre of land;

        3.    All new commercial development or expansions of existing commercial enterprises.

    b.    *Class 2 development.* Any development not meeting subsection a. of this subsection's described thresholds for Class 1 development, but involving one or more of the following:

        1.    Construction or expansion of a structure intended for human habitation;

        2.    Installation or replacement of a septic system or septic drain field; or

        3.    Any new connection with town services, including water and roadways.

    c.    *Class 3 development.* Any development not meeting the described thresholds for Classes 1 and 2. This class would include repairs to residential structures or construction of structures not intended for human habitation, such as garage and storage sheds.

4.01.03. *Determination of development class.* At the time of submission of a development application, the administrative official shall make a determination of the development class and so indicate and initial directly on the application. The applicant will be informed of the definitions of the development classes, the reasoning for assigning a specific class to the developer's project, and the review and report requirements mandated by the concurrency management system. If the applicant disputes the classification assigned by the administrative official, the applicant may appeal the decision to the board of adjustment. The board of adjustment is required to request a recommendation from the land planning agency.

4.01.04. *Procedures for approving development orders or permits.*

    a.    *Class 1 developments.* The following shall be the procedures for approving class developments orders or permits:

        1.    *Required documentation.* In addition to the required permit application, the developer shall provide, in writing, estimates of the maximum, minimum, and average volume of town services the development will require during construction as well as after completion and full occupancy. The developer shall do likewise with regard to impacts on drainage volumes. The developer shall include any unusual requirements, such as the need to move heavy or wide-load equipment over town roadways. The developer shall detail the methodology employed to make all estimates.

        2.    *Review.* The administrative official and the land planning agency shall assess the adequacy of the developer's methodology and reasonableness of the service demand. The developer may be

required to provide additional information, including the development of additional estimates using a revised methodology.

3. *Assessment of economic impact.* To determine if the development would require an expansion of town facilities to maintain all level of service standards, the administrative official, with the recommendations of the land planning agency, shall make one of the following determinations and so inform the developer and the town council in writing:

(a) The development will not erode service levels below established level of service standards. The concurrency management requirements for issuing a development order or permit are met.

(b) The development will erode service levels below established level of service standards. The developer has proposed expansions or modifications of town facilities which are sufficient to prevent such degradations. The town may approve development, subject to the developer and the town council signing a binding, executable contract which:

(1) Provides for the specified expansions in town facilities at the expense of the developer, and

(2) Shall be completed prior to the realization of additional service demands from the development.

The town council has the right to determine that a public facility expansion, while technically feasible, may not be appropriate or otherwise desirable for the overall good of the community.

(c) The development will erode service levels below established level of service standards. The developer has proposed expansions or modifications of town facilities which are not sufficient to prevent such degradations. The developer is required to revise and resubmit the application.

(d) The development will erode service levels below established level of service standards. The developer has not proposed any expansions or modifications of town facilities which might prevent such degradations. The developer is required to revise and resubmit the application.

4. *Appeals.* The developer has the right to appeal the determination to the town council.

b. *Class 2 and Class 3 developments.* The following shall be the procedure for approving class 2 and class 3 developments orders or permits:

1. *Required documentation.* In addition to the required permit application, the developer shall provide, in writing, estimates of the additional volume of town services the development will require after completion and full occupancy. The developer shall detail the methodology employed to make all estimates.

2. *Review.* The administrative official shall assess the adequacy of the developer's methodology and reasonableness of the service demand. The administrative official may request an opinion from the land planning agency. The developer may be required to provide additional information, including the development of additional estimates using a revised methodology.

3. *Assessment of economic impact.* To determine if the development would require an expansion of town facilities to maintain all level of service standards, the administrative official shall make one of the following determinations:

(a) The development will not erode service levels below established level of service standards. The concurrency management requirements for issuing a development order or permit are met.

(b) The development will erode service levels below established level of service standards. The developer has proposed expansions or modifications of town facilities which are sufficient to prevent such degradations.

(c) The development will erode service levels below established level of service standards. The developer has proposed expansions or modifications of town facilities which are not sufficient to prevent such degradations.

(d) The development will erode service levels below established level of service standards. The developer has not proposed any expansions or modifications of town facilities which might prevent such degradations.

4. *Appeals.* The developer has the right to appeal this determination to the town council. If the administrative official's determination is subsection 3(b), (c) or (d) of this section, the administrative official must request an opinion from the land planning agency. Subsequently, the administrative official must inform the developer and the town council in writing of the final determination.

4.01.05. *Monitoring procedures and frequencies.*

a. *Construction.* During the construction of any developments that will erode the level of service, unless agreed upon improvements are made, the administrative official shall submit reports to the town council and the land planning agency indicating the progress of the construction and any instances in which the development required more town services than the maximums indicated in the developer's approved plans for construction phase. These reports must be submitted at least monthly. The administrative official may require the developer to supply information to assist in the preparation of the reports.

b. *Post-construction.* For one year after construction of any developments that will erode the level of service, unless agreed upon improvements are made, the administrative official shall report to the town council and the land planning agency any instances in which the development required more town services than the maximums indicated in the developer's approved plans for occupancy. Exceeding the approved maximum service demands may be cause for the town council to direct the administrative official to investigate if the development is being used in accordance with that indicated by the developer in the approved plans. Such an investigation must be undertaken if the additional service demands are deemed to reduce town service levels below established level of service standards.

c. *Annual reports.* The town shall prepare an annual report on concurrency management that includes:

1. A summary of actual development activity, including a summary of the certificates of occupancy, indicating quantity of development represented by type and square footage.

2. A summary of building permit activity, indicating:

a. Those that expired without commencing construction;

b. Those that are active at the time of the report;

c. The quantity of development represented by the outstanding building permits;

d. Those that result from final development orders issued prior to the adoption of this LDC; and

e.   Those that result from final development orders issued pursuant to the requirements of this LDC.

3.   A summary of final development orders issued, indicating:

a.   Those that expired without subsequent building permits;

b.   Those that were completed during the reporting period;

c.   Those that are valid at the time of the report, but do have associated building permits or construction activity; and

d.   The phases and quantity of development represented by the outstanding final development orders.

4.   An evaluation of each facility and service indicating:

a.   The capacity available for each at the beginning of the reporting period and the end of the reporting period;

b.   The portion of the available capacity held for valid final development orders;

c.   A comparison of the actual capacity to calculated capacity resulting from approved final development orders;

d.   A comparison of actual capacity and levels of service to the adopted levels of service from the town's comprehensive plan; and

e.   A forecast of the capacity for each based upon the most recently updated schedule of capital improvements in the town capital improvements element.

(Ord. No. 94-112, exh. A(4.01), 1-18-1994)


## Sec. 4.02. Adopted levels of service.

4.02.01.   *Potable water.* Development activity shall not be approved, unless there is sufficient available capacity to sustain the levels of service for potable water as established in objectives 8.1.1 and 8.1.2 and policies 8.1.1.1 and 8.1.1.2 of the potable water subelement of the town comprehensive plan.

4.02.02.   *Transportation system.* The following shall be the adopted levels of service for the transportation system:

a.   *Level of service.* Development activities shall not be approved, unless there is sufficient available capacity to sustain the following levels of service for transportation systems as established in the transportation circulation element of the town comprehensive plan:

| Type of Facility | Peak Hour Level of Service |
|---|---|
| Arterial roadway | C |
| Local collector roadway | C |
| Local roadway | C |

b.   *Determination of project impact.* The impact of the proposed development activity on available capacity shall be determined as follows:

1.   The area of impact of the development on the traffic shed shall be determined. The traffic shed shall be that area where the primary impact of traffic to and from the site occurs. If the town has

designated sectors of the jurisdiction for determining development impacts and planning capital improvements, such sectors or planning areas may be used.

2.  The projected level of service for roads within the traffic shed shall be calculated based upon estimated trips to be generated by the project. Where the development will have access to more than one road the calculations shall show the split in generated traffic and state the assumptions used in the assignment of traffic to each facility.

4.02.03. *Drainage system.* Development activities shall not be approved, unless there is sufficient available capacity to sustain the level of service for the drainage system established in objective 7.1.3, policies 7.1.3.1 and 7.1.3.2 of the drainage subelement of the town's comprehensive plan.

4.02.04. *Solid waste.* Development activities shall not be approved, unless there is sufficient available capacity to sustain the level of service of five and one-half pounds per capita per day established in the solid waste subelement of the town's comprehensive plan.

4.02.05. *Recreation.* Development activities shall not be approved, unless there is sufficient available capacity to sustain the level of service for the recreational facilities as established in table 11-1 of the recreation and open space element of the town's comprehensive plan.

4.02.06. *Sewage treatment.* Development activities shall not be approved, unless there is sufficient available capacity to sustain the level of service for the sewage treatment facilities as established in policy 5.1.2.2 of the sanitary sewer subelement of the town's comprehensive plan.

(Ord. No. 94-112, exh. A(4.02), 1-18-1994)

## Sec. 4.03. Proportionate share mitigation.

4.03.01. *Purpose and intent.* The purpose of this section is to establish a method whereby the impact of development on the transportation facilities can be mitigated by the cooperative efforts of the public and private sectors. This method is to be known as the proportionate fair-share program, as required by and in a manner consistent with F.S. § 163.3180(16).

4.03.02. *Applicability.* The proportionate fair-share program shall apply to all developments in town that have been notified of a lack of capacity to satisfy transportation concurrency on a transportation facility in the town concurrency management system (CMS), including transportation facilities maintained by the state department of transportation (FDOT) or another jurisdiction that are relied upon for concurrency determinations, pursuant to the requirements of section 14.14 of the comprehensive plan. The proportionate fair-share program does not apply to developments of regional impact (DRI) using proportionate fair-share under F.S. § 163.3180(12), or to developments exempted from concurrency as provided in the town comprehensive plan and this section of the land development regulations, and/or F.S. § 163.3180, regarding exceptions and de minimis impacts.

4.03.03. *General requirements.*

(1)  An applicant may choose to satisfy the transportation concurrency requirements of the town by making a proportionate fair-share contribution, pursuant to the following requirements:

(a)  The proposed development is consistent with the comprehensive plan and applicable land development regulations.

(b)  The five-year schedule of capital improvements in the town CIE or the long-term schedule of capital improvements for the adopted long-term CMS, which includes transportation improvements that, upon completion, will satisfy the requirements of the town transportation CMS. The provisions of section 14.16.2 (2), comprehensive plan, may apply if a project or projects

Created: 2022-09-16 13:47:38 [EST]

needed to satisfy concurrency are not presently contained within the town's CIE or an adopted long-term schedule of capital improvements.

(2) The town may choose to allow an applicant to satisfy transportation concurrency through the proportionate fair-share program by contributing to an improvement that, upon completion, will satisfy the requirements of the town transportation CMS, but is not contained in the five-year schedule of capital improvements in the CIE or the long-term schedule of capital improvements for an adopted long-term CMS, where the following apply:

(a) The town adopts, by resolution or ordinance, a commitment to add the improvement to the five-year schedule of capital improvements in the CIE or long-term schedule of capital improvements for an adopted long-term CMS no later than the next regularly scheduled update. To qualify for consideration under this section, the proposed improvement must be reviewed by the town council, and determined to be financially feasible pursuant to F.S. §163.3180(16)(b)1, consistent with the comprehensive plan, and in compliance with the provisions of this section. Financial feasibility for this section means that additional contributions, payments or funding sources are reasonably anticipated during a period not to exceed ten years to fully mitigate impacts on the transportation facilities.

(b) If the funds allocated for the five-year schedule of capital improvements in the town CIE are insufficient to fully fund construction of a transportation improvement required by the CMS, the town may still enter into a binding proportionate fair-share agreement with the applicant authorizing construction of that amount of development on which the proportionate fair-share is calculated if the proportionate fair-share amount in such agreement is sufficient to pay for one or more improvements which will, in the opinion of the governmental entity or entities maintaining the transportation facilities, significantly benefit the impacted transportation system.

The improvement or improvements funded by the proportionate fair-share component must be adopted into the five-year capital improvements schedule of the comprehensive plan or the long-term schedule of capital improvements of the adopted long-term concurrency management system at the next annual capital improvements element update.

(c) Any improvement project proposed to meet the developer's fair-share obligation must meet the towns esign standards for locally maintained roadways and those of the FDOT for the state highway system.

4.03.04. *Intergovernmental coordination.* Pursuant to policies in the intergovernmental coordination element of the town's comprehensive plan and applicable policies in the strategic regional policy plan for the Withlacoochee Region, the town shall coordinate with affected jurisdictions, including FDOT, regarding mitigation to impacted facilities not under the jurisdiction of the local government receiving the application for proportionate fair-share mitigation. An interlocal agreement may be established with other affected jurisdictions for this purpose.

4.03.05. *Application process.*

(1) Upon notification of a lack of capacity to satisfy transportation concurrency, the applicant shall also be notified in writing of the opportunity to satisfy transportation concurrency through the proportionate fair-share program pursuant to the requirements of section 4.16 of the comrehensive plan.

(2) Prior to submitting an application for a proportionate fair-share agreement, a preapplication meeting shall be held to discuss eligibility, application submittal requirements, potential mitigation options, and related issues. If the impacted facility is on the state intermodal system (SIS), then the FDOT will be notified and invited to participate in the preapplication meeting.

(3) Eligible applicants shall submit an application to the town that includes an application fee as established within the town's fee resolution, as amended, and the following:

(a)    Name, address and phone number of owner, developer and agent;

(b)    Property location, including parcel identification numbers;

(c)    Legal description and survey of property;

(d)    Project description, including type, intensity and amount of development;

(e)    Phasing schedule, if applicable;

(f)    Description of requested proportionate fair-share mitigation method; and

(g)    A copy of concurrency application.

(4)    The town administrative official shall review the application and certify that the application is sufficient and complete within ten business days. If an application is determined to be insufficient, incomplete or inconsistent with the general requirements of the proportionate fair-share program as indicated in the comprehensive plan 14.16, then the applicant will be notified in writing of the reasons for such deficiencies within 30 calendar days of submittal of the application. If such deficiencies are not remedied by the applicant within 30 calendar days of receipt of the written notification, the application will be deemed abandoned. The town council may, in its discretion, grant an extension of time not to exceed 60 calendar days to cure such deficiencies, provided that the applicant has shown good cause for the extension and has taken reasonable steps to effect a cure.

(5)    Pursuant to F.S. § 163.3180(16)(e), proposed proportionate fair-share mitigation for development impacts to facilities on the SIS requires the concurrency of the FDOT. The applicant shall submit evidence of an agreement between the applicant and the FDOT for inclusion in the proportionate fair-share agreement.

(6)    When an application is deemed sufficient, complete, and eligible, the applicant shall be advised in writing and a proposed proportionate fair-share obligation and binding agreement will be prepared by the town or the applicant with direction from the town and delivered to the appropriate parties for review, including a copy to the FDOT for any proposed proportionate fair-share mitigation on a SIS facility, no later than 60 calendar days from the date at which the applicant received the notification of a sufficient application, and no fewer than 14 calendar days prior to the town council meeting when the agreement will be considered.

(7)    The town shall notify the applicant regarding the date of the town council meeting when the agreement will be considered for final approval. No proportionate fair-share agreement will be effective until approved by the town council.

4.03.06. *Determining proportionate fair-share obligation.*

(1)    Proportionate fair-share mitigation for concurrency impacts may include, without limitation, separately or collectively, private funds, contributions of land, and construction and contribution of facilities.

(2)    A development shall not be required to pay more than it's proportionate fair-share. The fair market value of the proportionate fair-share mitigation for the impacted facilities shall not differ, regardless of the method of mitigation.

(3)    The methodology used to calculate an applicant's proportionate fair-share obligation shall be as provided for in F.S. § 163.3180(12), as follows:

"The cumulative number of trips from the proposed development expected to reach roadways during peak hours from the complete build out of a stage or phase being approved, divided by the change in the peak hour maximum service volume (MSV) of roadways resulting from construction of an improvement necessary to maintain the adopted LOS, multiplied by the construction cost, at the time of developer payment, of the improvement necessary to maintain the adopted LOS."

Created: 2022-09-16 13:47:38 [EST]

or

Proportionate fair-share = E [(development trips;sub\sub;)/(SV increase;sub\sub;)] × cost;sub\sub;]

Where:

| | |
|---|---|
| Development trips equals | Those trips from the stage or phase of development under review that are assigned to roadway segment "i" and have triggered a deficiency per the CMS; |
| SV increase equals | Service volume increase provided by the eligible improvement to roadway segment "i" per section 14.16.3, comprehensive plan; |
| Cost equals | Adjusted cost of the improvement to segment "i". Cost shall include all improvements and associated costs, such as design, right-of-way acquisition, planning, engineering, inspection, and physical development costs directly associated with construction at the anticipated cost in the year it will be incurred. |

(4)   For the purposes of determining proportionate fair-share obligations, the town shall determine improvement costs based upon the actual cost of the improvement as obtained from the CIE, the transportation improvement program (TIP) or the FDOT work program. Where such information is not available, improvement cost shall be determined using one of the following methods:

The most recent issue of FDOT transportation costs, as adjusted based upon the type of cross section, urban or rural; locally available data from recent projects on acquisition, drainage and utility costs; and significant changes in the cost of materials due to unforeseeable events. Cost estimates for state road improvements not included in the adopted FDOT work program shall be determined using this method in coordination with the FDOT district.

(5)   If the town has accepted an improvement project proposed by the applicant, then the value of the improvement shall be determined using one of the methods provided in this section.

(6)   If the town has accepted right-of-way dedication for the proportionate fair-share payment, credit for the dedication of the nonsite related right-of-way shall be valued on the date of the dedication at 120 percent of the most recent assessed value by county property appraiser or, at the option of the applicant, by fair market value established by an independent appraisal approved by the town and at no expense to the town. The applicant shall supply a drawing and legal description of the land and a certificate of title or title search of the land to the town at no expense to the town. If the estimated value of the right-of-way dedication proposed by the applicant is less than the town estimated total proportionate fair-share obligation for that development, then the applicant must also pay the difference. Prior to purchase or acquisition of any real estate or acceptance of donations of real estate intended to be used for the proportionate fair-share, public or private partners should contact the FDOT for essential information about compliance with federal law and regulations.

4.03.07. *Impact fee credit for proportionate fair-share mitigation.*

(1)   Proportionate fair-share contributions shall be applied as a credit against impact fees to the extent that all or a portion of the proportionate fair-share mitigation is used to address the same capital infrastructure improvements contemplated by the town's impact fee regulations.

(2)   Impact fee credits for the proportionate fair-share contribution will be determined when the transportation impact fee obligation is calculated for the proposed development. Impact fees owed by the applicant will be reduced per the proportionate fair-share agreement as they become due per the town impact fee regulations. If the applicant's proportionate fair-share obligation is less than the development's anticipated road impact fee for the specific stage or phase of development under

review, then the applicant or its successor must pay the remaining impact fee amount to the town pursuant to the requirements of the town impact fee regulations.

(3)    The proportionate fair-share obligation is intended to mitigate the transportation impacts of a proposed development at a specific location. As a result, any road impact fee credit based upon proportionate fair-share contributions for a proposed development cannot be transferred to any other location, unless provided for within the local impact fee regulations.

4.03.08. *Proportionate fair-share agreements.*

(1)    Upon execution of a proportionate fair-share agreement the applicant shall receive a town certificate of concurrency approval. Should the applicant fail to apply for a development permit within 12 months or timeframe provided in the town's capital improvements element of the execution of the agreement, then the agreement shall be considered null and void, and the applicant shall be required to reapply.

(2)    Payment of the proportionate fair-share contribution is due in full prior to issuance of the final development order or recording of the final plat and shall be nonrefundable. If the payment is submitted more than 12 months from the date of execution of the agreement, then the proportionate fair-share cost shall be recalculated at the time of payment based on the best estimate of the construction cost of the required improvement at the time of payment, pursuant to this article and adjusted accordingly.

(3)    All developer improvements authorized under this section must be completed prior to issuance of a development permit, or as otherwise established in a binding agreement that is accompanied by a security instrument that is sufficient to ensure the completion of all required improvements. It is the intent of this section that any required improvements be completed before issuance of building permits or certificates of occupancy.

(4)    Dedication of necessary right-of-way for facility improvements pursuant to a proportionate fair-share agreement must be completed prior to issuance of the final development order or recording of the final plat.

(5)    Any requested change to a development project subsequent to a development order may be subject to additional proportionate fair-share contributions to the extent the change would generate additional traffic that would require mitigation.

(6)    Applicants may submit a letter to withdraw from the proportionate fair-share agreement at any time prior to the execution of the agreement. The application fee and any associated advertising costs to the town will be nonrefundable.

4.03.09. *Selected corridor improvements.* The town town council may enter into proportionate fair-share agreements for selected corridor improvements to facilitate collaboration among multiple applicants on improvements to a shared transportation facility.

4.03.10. *Appropriation of fair-share revenues.*

(1)    Proportionate fair-share revenues shall be placed in the appropriate project account for funding of scheduled improvements in the town CIE, or as otherwise established in the terms of the proportionate fair-share agreement. At the discretion of the town council, proportionate fair-share revenues may be used for operational improvements prior to construction of the capacity project from which the proportionate fair-share revenues were derived. Proportionate fair-share revenues may also be used as the 50 percent local match for funding under the FDOT trip or other FDOT agreements or programs.

(2)    In the event a scheduled facility improvement is removed from the CIE, then the revenues collected for its construction may be applied toward the construction of another improvement within that same corridor or sector that would mitigate the impacts of development pursuant to the requirements of this article.

Created: 2022-09-16 13:47:38 [EST]

Where an impacted regional facility has been designated as a regionally significant transportation facility in an adopted regional transportation plan as provided in section F.S. § 339.155, and then the town may coordinate with other impacted jurisdictions and agencies to apply proportionate fair-share contributions and public contributions to seek funding for improving the impacted regional facility under the FDOT trip or other FDOT agreements or programs. Such coordination shall be ratified by the town through an interlocal agreement that establishes a procedure for earmarking of the developer contributions for this purpose.

(Ord. No. 2006-155, § 1(4.03), 3-8-2007)

# ARTICLE V. RESOURCE PROTECTION STANDARDS[3]

## Sec. 5.01. Purpose.

The purpose of this article is to implement the resource protection requirements of the town's comprehensive plan. This article is intended to establish those resources or areas of a development site that must be protected from harmful affects of development. A developer should apply the provisions of this article to a proposed development site before any other development design work is done. Application of the provisions of this article will divide a proposed development site into areas that may be developed and areas that must generally be left free of development activity. The proposed development should then be designed to fit within the areas that may be developed. The town shall coordinate with the state department of environmental protection, St. Johns River water management district, state game and fresh water fish commission, Withlacoochee regional planning district, the county and Alachua County during the review process of proposed developments to ensure adequate protection of the natural resources.

(Ord. No. 94-112, exh. A(5.01), 1-18-1994)

## Sec. 5.02. Wetlands.

5.02.01. *Purpose and intent.* It is the purpose and intent of this section to provide for the protection, maintenance, and enhancement of wetlands within the town in accordance with the adopted town comprehensive plan.

5.02.02. *Applicability.* The requirements of this section shall apply to all wetlands identified in figure 2-6 of the future land use element of the town comprehensive plan and/or under the jurisdiction of:

   a.   The U. S. Army Corps of Engineers as authorized by section 404, Clean Water Act or section 10, River and Harbor Act.

   b.   The state department of environmental protection as authorized by F.S. ch. 403.

   c.   The St. Johns River water management district pursuant to F.A.C. ch. 40C-4.

The most restrictive agency wetland boundary determination shall be recognized by the town as the wetlands boundary. The term "restrictive" means the boundary covering the largest area.

5.02.03. *Exemptions.* Activities which are exempted from this section include:

   a.   All activity exempt from regulation by the state department of environmental protection under F.S. ch. 403, and F.A.C. ch. 62-1 et seq.;

---

[3]State law reference(s)—Natural resources, F.S. ch. 369 et seq.; environmental control, F.S. ch. 403.

b.   All activity exempt from regulation by the U. S. Army Corps of Engineers as authorized by section 404, Clean Water Act or section 10, Rivers and Harbors Act;

c.   All activity exempt from regulation by the St. Johns River water management district pursuant to F.A.C. ch. 40C-4; and

d.   Any emergency activity which is immediately necessary for the protection and preservation of life or property or for the protection or preservation of a natural resource. Such emergency activities include, for example:

1.   Search and rescue operations; and

2.   Preventive and remedial activities related to large-scale contamination of streams or other bodies of water, floods, hurricanes and other storms, and public health concerns.

Within five days after the commencement of such emergency involving the undertaking of any activity which otherwise would be treated as a regulated activity under this section, the person chiefly responsible for undertaking such emergency activity shall send a written statement to the administrative official setting forth the pertinent facts regarding such emergency, including an explanation of the life, property or resource such activity was designed to protect or preserve.

5.02.04. *Wetland protection requirements.* No disturbance of wetlands covered by this section shall be permitted, unless authorized by the state department of environmental protection, the U. S. Army Corps of Engineers, and the St. Johns River water management district. In addition, all development shall comply with the following requirements:

a.   Wetlands shall remain unaltered and shall be included in conservation buffers as described in conservation policy 10.1.6.3 of the town's comprehensive plan.

b.   Stormwater runoff rates and quantities shall not be increased or have significant impacts on the existing surface water flow patterns or existing natural drainageways in the wetlands.

c.   Buildings shall be setback a minimum of 75 feet.

d.   Septic tanks and drain fields shall be setback a minimum of 200 feet.

e.   Impervious areas shall be setback a minimum of 50 feet.

f.   Drainage retention areas shall be setback a minimum of 25 feet.

g.   Stormwater runoff discharged into designated wetlands shall comply with the state water quality standards and St. Johns River water management district regulations.

h.   Stormwater runoff shall not adversely impact adjacent lands, natural drainage facilities, wetlands and surface waters.

(Ord. No. 94-112, exh. A(5.02), 1-18-1994)


## Sec. 5.03. Waterfront development.

5.03.01. *Purpose and intent.* In order to maintain surface water quality and reduce nutrient loading in lakes and creeks, this section is enacted as a measure to protect the public health and welfare by restricting the amount of clearing or removal of shoreline vegetation, by requiring that new structures be setback a reasonable distance from surface waters, requiring retention of vegetated shorelines and by requiring additional stormwater treatment.

5.03.02. *Applicability.* The regulations set forth in this section, shall apply to all lakes and creeks within or adjacent to the incorporated town limits.

Created: 2022-09-16 13:47:38 [EST]

5.03.03. *Surface water protection.* All development within 100 feet of the ordinary high water line (OHWL) of Lake Orange and creeks shall comply with the following requirements:

a.  Existing vegetated upland buffers shall be preserved or restored to provide for sheet flow of surface runoff, and shall be a minimum of 30 feet in width.

b.  Where there is no existing vegetated upland buffers to be preserved or restored, new development shall establish a 20-foot buffer of native vegetation adjacent to the protected lake or creek.

c.  Stormwater runoff from agricultural activities shall comply with the requirements of F.A.C. 62-302.500 and the best management practices (BMP's) contained in A Manual of Best Management Practices for Agricultural Activities published by the state department of environmental protection.

d.  Proof of compliance with the requirements of F.A.C. ch. 4OC-40, and F.A.C. 62-302.500 shall be required of all development covered by this subsection prior to issuance of a final development order.

5.03.04. *Development within the required buffers.*

a.  *Exemptions.* Except as expressly provided herein, no development activity shall be undertaken within buffers required by this section. The following activities are exempt from this subsection:

    1.  Emergency repairs on public or private projects necessary for the preservation of life, health, or property where taken to implement and accomplish the beneficial purposes of this section under such circumstances where it would be impractical to obtain approval from the planning department prior to making such emergency repairs.

    2.  Maintenance of public or privately owned portions of a structural stormwater or drainage control system which does not constitute major construction or rebuilding.

    3.  State department of environmental protection approved maintenance activity.

    4.  A property owner whose shoreline has previously been cleared and the clearing is continuously maintained. However, if shoreline vegetation is allowed to be reestablished, a permit must be obtained to clear it.

    5.  Activities undertaken by federal, state, regional and local agencies of government.

    6.  Nonmechanical clearing of vegetation from an area of less than ten percent of the area between the OHWL and a point landward 25 feet.

    7.  Minor maintenance or emergency repair to existing structures of improved areas.

    8.  Clearing of shoreline vegetation from the OHWL to a point landward 25 feet, to create a walking trail having no structural components, not to exceed four feet in width.

    9.  Timber catwalks, docks, and trail bridges that are less than or equal to four feet wide, provided that no filling, flooding, dredging, draining, ditching, tiling or excavating is done, except limited filling and excavating necessary for the installation of pilings.

    10. Utility crossings.

    11. Bona fide mosquito control activities.

    12. Scenic, historic, wildlife, or scientific preserves.

    13. Commercial or recreational fishing, and creation and maintenance of temporary blinds.

    14. Developing a wetlands stormwater discharge facility or treatment wetland in accordance with state permits received under F.A.C. ch. 62-25.

b.   *Limitations on clearing.* A property owner who desires to clear up to 25 feet of shoreline must provide proof of receipt of a state department of environmental protection permit authorizing such vegetation removal.

c.   Water dependant activities.

1.   *Generally.* Water dependent activities that are otherwise prohibited may be allowed if the developer demonstrates that the public interest is served by showing:

(a)   A demonstrated public need for the proposed water dependent activity;

(b)   The public benefits of the activity substantially outweigh the adverse environmental effects on a shoreline of a lake or river; and

(c)   No practicable alternative to placement in the surface water protection zone exists.

2.   *Permittable water dependent activities.* The following are permittable water dependent activities:

(a)   Projects not exceeding 10,000 cubic yards of material placed in or removed from within the shoreline protection zone.

(b).   Dockage or marinas, where dock length does not exceed 25 percent of the width of the water body and containing less than one slip per 100 feet of shoreline.

(c)   Installation of buoys, aids to navigation, signs, and fences.

(d)   Performance of maintenance dredging for ten-years from the date of the original permit. Thereafter, performance of maintenance dredging so long as less than 10,000 cubic yards of material is removed.

(e)   Installation of subaqueous transmission and distribution lines for water, wastewater, electricity, communication cables, oil, gas or other public utilities. Lines may be entrenched in, not exceeding 10,000 cubic yards of dredging, laid on, or embedded in bottom waters.

3.   *Minimization of impacts.* The water dependent activity shall be designed, constructed, maintained and undertaken in a way that minimizes the adverse impacts on the beneficial functions of the affected shoreline protection zone.

4.   *Design standards for water dependent activities.*

(a)   Marinas and other appropriate developments shall post the following signs where they are readily visible to all users of the development:

(1)   Regulations pertaining to handling and disposal of waste, sewage, or toxic materials.

(2)   Regulations prohibiting the use of vessel toilets while moored, unless these toilets are self-contained or have an approved treatment device.

(3)   Regulations prohibiting the disposal of fish or shellfish cleaning wastes, scrap-fish, viscera, or unused bait in or near the development.

(4)   Appropriate messages relating to local economical concerns, e.g., manatee protection.

(b)   A marina shall include boat launch facilities, unless the applicant can demonstrate that providing such facilities is not feasible or it is determined that the ramp would be excessively damaging to the aquatic environment.

(c)   Marinas shall have adequate restroom facilities in compliance with the local health board regulations.

(d)   Adequate garbage receptacles shall be provided and maintained by the marina operator at several locations convenient to users.

(e)   Any dredging shall be conducted at times of minimum biological activity to avoid fish migration and spawning, and other cycles and activities of wildlife.

(f)   If dredging changes the littoral drift processes and causes adjacent shores to erode, the developer shall periodically replenish these shores with the appropriate quantity and quality of aggregate in accordance with appropriate permits obtained from federal, state or regional levels of government.

(g)   Where wet moorage is offered for boats which have holding facilities for sewage, or where other recreational vehicles are allowed to stay overnight, then pump-out, holding, or treatment facilities shall be provided by the developer for sewage and other wastes, including bilge, contained on vessels and vehicles. The facilities shall be conveniently available to all vessels and vehicles.

(Ord. No. 94-112, exh. A(5.03), 1-18-1994)


## Sec. 5.04. Habitat of endangered or threatened species.

5.04.01. *Purpose and intent.* It is the purpose of this section to provide standards necessary to protect endangered and threatened animal and plant species through the preservation of wildlife habitat of species of animals, flora and fauna, identified in the town inventory of areas supporting endangered or threatened plants or wildlife species.

5.04.02. *Applicability.* The requirements of this section shall apply to all areas within 1,000 feet of nesting eagles and all areas identified in the town inventory of areas supporting endangered or threatened plants or wildlife species which has been produced in conformance with the requirements of objective in section 10.1.7 of the town's comprehensive plan.

5.04.03. *Exemptions.* Inventories and management plans are not required for properties and any development project of less than ten acres in land area and for projects involving less than two acres of impervious area.

5.04.04. *Development application requirements.*

a.   *Inventory.* An inventory shall accompany all preliminary development order applications where FLUCCS codes for the property indicate a possible presence of a town listed species, except as set forth in subsection 5.04.03 of this section. The inventory shall be prepared by using the inventory method of diminishing quarters set forth in a document entitled "Town of McIntosh Listed Species Inventory Method" which is on file in the town planning office. Such inventory shall include town listed species presence, sightings, signs, tracks, trails, rests, evidence of feeding, etc., population estimates, and occupied habitat boundaries. A map and narrative shall describe the methodology as applied and the findings. The mapped information shall be at the same scale as the development application and an aerial map at a scale of one inch less than or equal to 400 feet.

b.   *Management plan.* A management plan meeting the requirements of subsection 5.04.05 of this section may be submitted with any preliminary development order application as provided in subsection 5.04.05 of this section. However, except as set forth in subsection 5.04.03 of this section, a management plan meeting the requirements of subsection 5.04.05 of this section shall be required for all final development order applications, if listed species are found on the property.

5.04.05. *Habitat management plan.*

a.   *Required.* A habitat management plan shall be prepared as a prerequisite to the approval of any development, rezoning, preliminary plat approval or site plan approval, not otherwise exempt from this section pursuant to subsection 5.04.03 of this section, proposed on a site containing locally significant resources as identified in areas where listed species are found or would be affected by the development.

b.   *Contents.* The habitat management plan shall be prepared by an ecologist, biologist or other related professional. The plan shall document the presence of affected species, the land needs of the species that may be met on the development site, and shall recommend appropriate habitat management activities and other measures to protect the subject wildlife. The plan shall include the following:

1.   Recommended management activities;

2.   An action plan with specific implementation activities, costs, schedules, and assignment of responsibilities;

3.   Occupied habitat zones shall be established which include all occupied habitat of listed species;

4.   Occupied habitat buffer zone boundaries shall be established parallel to all occupied habitat zones, and shall extend at a distance appropriate for the habitat in accordance with the habitat management criteria recommended by the U.S. Fish and Wildlife Service and the state fish and wildlife conservation commission pursuant to Policy 10.1.5.1 of the town comprehensive plan; and

5.   A one inch less than or equal to 400 feet aerial map and map at the scale of the development application indicating the following:

a.   Habitat classifications depicted by using FLUCCS;

b.   Location of individuals, nest sites, dens, burrows, feeding locations, roosting and perching areas, and trails, as appropriate;

c.   Areas to be preserved, including occupied habitat zones and occupied habitat buffer zones; and

6.   Except as provided for in subsection eight of this subsection, the occupied habitat zone and the occupied habitat buffer zone shall remain free of all development. Each zone shall be identified on final site plans and plats. A conservation easement shall be granted to the town for the preserved habitat as a condition of the final development order approval, unless the administrative official determines that it would not be logistically or economically feasible for the town to maintain the easement.

7.   In the event that adjacent parcels include conservation easements or other public interest in the land, effort shall be made to connect the conservation easements to provide wildlife corridors.

8.   Encroachment into occupied habitat and habitat buffer zones is permissible where the developer demonstrates, to the satisfaction of the administrative official and the state fish and wildlife conservation commission, that the development will not cause degradation of species existing on the site and then only after the incentives for habitat preservation contained in subsection 5.04.06 c. are exhausted.

9.   In cases where guidelines have been prepared by the state fish and wildlife conservation commission for a listed species, those guidelines shall be considered in the preparation of the management plan.

Created: 2022-09-16 13:47:38 [EST]

10.  The management plan shall clearly provide that the applicant or his successor in interest is responsible for all aspects of the implementation of the management plan. A monitoring report as to the condition of the habitat and management techniques applied to the habitat shall be submitted to the administrative official for review on an annual basis from the date that the final development order is issued for five consecutive years.

11.  The management plan shall be finalized prior to issuance of the final development order.

c.  *Review.* The management plan shall be subject to final approval by the administrative official. The management plan shall be reviewed by the administrative official and when possible, by the state fish and wildlife conservation commission. If the Florida Fish and Wildlife Conservation Commission fails to review any plan in conjunction with the administrative official, determinations shall be made without the benefit of state fish and wildlife conservation commission expertise.

d.  *Conformity.* The final development plan approved for a development shall conform to the recommendations in the habitat management plan.

5.04.06.  *Habitat preservation.*

a.  *Mandatory.* Preservation of the occupied habitat zone and occupied habitat buffer zone for up to a total of ten percent of the entire property acreage shall be required.

b.  *Preservation of land.* Where land on a proposed development site is to be preserved as habitat of rare, endangered or special concern species, such land shall be adjacent to existing viable habitat, a significant wetland system, floodplain, or wildlife corridor. If such lands are not adjacent to the development site, land to be set aside shall be of such quantity and quality as to provide viable habitat, as documented in the study required in subsection 5.05.05 of this section.

c.  *Fee-in-lieu.* As an alternative to preservation of land, the town may establish a fee-in-lieu-of-land program, whereby the town can purchase land which will provide significant habitat. In the event that the administrative official and applicant agree to mitigate impacts off-site, the applicant shall pay a fee-in-lieu of providing conservation areas for occupied habitat and required buffer. The collected fee shall be dedicated for use by the town only for purposes of establishing and maintaining a listed species mitigation park, administered by the town, St. Johns water management district, the state fish and wildlife conservation commission or the state department of environmental protection. Assessments shall be based upon the acreage of occupied habitat impacted that would otherwise be preserved by this section.

d.  *Waiver.* The administrative official and the applicant may agree to waive the preservation techniques listed in this section, provided that:

(1)  The occupied habitat zone is isolated;

(2)  The applicant provides an appraisal of the impacted area at predevelopment values; and

(3)  Off-site mitigation procedures set forth in subsection 5.04.06c. of this section are met.

e.  *Optional habitat preservation.* In order to promote habitat preservation in excess of the minimum habitat preservation requirements of this section, the following incentives are offered. These incentives shall only apply to those areas which are not already preserved under the lakes and wetland protection provisions of this article. The incentives are as follows:

1.  Transfer of density and intensity is permitted from the area to be preserved for habitat to the developable portion of the site, provided that all other applicable requirements of this article are met and subject to the following limitations:

Residential densities may be transferred from habitat areas to contiguous nonhabitat areas within the same subdivision, subject to the following:

(1)   Residential densities shall be transferred from the habitat areas to nonhabitat areas based on the underlying residential land-use density, provided however, that the density transfer shall not include density allocated to land area that would have been devoted to the provision of access to the site, internal traffic circulation within the site, and pop-over areas for drainage systems.

(2)   All such transfers of density shall:

i.   Be to contiguous property under the same ownership or control;

ii.   Only be permitted within a subdivision platted and developed in accordance with this LDC;

iii.   Not result in lot sizes, or areas per dwelling unit, less than 65 percent of that required by this LDC, the minimum lot/area size shall be exclusive of the habitat area; and

iv.   Be noted on the face of the final plat as a restrictive covenant enforceable by the town council.

(3)   Transfers of intensities of nonresidential uses from habitat areas to nonhabitat areas shall be allowed at an amount equivalent to residential-density transfers. All other requirements of this article shall be met within areas receiving the transferred intensities.

2.   Occupied habitat and habitat buffers in excess of ten percent of the entire property acreage may be used to fulfill any applicable minimum open space requirements at a ratio of one unit habitat and habitat buffer to 1½ units required open space (1:1.5). In no event shall this credit be interpreted to reduce any required buffer zone.

5.04.07. *Eagle nesting site.* Future development in the vicinity of eagle nesting sites shall meet the habitat management criteria as published by the U.S. Fish and Wildlife Service in the Eagle Management Guidelines. Development near other threatened or endangered species habitats as determined in response to policy 10.1.5.1, shall be reviewed and the impact evaluated according to the habitat management criteria of the U.S. Fish and Wildlife Service and the state fish and wildlife conservation commission.

(Ord. No. 94-112, exh. A(5.04), 1-18-1994)


## Sec. 5.05. Flood hazard management and floodplain protection.

5.05.01. *Objectives.* The objectives of this section are to:

a.   Protect human life and health;

b.   Minimize expenditure of public money for costly flood-control projects;

c.   Minimize the need for rescue and relief efforts associated with flooding and generally undertaken at the expense of the general public;

d.   Minimize prolonged business interruptions;

e.   Minimize damage to public facilities and utilities such as water and gas mains, electric, telephone and sewer lines, streets an bridges located in floodplains;

f.   Help maintain a stable tax base by providing for the sound use and development of floodprone areas in such a manner as to minimize flood blight areas;

g.   Ensure that potential home buyers are notified that property is in a flood area; and

h.   Comply with the requirements of the national flood insurance program so as to ensure the availability of flood insurance for residents and property owners.

5.05.02. *Scope.* This section shall apply to all areas of the special flood hazard within the town's jurisdiction.

5.05.03. *Compliance.*

a.   No structure or land shall hereafter be located, extended, converted or structurally altered without full compliance with the terms of this section and other applicable regulations.

b.   Violation of the provisions of this section or failure to comply with any of its requirements, including violation of conditions and safeguards established in connection with grants of variance or special exceptions, shall constitute an offense.

5.05.04. *Interpretation.*

a.   This section is not intended to repeal, abrogate, or impair any existing easements, covenants, or deed restrictions. However, where this section and another section conflict or overlap, whichever imposes the more stringent restrictions shall prevail.

b.   In the interpretation and application of this section, all provisions shall be considered as minimum requirements, liberally construed in favor of the town, and deemed neither to limit nor repeal any other powers granted under state statutes.

c.   The degree of flood protection required by this section is considered reasonable for regulatory purposes and is based on scientific and engineering consideration. Larger floods can and will occur on rare occasions. Flood heights may be increased by manmade or natural causes. This section does not imply that land outside the areas of special flood hazard or uses permitted within such areas will be free from flooding or flood damages. This section shall not create liability on the part of the town or by any officer or employee thereof for any flood damages that result from reliance on this section or any administrative decision lawfully made hereunder.

5.05.05. *Definitions.* The following words, terms and phrases, when used in this article, shall have the meanings ascribed to them in this section, except where the context clearly indicates a different meaning:

*Addition,* to an existing building, means any walled and roofed expansion to the perimeter of a building in which the addition is connected by a common load-bearing wall other than a firewall. Any walled and roofed addition which is connected by a firewall or is separated by independent perimeter load-bearing walls is new construction.

*Areas of special flood hazard* means, in the absence of a flood insurance rate map issued by the Federal Emergency Management Agency (FEMA), the areas including, at minimum, the following:

1.   Identified wetlands;

2.   Low-lying areas along the shores of takes and streams;

3.   Areas subject to shallow flooding during intense storms; and

4.   Areas known to have flooded historically.

As portrayed on maps issued by FEMA, the term "area of special flood hazard" means the area that is anticipated to be inundated by the base flood.

*Base flood* means the flood having a one percent chance of being equaled or exceeded in any given year.

*Basement* means that portion of a building having its floor subgrade, below ground level, on all sides.

*Building* means any structure built for support, shelter, or enclosure for any occupancy or storage.

*Development* means any manmade change to improved or unimproved real estate including, but not limited to, buildings or other structures, mining, dredging, filling, grading, paving, excavating, drilling operations, or permanent storage of materials or equipment.

*Flood* or *flooding* means a general and temporary condition of partial or complete inundation of normally dry land areas from:

1. The overflow of inland or tidal waters.

2. The unusual and rapid accumulation or runoff of surface waters from any source.

The term *"flood"* also means the top surface of an enclosed area in a building, including the basement, i.e., the top of slab in concrete slab construction or the top of wood flooring in wood frame construction. The term "flood" does not mean and include the floor of a garage used solely for parking vehicles.

*Flood hazard boundary map* (FHBM) means an official map of a community, issued by the Federal Emergency Management Agency, where the boundaries of the areas of special flood hazard have been defined as zone A.

*Flood insurance rate map* (FIRM) means an official map of a community, on which the Federal Emergency Management Agency has delineated both the areas of special flood hazard and the risk premium zones applicable to the community.

*Flood insurance study* is the official report provided by the Federal Emergency Management Agency. The report contains flood profiles, as well as the flood boundary floodway map and the water surface elevation of the base flood.

*Floodway* means the channel of a river or other watercourse and the adjacent land areas that must be reserved in order to discharge the base flood without cumulatively increasing the water surface elevation more than one foot.

*Highest adjacent grade* means the highest natural elevation of the ground surface, prior to construction, next to the proposed walls of a building.

*Historic structure* means any structure that is:

1. Listed individually in the National Register of Historic Places, a listing maintained by the department of interior, or preliminarily determined by the Secretary of the Interior as meeting the requirements for individual listing on the national register.

2. Certified or preliminarily determined by the Secretary of the Interior as contributing to the historical significance of a registered historic district or a district preliminarily determined by the Secretary to qualify as a registered historic district.

3. Individually listed on a state inventory of historic places in states with historic preservation programs which have been approved by the Secretary of the Interior; or

4. Individually listed on a local inventory of historic places in communities with historic preservation programs that have been certified either:

   (a) By an approved state program as determined by the Secretary of the Interior; or

   (b) Directly by the Secretary of the Interior in states without approved programs.

*Lowest floor* means the lowest floor of the lowest enclosed area, including the basement. The term "lowest floor" does not mean and include an unfinished or flood resistant enclosure, usable solely for parking of vehicles, building access or storage in an area other than a basement area, provided that such enclosure is built in compliance with other applicable flood damage reduction standards.

*Manufactured home* means a building, transportable in one or more sections, which is built on a permanent chassis and designed to be used with or without a permanent foundation when connected to the required utilities.

The term "manufactued home" also means and includes park trailers, travel trailers, and similar transportable structures placed on a site for 180 consecutive days or longer and intended to be improved property.

*New construction* means any structure for which the start of construction commenced after the effective date of the ordinance from which this LDC is derived. The term "new construction" also means and includes any subsequent improvements to such structure.

*Recreational vehicle* means a vehicle which is:

1.   Built on a single chassis;

2.   Four hundred square feet or less when measured at the largest horizontal projection;

3.   Designed to be self-propelled or permanently towable by a light duty truck; and

4.   Designed primarily not for use as a permanent dwelling, but as temporary living quarters for recreational, camping, travel, or seasonal use.

*Start of construction,* for other than new construction or substantial improvements under the Coastal Barrier Resources Act (P.L. 97-348), means and includes substantial improvement, and means the date the building permit was issued, provided the actual start of construction, repair, reconstruction, or improvement was within 180 days of the permit date. The term "actual start" means the first placement of permanent construction of a building, including a manufactured home on a site, such as the pouring of slabs or footings, installation of piles, construction of columns, or any work beyond the stage of excavation or the placement of a manufactured home on a foundation. The term "permanent construction" does not mean and include:

1.   Land preparation, such as clearing, grading and filling;

2.   The installation of streets and or walkways;

3.   Excavation for a basement, footings, piers or foundations or the erection of temporary forms; and

4.   The installation on the property of accessory buildings, such as garages or sheds not occupied as dwelling units or not part of the main building.

For a substantial improvement, the term "actual start of construction" means the first alteration of any wall, ceiling, floor, or other structural part of a building, whether or not that alteration affects the external dimensions of the building.

*Structure* means a walled and roofed building that is principally above ground, a manufactured home, a gas or liquid storage tank, or other manmade facilities or infrastructures.

*Substantial damage* means damage of any origin sustained by a structure whereby the cost of restoring the structure to its before damaged condition would equal or exceed 50 percent of the market value of the structure before the damage occurred.

*Substantial improvement* means any combination of repairs, reconstruction, alteration, or improvements to a building, including electrical, plumbing and heating/air conditioning, taking place during a two-year period, in which the cumulative cost equals or exceeds 50 percent of the market value of the building. The market value of the building should be:

1.   The appraised value of the building prior to the start of the initial repair or improvement; or

2.   In the case of damage, the value of the building prior to the damage occurring.

The term "substantial improvement" also means and includes structures which have incurred substantial damage, regardless of the actual repair work performed. For the purposes of this definition, the term "substantial improvement" means when the first alteration of any wall, ceiling, floor, or other structural part of the building commences, whether or not that alteration affects the external dimensions of the building. The term "substantial improvement" does not mean and include any project for improvement of a building required to comply with

Created: 2022-09-16 13:47:38 [EST]

existing health, sanitary, or safety code specifications which have been identified by the LDC enforcement official, which have been cause for issuance of a citation or condemnation, and which are solely necessary to ensure safe living conditions.

*Variance* is a grant of relief from the requirements of this LDC which permits construction in a manner otherwise prohibited by this LDC where specific enforcement would result in unnecessary hardship.

5.05.06. *Building standards for flood damage reduction.* In areas of special flood hazard the following provisions shall apply to new construction or substantial improvement of buildings and structures:

a.   New construction and substantial improvements shall be:

   1.   Elevated at least two feet above the base flood elevation;

   2.   Designed or modified and adequately anchored to prevent flotation, collapse or lateral movement of the structure;

   3.   Constructed with materials and utility equipment resistant to flood damage; and

   4.   Constructed by methods and practices that minimize flood damage.

b.   Manufactured homes shall be elevated at least two feet above the base flood elevation and shall be anchored to prevent flotation, collapse, or lateral movement. Methods of anchoring may include, but are not limited to, use of over-the-top or frame ties to ground anchors. This standard shall be in addition to and consistent with applicable state requirements for resisting wind forces.

c.   Electrical, heating, ventilation, plumbing, air conditioning equipment, and other service facilities shall be designed and/or located so as to prevent water from entering or accumulating within the components during conditions of flooding.

d.   New and replacement water supply systems shall be designed to minimize or eliminate infiltration of floodwaters into the system.

e.   New and replacement sanitary sewerage systems shall be designed to minimize or eliminate infiltration of floodwaters into the systems and discharges from the systems into floodwaters.

f.   On-site waste disposal systems shall be located and constructed to avoid impairment to them or contamination from them during flooding, and shall be restricted as specified by the county department of health and the state department of environmental protection.

g.   Any alteration, repair, reconstruction or improvements to a structure which is in compliance with the provisions of this section, shall meet the requirements of new construction as contained in this section.

h.   Any alteration, repair, reconstruction or improvements to a building which is not in compliance with the provisions of this section, shall be undertaken only if said nonconformity is not furthered, extended, or replaced.

i.   The flood-carrying capacity of a watercourse shall not be diminished by any relocation or alteration or bridge construction.

j.   Adequate drainage paths shall be provided around structures to guide stormwater runoff away from them.

k.   Any development within an area of special flood hazard will maintain the natural topography and hydrology of the development site.

l.   Structures that represent a minimal investment, that are not used for human habitation, and that are subordinate to and accessory to the primary structure or use on the property, e.g., storage sheds, detached garages, gazebos, and barns, may be exempted from the elevation requirements, provided the other standards in this section are met.

m.   All recreational vehicles placed on sites must either be fully licensed and ready for highway use, or the recreational vehicle must be installed as a manufactured home. A recreational vehicle is ready for highway use if it is on its wheels or jacking system, is attached to the site only by quick disconnect type utilities and security devices and has no permanently attached structures.

n.   Historic buildings are exempt from the elevation and other standards of this section, provided written documentation is provided from the state historic preservation officer that the proposed repairs or rehabilitation will not preclude the building's continued designation as a historic structure.

5.05.07.  *Standards for subdivision proposals and other large developments.* Proposals for subdivisions and other large developments, including shopping centers, industrial parks and complexes, public facilities and manufactured home parks and subdivisions, shall:

a.   Be designed and located so as to minimize future flood damages both onsite and on lands affected by the development.

b.   Have public utilities and facilities such as sewer, gas, electrical and water systems located and constructed to minimize flood damage.

c.   Have adequate drainage provided to reduce exposure to flood hazards.

d.   Have base flood elevation data developed in accordance with standard engineering practices when the development is greater in size than 50 lots or five acres. Such data shall be provided to the Federal Emergency Management Agency within six months.

e.   Have the base flood boundary and the base flood elevation for the building site on each lot clearly marked on all recorded subdivision plats and approved site development plans.

(Ord. No. 94-112, exh. A(5.05), 1-18-1994)

## Sec. 5.06. Potable water wellfield protection.

5.06.01.  *Purpose and intent.* The purpose and intent of this section is to safeguard the health, safety and welfare of the citizens of the town. The availability of adequate and dependable supplies of potable quality water is of primary importance to the future of the town. Therefore, standards are prescribed in this section with the intent of protecting both the quantity and quality of the groundwater supply. It is further the intent of this section to control development near and adjacent to designated wellheads to protect water supplies from potential contamination.

5.06.02.  *Establishment of wellhead protection area.* A zone of protection for potable water wellfields is established. Limitations upon activity within the zone of protection are specified in this section. The regulations set out in this section shall apply to all lands within 1,000 feet of the wells identified on figure 8-1 of the town's comprehensive plan.

5.06.03.  *Restrictions within the wellhead protection area.*

a.   Except as otherwise provided in this section, any new nonresidential use, handling, production or storage of hazardous substances shall be prohibited within the wellhead protection area. Any existing nonresidential use, handling, production or storage of hazardous substances shall be considered a nonconforming activity.

b.   Except as otherwise provided in this section, the following uses and activities shall be setback from the wells identified on figure 8-1 of the town's comprehensive plan:

1.   Septic tanks: 200 feet.

2.   Drainage retention areas: 300 feet.

3.   Sewage treatment facilities, landfills, commercial animal facilities, underground or above ground storage tanks containing regulated substances: 500 feet.

4.   Excavation into the aquifer: 1,000 feet.

c.   Any nonconforming land use located within 200 feet of a well serving the public will not be permitted to expand or be improved.

d.   The following activities or uses are exempt from the provisions of this section:

1.   The transportation of any hazardous substance through protection zone.

2.   Agricultural and silvicultural uses, except that said uses shall comply with F.S. § 487.2011 et seq., the Florida Agricultural Worker Safety Act, and F.A.C. 5E-2.011 et seq.

3.   The use of any hazardous substance solely as fuel in a vehicle fuel tank or as lubricant in a vehicle.

4.   Fire, police, emergency medical services, governmental emergency management center facilities, and public utilities.

5.   Storage tanks which are constructed and operated in accordance with the storage tanks regulations as set forth in F.A.C. chs. 62-761 and 62-762.

6.   Geotechnical borings.

7.   Residential activities.

(Ord. No. 94-112, exh. A(5.06), 1-18-1994)


## Sec. 5.07. Groundwater recharge areas.

5.07.01. *Purpose and intent.* The purpose and intent of this section is to safeguard the health, safety and welfare of the citizens of the town. The availability of adequate and dependable supplies of potable quality water is of primary importance to the future of the town. Therefore, standards are prescribed in this section with the intent of protecting both the quantity and quality of the groundwater supply. This is accomplished by prohibiting certain uses that threaten to pollute the state aquifer, establishing limitations upon impervious surface coverage created by development. It is also the purpose of this section to provide standards necessary to protect the recharge capabilities of areas of prime aquifer recharge to the state aquifer and to minimize the risk of aquifer contamination from pollution.

5.07.02. *Applicability.* The requirements of this section shall apply to all areas of high recharge as identified and within prime groundwater recharge areas to the state aquifer, as defined by the St. Johns River water management district. Requirements of general application shall apply in all areas of the town.

5.07.03. *Establishment of groundwater protection area.* There is hereby established a groundwater protection area consisting of all aquifer recharge areas to the state aquifer as identified by the St. Johns River water management district.

5.07.04. *Exemptions.* The following activities or uses are exempt from the provisions of subsection 5.07.03:

a.   The transportation of any hazardous substance through an aquifer protection zone.

b.   Agricultural and silvicultural uses, other than cattle and dairy feedlots, except that said uses shall comply with F.S. § 487.2011 et seq., the Florida Agricultural Worker Safety Act, and F.A.C. 5E-2.011 et seq.

c.   The use of any hazardous substance solely as fuel in a vehicle fuel tank or as lubricant in a vehicle.

   d.  Fire, police, emergency medical services, governmental emergency management center facilities, and public utilities.

   e.  Storage tanks which are constructed and operated in accordance with the storage tanks regulations as set forth in F.A.C. chs. 62-761 and 62-762.

   f.  Geotechnical borings.

5.07.05. *Restrictions within the groundwater protection area.*

   a.  Upon identification of prime groundwater recharge areas to the Florida aquifer by the St. Johns River water management district, the following uses shall be prohibited within such areas:

      1.  Auto salvage and junkyards;

      2.  Landfills; and

      3.  Underground storage of toxic materials and hazardous waste sites.

   b.  Development standards. All development within the groundwater protection areas shall be designed, constructed and maintained so that total impervious surface, including but not limited to, buildings, houses, parking lots, garages, accessory buildings, driveways, pools, and walkways is limited to 25 percent of the land area of the entire site.

5.07.06. *Restrictions of general application.*

   a.  All development using septic tank systems shall comply with the requirements of the county septic tank maintenance program and the applicable rules of the state department of environmental protection.

   b.  All developments with storage tanks on site shall comply with the county storage tank ordinance.

(Ord. No. 94-112, exh. A(5.07), 1-18-1994)


## Sec. 5.08. Trees.

5.08.01. *Purpose.* Trees are vital to the town's beauty and character. It shall be unlawful for any person to kill, remove, destroy, or cause to be killed, destroyed or substantially injured or defaced any of the protected trees as designated herein, without permit.

5.08.02. *Tree permit required for removal of protected trees.*

(a)  *Permit, when required.*

   (1)  No person, agent or representative thereof, directly or indirectly, shall cut down, remove, damage or destroy, or shall authorize the cutting down, removal, damage, or destruction of any protected tree on any private property located in the Town of McIntosh, Florida without first obtaining a tree permit as provided herein.

   (2)  Tree trimming or pruning shall be conducted in such a manner as to enhance and protect the life of the tree being trimmed. Any trimming/pruning other than that routinely performed as part of seasonal care shall require a tree permit as provided herein.

(b)  *Tree permit application requirements.* The property owner or authorized agent shall submit a tree permit application to the town manager/clerk on the town's tree permit application form. The town manager/clerk shall retain the original tree permit application and submit a copy of the tree permit application to the tree preservation committee. A tree permit application shall include supporting documents and plans to provide adequate description and information to verify the intended tree activity, site conditions, proposed construction and work specification in order to issue a tree permit.

(c)   *Plan requirements.* Plans submitted with a tree permit application shall comply with the following:

   (1)   Plans in conjunction with new construction. Plans for a tree permit in conjunction with new construction, including, but not limited to, demolition, additions, pools, and decks shall include:

      a.   A site plan drawn to scale, or existing property survey prepared by the property owner or the property owner's representative, identifying the location of the tree(s), the species, and listing the height, spread, and diameter of all existing trees. The site plan may be limited to the immediate area of the proposed work.

      b.   A tree disposition plan drawn to scale, prepared by the property owner or the property owner's representative, or such plan incorporated onto an existing property survey, listing all existing trees and specifying the condition of each tree and whether said trees are to remain, to be removed, and/or to be relocated. The tree disposition plan shall also illustrate the location of all existing structures and all proposed new construction, the location of any overhead and/or underground utilities, and the new locations of existing trees to be relocated on site, to include a plan to protect the existing trees during and after construction activities.

   (2)   Plans for a tree permit unrelated to construction shall be drawn to scale using a site plan or existing property survey prepared by the property owner or the property owner's authorized representative.

(d)   *Review of application.* Upon receipt of a completed tree permit application, the tree preservation committee shall review the tree permit application for compliance with the conditions, regulations, and criteria set forth in this section. Such review may include a field inspection of the site by one or more designated member(s) of the tree preservation committee, and referral of the application to other departments or agencies, as may be necessary. Upon completion of the review process, the tree preservation committee shall set a public hearing and give reasonable notice of the hearing to the applicant.

(e)   *Issuance of permit.* Should the tree preservation committee, at a public hearing, determine that the conditions, regulations, and criteria of this section have been met for issuance of a tree permit, the tree preservation committee shall, at a public hearing, issue in writing the tree permit. If, however, the conditions, regulations and criteria have not been met, then denial of the tree permit shall be issued in writing at a public hearing. Written-issuance of the tree permit, or denial of the application, shall be provided by the tree preservation committee secretary the town manager/clerk within seven business days of the determination.

(f)   *Tree permit application fee.* The fee for each tree permit application shall be established by town council at a public meeting and by resolution.

(g)   *Tree permit term.* Any tree permit issued under this section is effective for 60 days from the date of issuance. All tree activities implemented pursuant to a tree permit must be completed prior to the end of the 60-day term, including removal of any debris resulting from the permitted tree activities. Should the property owner or applicant fail to perform the tree activities pursuant to the applicable tree permit within that time, the property owner may apply for an extension to complete the project.

5.08.03. *Criteria and conditions for tree permits.*

(a)   *Criteria for tree permits.* In determining whether a tree permit should be issued, the tree preservation committee will consider the following criteria:

   (1)   Whether the tree is located in the buildable area or yard area where a structure or improvement may be placed and the tree unreasonably restricts the permitted use of the property.

   (2)   Whether the tree is in danger of falling; interferes with utility services; creates unsafe vision clearance within a sight triangle or other legal right-of-way; or materially impairs the structural integrity of an existing structure.

(3) Whether the tree is deemed a high-risk tree, fatally diseased or dead. The tree preservation committee may require supporting documentation confirming that the tree is a high-risk tree, fatally diseased or dead and cannot be abated by other means (i.e. pruning, trimming, fruit removal, removal of hazardous limbs); photographs of the tree(s) showing the conditions, signs, or symptoms of the tree; any laboratory analysis or relevant scientific literature; and any other potential supporting documentation.

(4) Whether the tree creates a health hazard; interferes with native tree species; or creates a negative impact on natural land features such as geological, historical, or archeological features.

(b) *Conditions for issuance of a tree permit.* Any or all of the following conditions may be required by the tree preservation committee prior to issuance of a tree permit:

(1) The applicant may be required to redesign the project to preserve specimen tree(s) or any other tree determined by the tree preservation committee to be of substantial value because of its species, age, form and/or historical significance, and to provide an alternate plan that includes the adequate preservation of said tree(s) and design alterations within the scope and intent of the initially proposed plan.

(2) The tree preservation committee may require that the applicant provide a written report from a certified arborist before making any determinations in conjunction with this section.

5.08.04. *Protected tree species; violations.* The following trees are hereby designated worthy of and requiring protection in the town and are designated protected species:

(a) The following trees which are more than eight inches in diameter as measured at a distance of six feet above the ground:

| Common Name | Botanical Name |
|---|---|
| Live Oak | *Quercus virginiana* |
| White Oak | *Quercus alba* |
| Magnolia | *Magnolia grandiflora* |
| Cypress | *Taxodium distichum* |
| Cabbage Palm | *Sabal palmetto* |
| Sycamore | *Platanus occidentalis* |
| Red Maple | *Acer rebrum* |
| Shumard Oak | *Quercus shumardii* |
| Any and all "heritage trees" as registered through federal, state or local agencies | |

(b) The following trees which are more than six inches in diameter as measured at a distance of four feet above the ground:

| Common Name | Botanical Name |
|---|---|
| Dogwood | *Cornus florida* |
| Holly | *Ilex opaca* |
| Red Bud | *Circis canadensis* |
| Crepe Myrtle | *Lagerstroemia indica* |

(c) It is a violation of this section for any person, utility, company, employee of any company, agent, or representative, to damage, kill, remove, destroy, or caused to be damaged, killed, removed, destroyed, or substantially injured, any protected tree.

Created: 2022-09-16 13:47:38 [EST]

5.08.05. *Enforcement.* Violation of this section by any person, utility, company, employee of any company, or agent, or representative, shall be punishable by a fine not to exceed $500.00 for each offense. Each incident of damage to a protected tree without a permit shall be considered an individual separate offense, and each tree killed, removed, destroyed, or caused to be damaged, killed, removed, destroyed, or substantially injured in violation of this section shall be considered an individual and separate offense subject to said fine. Within seven (7) business days following the tree preservation committee meeting, the tree preservation committee secretary shall provide recommendation(s) of the subject fine to the town manager/clerk in writing for a decision to approve or deny, to be followed with notification by the town manager/clerk within a reasonable amount of time via certified mail to the alleged violator.

5.08.06. *Appeals.* Within 30 days after any decision is made by the town manager/clerk in the enforcement and interpretation of this section, but not thereafter, the applicant may appeal to the town council which, by majority vote, may affirm, reverse, or modify the decision(s) for reasons given in writing. Any aggrieved party may appeal any decision rendered under this section by the town council within the time prescribed by the state rules of appellate procedure.

5.08.07. *Prohibitions under Florida Statute.* This section of the Historic Town Land Development Code is subject to the requirements and prohibitions set forth in Florida Statute § 163.045, entitled "Tree pruning, trimming, or removal on residential property".

5.08.08. *Municipal Rights and Duties.* Notwithstanding the provisions of Section 5.08, subject to the requirement that it must act in good faith, the town manager/clerk, designated as administrative official, has the authority including oversight and maintenance over its streets, including parks, rights-of-way, and all town owned property or space occupied by trees in the interest of public safety, convenience or health, may act upon trimming, pruning, planting or removal of trees, when necessary, in connection with making improvements on the street or removing an obstruction to travel, to improve and render a safe area, to carry out a plan or system of improvements of streets, sidewalks, to prevent the roots of trees from clogging a water/sewer system, or to aid and promote the work of public utilities. To the best of the town's ability, public trees will be planted, maintained, and removed pursuant to the guidelines and voluntary industry consensus standards provided in the American National Standards Institute (ANSI) A300 "Standards for Tree Care Operations".

(Ord. No. 92-107, § 7, 7-23-1992; Ord. No. 95, § 1, 9-5-1985; Ord. No. 94-112, exh. A(5.08), 1-18-1994; Ord. No. 97-120, § 7, 1-2-1997; Ord. No. 2022-01 , §§ 1—6, 7-14-2022)

## ARTICLE VI. DEVELOPMENT DESIGN AND IMPROVEMENT STANDARDS

### Sec. 6.00. General provisions.

6.00.01. *Purpose.* The purpose of this article is to provide development design and improvement standards applicable to all development activity within the town.

6.00.02. *Responsibility for improvements.* Unless otherwise specifically provided, all improvement required by this article shall be designed, installed, and paid for by the developer.

6.00.03. *Principles of development design.* The provisions of this article are intended to ensure functional and attractive development. Development design shall first take into account the protection of natural resources as prescribed in article V of this LDC. All development shall be designed to avoid unnecessary impervious surface cover; to provide adequate access to lots and sites; and to avoid adverse effects of shadow, glare, noise, odor, traffic, drainage, and utilities on surrounding properties.

(Ord. No. 94-112, exh. A(6.00), 1-18-1994; Ord. No. 00-136, exh. B(6.00), 1-11-2001)

## Sec. 6.01. Dimensional requirements.

6.01.01. *Generally.* The table at subsection 6.01.02 contains the basic dimensional requirements for all development regulated by this LDC, subject to the following:

    a.    *Supplemental regulations.* Supplemental requirements are contained in section 2.03 of this LDC.

    b.    *Exceptions to height regulations.* The height restrictions contained herein do not apply to spires, belfries, cupolas, antennas, water tanks, ventilators, chimneys, or other appurtenances usually required to be placed above roof level and not intended for human occupancy.

    c.    *Multiple use of required space prohibited.* No part of a yard, or other open space, or off-street parking or loading space required about or in connection with any building for the purpose of complying with this LDC, shall be included as part of a yard, open space, or off-street parking or loading space similarly required for any other building.

    d.    *Reduction of lot area prohibited.* No yard or lot existing at the time of passage of this LDC shall be reduced in dimension or area below the minimum requirements set forth herein. Yards or lots created after the passage of this LDC shall meet at least the minimum requirements established by this LDC.

6.01.02. *Dimensional requirements table.*

| Zoning District | Dimensional Requirements | |
|---|---|---|
| AC | Minimum yard requirements | |
| | Front | 30 feet |
| | Rear | 30 feet |
| | Side | 25 feet |
| | Minimum lot requirements | |
| | Width | 150 feet |
| | Area | Ten acres for single-family; none for all other uses, except as otherwise specified or as necessary to meet other requirements set out within this LDC |
| | Maximum lot coverage by buildings | 15 percent for single-family dwellings and permitted accessory buildings; other permitted or permissible uses are unrestricted |
| | Maximum building height | 35 feet for single-family dwellings except as permitted by section 2.03, supplementary district regulations<br>45 feet for all other permitted or permissible buildings |
| R-1 | Minimum yard requirements | |
| | Front | 25 feet for single-family; 30 feet for all other permitted uses |
| | Rear | 25 feet for single-family; 30 feet for all other permitted uses |
| | Side | 15 feet |
| | Minimum lot requirements | |
| | Width | 100 feet |
| | Area | 21,780 sq. ft. or one-half acre |
| | Maximum lot coverage by buildings | 35 percent |
| | Maximum building height | 35 feet, except as permitted by section 2.03, supplementary district regulations |

| R-2 | Minimum yard requirements | | | | |
|---|---|---|---|---|---|
| | Front | 20 feet for single-family; 25 feet for other permitted or permissible uses | | | |
| | Rear | 20 feet for single-family; 25 feet for other permitted or permissible uses | | | |
| | Side | 10 feet for single-family; 15 feet for other permitted or permissible uses | | | |
| | Minimum lot requirements | | | | |
| | Width | 100 feet for single-family dwellings, site-built, manufactured, and mobile homes; none for all other uses, except as otherwise specified or as necessary to meet other requirements set out herein | | | |
| | Area | 21,780 sq. ft. or one-half acre for all single-family dwellings, site-built, manufactured, and mobile homes; none for all other uses, except as otherwise specified or as necessary to meet other requirements set out herein. | | | |
| | Maximum lot coverage by buildings | 35 percent | | | |
| | Maximum building height | 35 feet, except as permitted by section 2.03, supplementary district regulations | | | |
| R-3 | | S.F. | Duplex | Multifamily | Other Uses |
| | Minimum yard requirements | | | | |
| | Front | 25 feet | 25 feet | 25 feet | 25 feet |
| | Rear | 25 feet | 25 feet | 25 feet | 25 feet |
| | Side | 15 feet | 15 feet | 15 feet | 15 feet |
| | Minimum lot requirements | | | | |
| | Width: | 90 feet | 100 feet | 100 feet | 100 feet |
| | Area: | 15,000 | 15,000 | 21,870[1] | 15,000 sq. ft |
| | Maximum lot coverage by buildings | 35 percent | 35 percent | 35 percent | 35 percent |
| | Maximum building height | 30 feet | 35 feet | 35 feet | 30 feet |
| R-4 | Minimum yard requirements | | | | |
| | Front | 25 feet for single-family; 30 feet for all other permitted uses | | | |
| | Rear | 25 feet for single-family; 30 feet for all other permitted uses | | | |
| | Side | 15 feet | | | |
| | Minimum lot requirements | | | | |
| | Width | 100 feet | | | |
| | Area | 21,780 sq. ft. or one-half acre | | | |
| | Maximum lot coverage by buildings | 35 percent | | | |
| | Maximum building height | 35 feet, except as permitted by section 2.03, supplementary district regulations | | | |
| MHP | | Mobile Homes | | All Other Uses | |
| | Minimum yard requirements | | | | |
| | Front in feet | 10 feet | | 15 feet | |
| | Rear in feet | 10 feet | | 15 feet | |

Created: 2022-09-16 13:47:38 [EST]

|    |    |    |    |    |
|----|----|----|----|----|
|    | Side in feet | 8 feet | | 10 feet |
|    | Minimum lot requirements | | | |
|    | Width | 45 feet | | None |
|    | Area in sq. ft. | 4,000 | | None |
|    | Maximum lot coverage by buildings | 35 percent | | 45 percent |
|    | Maximum building height | 30 feet | | 30 feet |
| HC | Maximum lot coverage | 50 percent | | |
|    | Maximum building height | 35 feet | | |
| C-1 | | S.F. | Commercial | |
|    | Minimum lot requirements | | | |
|    | Width | 80 feet | 70 feet | |
|    | Area | 18,000 sq. ft. | 7,500 sq. ft. | |
|    | Minimum yard requirements | | | |
|    | Front | 20 feet | 20 feet | |
|    | Rear | 20 feet | 10 feet; 20 feet if adjacent to property zoned residential | |
|    | Side | 10 feet | 15 feet when lot is adjacent to a residentially zoned parcel; otherwise zero feet or 8 feet is allowed | |
|    | Maximum lot coverage by buildings | 35 percent | Unrestricted, except as may be necessary to meet other requirements set out herein | |
|    | Maximum lot coverage | 75 percent | 75 percent | |
|    | Maximum building height | 35 feet | 35 feet | |
| C-2 | | S.F. | Commercial Establishments | All Other Uses |
|    | Minimum lot requirements | | | |
|    | Width | same as R-2 | 100 feet | None |
|    | Area | same as R-2 | 10,000 sq. ft. | None |
|    | Minimum yard requirements | | | |
|    | Front | 20 feet | 20 feet | |
|    | Rear | 20 feet | 10 feet; 15 feet where lot is adjacent to property zoned residential | |
|    | Side | 10 feet | 10 feet; 20 feet if property is adjacent to property zoned residential | |
|    | Maximum lot coverage by buildings | 35 percent | 50 percent | 50 percent |
|    | Maximum building height | 35 feet | 30 feet | 35 feet |
| GU | Minimum lot requirements | | | |
|    | Width | None | | |
|    | Area | None | | |
|    | Minimum yard requirements | | | |
|    | Front | None | | |
|    | Rear | None | | |
|    | Side: | None | | |
|    | Maximum lot coverage | 50 percent | | |

Created: 2022-09-16 13:47:38 [EST]

(Supp. No. 7)

| | | |
|---|---|---|
| | Maximum building height | 35 feet |
| PF | Maximum lot coverage | 50 percent |
| | Maximum building height | 35 feet |
| CO | Maximum lot coverage | 0 percent |

[1];sz=9.5q; Plus 4,000 sq. ft. for each dwelling unit in excess of three.

(Ord. No. 94-112, exh. A(6.01), 1-18-1994; Ord. No. 00-136, exh. B(6.01), 1-11-2001; Ord. No. 2010-175, 4-8-2010)


## Sec. 6.02. Subdivisions.

For the purpose of this section, the term "subdivision" means the division of any tract of land, as it existed when it became a part of the town, into any three or more lots, sites, or parcels, any one of which contains two acres or less in area. The sale or exchange of land to or between adjoining property owners, where such sale or exchange does not create additional lots, shall not be considered a subdivision of land. When a new subdivision is created in the town, the developer shall be responsible for providing roads, water mains, and any required sewers within the subdivision. The developer shall be responsible for roads within a subdivision for one year from the date of construction, at which time the roads may be transferred to the town upon the approval of the town council. Within the subdivision, the individual property owner shall pay for installation of water meters at a rate determined by the town council. Subdivision developers are also responsible for complying with regulations from the state, regional, and county authorities and from the St. Johns water management district.

(Ord. No. 94-112, exh. A(6.02), 1-18-1994; Ord. No. 00-136, exh. B(6.02), 1-11-2001)


## Sec. 6.03. Transportation systems.

6.03.01. *Official street maps.* Figure 3-1 (town existing transportation circulation), and figure 3-2 (town future transportation circulation) of the town comprehensive plan, and any amendments thereto, are hereby made a part of this LDC. These maps shall be the basis for all decisions regarding required road improvements, reservation or dedication of rights-of-way for required road improvements, or access of proposed uses to existing or proposed roadways.

6.03.02. *Rights-of-way.*

a. *Future rights-of-way.* Where roadway construction, improvements, or reconstruction is not required to serve the needs of the proposed development project, future rights-of-way shall nevertheless be reserved for future use. No part of the reserved area shall be used to satisfy minimum requirements of this LDC.

b. *Protection and use of rights-of-way.*

1. No encroachment shall be permitted into existing rights-of-way, except for temporary use authorized by the town.

2. Use of the right-of-way for public or private utilities including, but not limited to, sanitary sewer, potable water, telephone wires, cable TV wires, or electricity transmission, shall be allowed by the town subject to placement specifications and other applicable town regulations and payment of franchise fees to the town.

6.03.03. *Access to lots.*

a. Access to nonresidential uses shall not be through an area designed, approved, or developed for residential use.

b.   All lots in a proposed residential subdivision shall have frontage on and access from an existing street.

c.   Access to all lots in a proposed residential subdivision shall be by way of a residential access or residential subcollector street.

d.   Access points on state roads must be in conformance with chapter F.A.C. chs. 14-96 and 14-97.

e.   The separation between access points onto arterial and collector roadways, or between an access point and an intersection of an arterial or collector with another road, shall be as follows. Access points on county roads shall be subject to the following restrictions:

1.   One access point for ingress and egress purposes shall be allowed to any single property or development.

2.   Two access points shall be allowed if the distance between the two access points exceeds 20 feet.

3.   Three access points shall be allowed if the minimum distance between the third access point and both other access points is at least 100 feet.

4.   More than three access points shall be allowed where a minimum distance of 1,000 feet is maintained between each additional access point and all other access points.

(Ord. No. 94-112, exh. A(6.03), 1-18-1994; Ord. No. 00-136, exh. B(6.03), 1-11-2001)

## Sec. 6.04. Off-street parking and loading.

6.04.01. *Off-street parking required.* Every building, use or structure instituted or erected after the effective date of the ordinance from which this article is derived shall be provided with offstreet parking and loading facilities for the use of occupants, employees, patrons, or visitors in accordance with this section. such offstreet parking shall be maintained and continued as an accessory use as long as the principal use or structure is continued. It shall be unlawful for the owner or operator of any building, structure, or use affected by this article to discontinue, change or dispense with, or to cause the discontinuance or reduction of the required parking facilities apart from the discontinuance, sale, or transfer of such principal structure or use, without establishing alternate parking facilities which meet the requirements of this article. It shall be unlawful for any person, firm, or corporation to utilize such principal building, structure, or use without providing the off-street parking facilities required by this article.

6.04.02. *Location, character, and size of required off-street parking facilities.*

a.   The off-street parking facilities required by this section shall be located on the same lot or parcel of land as the use or structure they are intended to serve, or not more than 300 feet therefrom.

b.   Each parking space required and provided pursuant to the provisions of this section shall be not less than ten feet in width and 18 feet in length.

c.   Each parking space shall be directly accessible from a street or alley, or from an adequate aisle or driveway leading to a street or alley. Access alleys or driveways shall be of sufficient size to permit convenient maneuvering of vehicles, and each space shall be accessible without driving over or through any other parking space. No vehicle shall have to back into a town street or avenue, except for one-family and two-family dwellings.

d.   All required off-street parking facilities shall be arranged for convenient access and safety of pedestrians and vehicles. For nonresidential uses and structures in the C-1 community business district, aisles or driveways shall be placed so that vehicles enter and exit the required off-street parking facilities from either U.S. 441 or from roads running east and west, i.e., avenues. Vehicles shall not enter or exit such required off-street parking facilities from roads running north and south, i.e., streets,

with the exception of U.S. 441, in order to preserve the character of surrounding residential neighborhoods.

e.   The required off-street parking facilities shall be identified as to purpose and location when such purpose and location is not clearly evident from a road or alley.

f.   Required off-street parking facilities, including access alleys and driveways, shall be surfaced with a hard, dustless material and maintained in good condition.

g.   All required off-street parking facilities shall be drained so as not to cause any nuisance to adjacent or public property, and all lighting thereon shall be so arranged and designed as to prevent and glare or excessive light on adjacent property.

h.   In addition to the foregoing, all off-street parking facilities shall comply with the town public works manual.

i.   Every application for a building permit for any use or structure required to provide offstreet parking facilities shall include a plan clearly and accurately designating the required parking spaces, access aisles and driveways, and the relation of such items to the uses or structures these off-street parking facilities are designed to serve.

6.04.03. *Minimum amount of off-street parking required.* The off-street parking required by this section shall be provided and maintained on the basis of the following minimum requirements:

a.   *Dwellings, single-family site-built, manufactured homes,* and *mobile homes.* One parking space for each dwelling unit.

b.   *Dwellings, two-family* and *multiple-family.* One parking space for each dwelling unit.

c.   *Mobile home parks, travel trailer parks* and *camps, motels, cabins, etc.* One parking space for each site or guest room.

d.   *Theaters* and *other places or assembly having fixed seats.* One parking space for each five seats

e.   *Places of public assembly, including the community center, assembly halls,* and *libraries.* One parking space for each seven seats or one parking space for each 200 square feet of gross floor area used by the guests, patrons or other occupants, whichever is greater.

f.   *Houses of worship.* One parking space for each eight seats in auditorium, exclusive of Sunday school classrooms.

g.   *Medical, dental, chiropractic, etc. clinics in separate buildings.* Three parking spaces for each doctor or other health service professional.

h.   *Business, professional,* and *governmental offices.* One parking space for each 600 square feet of floor area.

i.   *Retail establishments* and *personal service shops.* One parking space for each 400 square feet of floor area.

j.   *Restaurants, etc.* One parking space for each four seats for customer service.

k.   *Warehouse* and *storage buildings.* One parking space for each 600 feet of floor area.

l.   *Uses not specifically mentioned.* It is the intent of this article to require off-street parking for all uses, thus requirements for uses not specifically mentioned shall be the same as for the use most similar to the one proposed.

m.   *Regulations.* In determining the number of off-street parking spaces required by this article, the following regulations shall apply:

1.  When measurement to determine required off-street parking results in requirement of a fractional space, any fraction greater than one-half shall require a full off-street parking space.

2.  In the case of mixed uses, the total requirements for off-street parking shall be computed separately for each use and off-street parking required for one use shall not be considered as required off-street parking for another use.

3.  For the purposes of this section, floor area shall mean gross floor area inside the exterior walls.

4.  In houses of worship and other places of assembly utilizing pews, each 20 lineal inches of such seating facilities or major fraction thereof shall be considered one seat for the purposes of this section.

5.  Irrespective of other requirements of this section, each separate and individual store, office, or other business shall be provided with at least one off-street parking space.

6.04.04. *Combined off-street parking.* Nothing in this section shall be construed to prevent joint provision or use of off-street parking facilities by two or more buildings or uses, or two or more owners or operators, provided that the total of spaces provided in such combined parking facilities shall not be less than the sum of the requirements of the several individual uses or buildings, computed separately in accordance with this article.

6.04.05. *Nonconforming uses.* Where major repairs, alterations, or extensions of use are to be made in a building occupied by a nonconforming use, no such repairs, alterations, or extensions shall be permitted, unless and until the off-street parking requirements of this section, for a new use of the type involved, are applied to the existing use and off-street parking facilities are fully provided for.

6.04.06. *Off-street loading facilities.*

On the same tract with every structure or use hereafter erected or instituted, there shall be provided and maintained adequate space for loading and unloading of materials, goods, or things for delivery or shipment, so that vehicles engaged in these activities will not encroach on or interfere with public use of streets and alleys by vehicles and pedestrians.

Where any structure is enlarged or any use is extended so that the size of the resulting occupancy comes within the scope of these provisions, the full amount of off-street loading space required shall be supplied and maintained.

For the purposes of this section, an off-street loading space shall be considered to be an area at least ten feet wide by 30 feet long with 12 feet vertical clearance. Each required off-street loading space shall be directly accessible from a street or alley without crossing or entering any other required off-street parking or loading space and shall also be accessible from the interior of the building to be served. No required off-street loading space shall occupy any required off-street parking spaces.

a.  Off-street loading spaces shall be required as follows:

1.  For all commercial and warehouse uses:

| Square Feet | Number of Spaces |
| --- | --- |
| 5,000—25,000 | 1 |
| 25,001—60,000 | 2 |
| 60,001—120,000 | 3 |
| 120,001—200,000 | 4 |
| 200,001—290,000 | 5 |

2. For each assembly hall, motel, office building, or similar use which has a gross floor area of: over 10,000 square feet to 40,000 square feet, one space; plus for each additional 60,000 square feet or major fraction thereof over the original 40,000 square feet, one additional space.

b. Off-street loading facilities required to meet the needs of one use shall not be considered as meeting the needs of any other use.

c. Nothing in this section shall be construed to prevent the joint or collective provision of off-street loading facilities for two or more uses or buildings, provided the requirements of this section are fulfilled.

d. Off-street loading facilities shall be plainly marked on applications for permits and shall be maintained at all times as off-street loading areas.

e. The required off-street loading facilities shall be identified as to purpose and location when such purpose and location is not clearly evident from a road or alley.

(Ord. No. 94-112, exh. A(6.04), 1-18-1994; Ord. No. 00-136, exh. B(6.04), 1-11-2001)

## Sec. 6.05. Stormwater management.

All development shall provide for adequate drainage and stormwater management. Compliance with the stormwater management requirements of the St. John's river water management district, F.A.C. chs. 40C-4 and 40C-40, shall constitute compliance with this provision and with the provisions of the town's comprehensive plan which relate to stormwater management.

(Ord. No. 94-112, exh. A(6.05), 1-18-1994; Ord. No. 00-136, exh. B(6.05), 1-11-2001)

## Sec. 6.06. Signs.

6.06.01. *Intent.* The provisions of this section shall govern the number, sizes, location, and characteristics of all signs which may be permitted as a main or accessory use under the terms of this article. No sign shall be permitted or erected in any location, either as a main or an accessory use, except in accordance with the provisions of this section. These regulations are intended to:

(1) Minimize distractions to motorists and prevent interference with traffic safety; and

(2) Preserve the town's scenic and aesthetic characteristics.

6.06.02. *General regulations.* The following regulations shall apply to all signs:

a. The surface area of a sign shall be calculated as including the entire area within a regular geometric form or combinations of geometric forms comprising all the display area of the sign and including all the elements of the matter displayed.

b. Frames and structural members not bearing advertising matter shall not be included in the computation of the surface area.

c. All signs shall be located so as not to block or obstruct the view from any vehicle entering or leaving the premises on which the sign is located and shall not obstruct the view from any vehicle using streets adjacent to the property on which such sign is located.

d. Any wood framing used for signs shall be of treated material. All wood material under the surface of the ground shall be pressure treated.

e.  All advertising signs shall be constructed according to the towns' construction code standards.

f.  When the back of any sign is visible from any point outside the property on which the sign is located, the back of such sign shall be painted or shall be treated with material suitable for the preservation of the appearance of such sign.

g.  All signs shall be maintained in good repair. Standards for good repair shall include:

1.  Paint shall not be peeling or flaked;

2.  The sign shall at all times be legible from a distance of 100 feet; and

3.  Signs shall be kept in a vertical, upright position at all times.

6.06.03. *Prohibited signs.* It shall be a violation of these zoning regulations to erect or maintain:

a.  Any sign which constitutes a traffic hazard or detriment to traffic safety by reason of its size, location, movement, content, coloring, or method of illumination;

b.  Any sign erected in such a manner as to obstruct the view of pedestrians;

c.  Any sign using the words "stop," "look," "danger," or any other word, phrase, symbol, or character in such a manner as to confuse, mislead, or interfere with traffic;

d.  Signs which are harmful to minors as defined herein;

e.  Signs located so as to prevent free ingress and egress from any door, window, or fire escape;

f.  Off-site advertising signs, except as specifically permitted by this section.

6.06.04. *Signs permitted in AC, R-1, R-2, and R-4 districts.* Subject to the other provisions of this section, the following signs may be erected in the AC, R-1, R-2, and R-4 districts:

a.  One nonilluminated real estate sign, not to exceed six square feet in area, advertising the sale or rental of the premises upon which it is located.

b.  Bulletin boards for public, charitable, or religious institutions located on the premises of such institution and not exceeding twelve square feet in area.

c.  Nonilluminated signs, not exceeding 20 square feet in area, identifying the architect, engineer, contractor, or subcontractor on the premises of work in progress.

d.  Nonilluminated signs, not exceeding two square feet in area, to prohibit trespassing, for safety, or for caution.

e.  One nonilluminated sign, not exceeding two square feet in area, denoting only the name, address, and business of the occupant of a commercial building, dwelling unit, or public institution.

f.  Flags and insignia of any government, when not displayed in connection with any commercial promotion.

g.  One nonilluminated sign, not exceeding two square feet in area, for purposes of identification at the entrance of a residence, estate, or farm.

h.  On permitted nonresidential uses, other than accessory uses, one sign for purposes of identification, not exceeding 20 square feet in area. Such sign may be either a ground sign or a wall sign.

6.06.05. *Signs permitted in R-3 districts.* Subject to the other provisions of this section, the following signs may be erected in R-3 districts:

a.  Signs as permitted in R-1 districts;

b.  One nonilluminated ground or wall sign, not exceeding 16 square feet in area, on a multiple-family or two-family dwelling for purposes of identification.

6.06.06.  *Signs permitted in C-1, C-2, And MHP districts.* Subject to the other provisions of this section, the following signs may be erected in C-1, C-2, and MHP districts:

a.  Signs as permitted in the R-1 district;

b.  On permitted or permissible nonresidential uses, two on-site signs, each of which shall not exceed 40 square feet in area, for the purpose of advertising.

c.  One off-site sign, which shall not exceed 40 square feet in area, however such off-site sign shall not be permitted on property upon which on-site signs are displayed for the purpose of advertising.

6.06.07.  *Signs permitted in the GU district.* Only signs approved by town council via a resolution may be erected in GU districts. Such signage is not subject to the other provisions of this section.

6.06.08.  *Noncommercial content of signs.* The commercial message allowed on any sign authorized by this section may be replaced with any noncommercial message so long as it is not harmful to minors as defined herein.

6.06.09.  *Signs permitted in the historic preservation/conservation district.* Subject to the other provisions of this section, only signs issued a certificate of appropriateness by the McIntosh Preservation Board may be erected in the historic preservation/conservation district.

6.06.10.  *Signs permitted on property owned by the Town of McIntosh.* Only signs approved by town council via a resolution may be erected on property owned by the Town of McIntosh. Such property shall include public rights-of-way and easements owned by the Town of McIntosh. Such signage is not subject to the other provisions of this section.

(Ord. No. 94-112, exh. A(6.06), 1-18-1994; Ord. No. 00-136, exh. B(6.06), 1-11-2001; Ord. No. 2011-183, §§ 1—3, 12-8-2011)


## Sec. 6.07. Landscaping.

6.07.01.  *Exemption.* Lots or parcels of land on which a single-family home is used as a residence shall be exempt from all provisions of these landscaping regulations.

6.07.02.  *Required landscaping.*

a.  *Vehicle use areas—Perimeter requirements.*

1.  *Perimeter landscaped area.* All vehicular use areas shall be separated by a perimeter landscaped area, a minimum of nine feet in width, from any public right-of-way and from any boundary of the property on which the vehicular use area is located.

2.  *Exceptions.* This landscape area is not required:

(a)  When the paved ground surface area is completely screened from adjacent properties or public rights-of-way by intervening buildings or structures; or

(b)  When an agreement to operate abutting properties as essentially one contiguous parking facility is in force. The agreement shall be executed by the owners of the abutting properties, and shall bind their successors, heirs and assigns. Prior to the issuance of any building permit for any site having such a contiguous parking facility, the agreement shall be recorded in the public records of county; or

(c)  When the paved area is at least 150 feet from the nearest property line; or

(d)   When the required landscape strip would be in conflict with utility installations, and such conflicts cannot be resolved, such areas may be reduced to five feet and planted with shrubs and such understory trees as may be acceptable to the utility.

3.   *Location of perimeter landscape area.* The landscape area shall commence within five feet of the paved surface area, except that when a grass parking area is provided the landscaped strip may be located around such area. Where the perimeter landscape area and a required buffer strip overlap, the more stringent requirements shall be applied, except that the street buffer requirements shall be applied to street frontages not to exceed 300 feet for properties in use for auto sales. Perimeter buffering shall be required for all properties in use for auto sales. Perimeter buffering shall be required for all storage, accessory service and customer parking areas at any auto sales facility.

4.   *Administrative offical determination.* The administrative official may determine the following:

   a.   That screening is better achieved by relocation of the landscape strip;

   b.   There is an unresolvable conflict between other elements of the development plan and the location, width or height of the perimeter landscape area, and that the public interest is therefore best served by relocation of the landscape area, lowering the height of required material or the substitution of a solid fence or wall in conjunction with a reduction in width; or

   c.   That the screening would only serve to emphasize a long driveway that would otherwise be unobtrusive.

5.   *Required plant material.* The perimeter landscape area shall contain:

   a.   Shrubs, arranged to provide a visual screen of 75 percent opacity and achieve a height of at least three feet within three years;

   b.   At least one shade tree, planted for each 50 linear feet, or part thereof, of the boundary of the vehicular use area. The distance between such trees shall not exceed 55 feet.

   c.   The administrative official during development plan review, may determine that natural vegetation is sufficient to screen adjacent properties and rights-of-way. In such instance the existing vegetation, including understory plants and bushes within the required landscaped area shall be protected from pruning and removal, except that diseased plant material and invasive nonnative species may be replaced in accordance with this section.

b.   *Same—Shading requirement.* Trees shall be planted to produce shading that will within 15 years of planting, produce shading such that 50 percent of the paved area receives shade.

c.   *Required landscaped buffer.*

1.   A landscaped buffer is a landscaped strip along parcel boundaries that serves as a buffer between incompatible zoning districts, as an attractive boundary of the parcel or use, or as both a buffer and attractive boundary. This shall not be interpreted to mean that parcels within a planned mixed use development must meet these requirements.

2.   Where required, a landscaped buffer of hardy shrubs not less than five feet in height at planting, or a masonry or wood opaque wall of good quality and design not less than five feet in height, shall be planted or constructed along the property line abutting the incompatible use.

3.   Landscaped buffers shall be required between incompatible zoning districts as indicated in the following table where an X indicates that the landscaped buffer is required and an NR indicates that the landscaped buffer is not required:

Created: 2022-09-16 13:47:38 [EST]

(Supp. No. 7)

| Zoning District | Zoning District | | | | | | | | | | | |
| --- | AC | R-1 | R-2 | R-3 | R-4 | HC | MHP | C-1 | C-2 | GU | CO | PF |
| AC | NR | NR | NR | NR | NR | X | X | X | X | X | X | X |
| R-1 | NR | NR | NR | NR | NR | X | X | X | X | X | X | X |
| R-2 | NR | NR | NR | NR | NR | X | X | X | X | X | X | X |
| R-3 | NR | NR | NR | NR | NR | X | X | X | X | X | X | X |
| R-4 | NR | NR | NR | NR | NR | X | X | X | X | X | X | X |
| HC | X | X | X | X | X | NR | X | X | X | X | X | X |
| MHP | X | X | X | X | X | X | NR | X | X | X | X | X |
| C-1 | X | X | X | X | X | NR | X | NR | NR | X | X | X |
| C-2 | X | X | X | X | X | X | X | NR | NR | X | X | X |
| GU | X | X | X | X | X | X | X | X | X | NR | X | X |
| CO | X | X | X | X | X | X | X | X | X | X | NR | X |
| PF | X | X | X | X | X | X | X | X | X | X | X | NR |

d. *Street trees.*

1. The developer shall plant, within five feet of the right-of-way of each street within a residential development, one shade tree for every 50 linear feet of right-of-way. Except where property on one side of the right-of-way is not owned by the developer, the trees shall be planted alternatively on either side of the street. Existing trees and native tree species that need less water and maintenance are preferred. See section 5.08 of this LDC for tree protection requirements.

2. Trees planted pursuant to this section shall be selected from the approved list of canopy trees as provided in the town public works manual and shall have a minimum overall height of ten to 12 feet at the time of planting. Existing trees and native tree species that need less water and maintenance are preferred.

e. *Use of required areas.* No accessory structures, garbage or trash collection points or receptacles, parking, or any other functional use contrary to the intent and purpose of this LDC shall be permitted in a required landscape area. This does not prohibit the combining of compatible functions such as landscaping and drainage facilities.

6.07.03. *Landscape design and materials.*

a. *Design principles.* All landscaped areas required by this LDC should conform to the following general design principles:

1. Landscaping should integrate the proposed development into existing site features through consideration of existing topography, hydrology, soils and vegetation.

2. The functional elements of the development plan, particularly the drainage systems and internal circulation systems for vehicles and pedestrians, should be integrated into the landscaping plan.

3. Landscaping should be used to minimize potential erosion through the use of ground covers or any other type of landscape material that aids in soil stabilization.

4. Existing native vegetation should be preserved and used to meet landscaping requirements. See section 5.08 of this LDC for tree protection requirements.

5. Landscaping should enhance the visual environment through the use of materials that achieve variety with respect to seasonal changes, species of living material selected, textures, colors and size at maturity.

Created: 2022-09-16 13:47:38 [EST]

6. Landscaping design should consider the aesthetic and functional aspects of vegetation, both when initially installed and when the vegetation has reached maturity. Newly installed plants should be placed at intervals appropriate to the size of the plant at maturity, and the design should use shortterm-and longterm elements to satisfy the general design principles of this section over time.

7. Landscaping should enhance public safety and minimize nuisances.

8. Landscaping should be used to provide windbreaks, channel wind and increase ventilation.

9. Landscaping should maximize the shading of streets and vehicle use areas.

10. The selection and placement of landscaping materials should consider the effect on existing or future solar access, of enhancing the use of solar radiation, and of conserving the maximum amount of energy.

No development plan shall be denied solely on the basis of the design principles in this section.

b. *Installation of plants.*

1. All plants shall be healthy and free of diseases and pests, and shall be selected from the list of approved species contained in the town's public works manual.

2. Plants shall be installed during the period of the year most appropriate for planting the particular species. If compliance with this requires that some or all of the landscaping be planted at a time after the issuance of a certificate of occupancy, the developer shall post a performance bond sufficient to pay the costs of the required, but not yet installed, landscaping before the certificate shall be issued.

3. Landscaping shall be protected from vehicular and pedestrian encroachment by means of raised planting surfaces, depressed walks, curbs, edges, and the like.

4. The landscaping shall not interfere, at or before maturity, with power, cable TV, or telephone lines, sewer or water pipes, or any other existing or proposed overhead or underground utility service.

5. All plants shall be installed according to standards adopted by the town council.

6. The developer shall provide sufficient soil and water to sustain healthy growth of all plants.

c. *Use of native plants.* Forty percent of the total number of individual plants selected from each of the categories of the list of approved species contained in the town's public works manual, canopy, understory, shrub and groundcover, and used to satisfy the requirements of this LDC shall be selected from the list of native species in that category. See section 5.08 of this LDC for tree protection requirements.

d. *Approved plants.* All approved canopy and understory trees, shrubs and groundcovers are listed in the town's public works manual.

e. *Prohibited plants.* All prohibited plants that shall not be installed as landscape material are listed in the town's public works manual.

f. *Irrigation.* All landscaped areas shall be provided with an appropriate irrigation system that conforms to the requirements contained in the town public works manual. If a landscaped area contained primarily species native to the immediate region, or plants acceptable for xeric landscaping, the town may waive the requirement for installation of an irrigation system. Consideration of a waiver of the irrigation requirement shall include, in addition to the area covered by native vegetation, such local conditions as sun or shade, use of fill soil, and depth to water table.

g.   *Nonliving materials.* Mulches shall be a minimum depth of two inches and plastic surface covers shall not be used.

h.   *Maintenance and replacement of plants.*

   1.   All required plants shall be maintained in a healthy, pest-free condition.

   2.   Within six months of a determination by the administrative official that a plant is dead or severely damaged or diseased, the plant shall be replaced by the developer in accordance with the standards specified in this LDC.

(Ord. No. 94-112, exh. A(6.07), 1-18-1994; Ord. No. 00-136, exh. B(6.07), 1-11-2001)

## Sec. 6.08. Utilities.

6.08.01. *Requirements for all developments.*

a.   *Generally.* The following basic utilities are required for all developments subject to the criteria listed herein.

b.   *Electricity.* Every principal use and every lot within a subdivision shall have available to it a source of electric power adequate to accommodate the reasonable needs of such use and every lot within such subdivision.

c.   *Telephone.* Every principal use and every lot within a subdivision shall have available to it a telephone service cable adequate to accommodate the reasonable needs of such use and every lot within such subdivision.

d.   *Water.* Every principal use and every lot within a subdivision shall have central potable water hookup whenever required by the town's comprehensive plan and where the topography permits the connection to a town water or sewer line by running a connecting line no more than 200 feet from the lot to such line.

e.   *Illumination.* All streets, driveways, sidewalks, bikeways, parking lots and other common areas and facilities in developments shall provide illumination meeting the standards of the town's public works manual.

f.   *Fire hydrants.* All developments served by a central water system shall include a system of fire hydrants consistent with the standards of the towns' public works manual.

g.   *Cable TV.* All developments served by cable TV shall be installed in accordance with the towns' public works manual.

6.08.02. *Design standards.*

a.   *Compliance.* All utilities required by this LDC shall meet or exceed the minimum standards contained in the town's public works manual.

b.   *Placement of utilities underground.*

   1.   All electric, telephone, cable TV, and other communication lines, exclusive of transformers or enclosures containing electrical equipment including, but not limited to, switches, meters, or capacitors which may be pad mounted, and gas distribution lines shall be placed underground within easements or dedicated public rights-of-way, installed in accordance with the specifications of the town's public works manual.

   2.   Lots abutting existing easements or public rights-of-way where overhead electric, telephone, or cable TV distribution supply lines and service connections have previously been installed may be

supplied with such services from the utilities' overhead facilities provided the service connection to the site or lot are placed underground.

3.   Screening of any utility apparatus placed aboveground shall be required.

6.08.03. *Utility easements.* When a developer installs or causes the installation of water, sewer, electrical power, telephone, or cable TV facilities and intends that such facilities shall be owned, operated, or maintained by a public utility or any entity other than the developer, the developer shall transfer to such utility or entity the necessary ownership or easement rights to enable the utility or entity to operate and maintain such facilities.

(Ord. No. 94-112, exh. A(6.08), 1-18-1994; Ord. No. 00-136, exh. B(6.08), 1-11-2001)

# ARTICLE VII. HARDSHIP RELIEF NONCONFORMITIES, VARIANCES, VESTED RIGHTS AND TAKINGS

## Sec. 7.00. Generally.

This article provides for the establishment of the hardship relief nonconformities, variances, vested rights and takings.

## Sec. 7.01. Nonconforming structures, nonconforming uses of structures and premises, and nonconforming characteristics of land.

7.01.01. *Intent.*

(1)   Within the districts established by this LDC or amendments which may later be adopted, there exist:

a.   Lots;

b.   Structures;

c.   Uses of land and structures; and

d.   Characteristics of use.

which were lawful before this LDC was passed or amended, but which would be prohibited, regulated, or restricted, under the terms of this LDC or future amendment. It is the intent of this section to permit these nonconformities to continue until they are removed, but not to encourage their survival. It is further the intent of this section that the nonconformities shall not be enlarged upon, expanded, nor extended, nor be used as grounds for adding other structures or uses prohibited elsewhere in the same district.

(2)   Nonconforming uses are declared by this section to be incompatible with permitted uses in the districts involved. A nonconforming use of land, or a nonconforming use of structure and land in combination shall not be enlarged or extended after passage of this LDC by attachment on a building or premises of additional signs intended to be seen from off the premises, or by the addition of other uses, of a nature which would be prohibited generally in the district involved.

(3)   To avoid undue hardship, nothing in this section shall be deemed to require a change in the plans, construction, or designated use of any building on which actual construction was lawfully begun prior to the effective date of the ordinance from which this LDC is derived and upon which the actual building construction has been carried out diligently. The term "actual construction"

means and includes the placing of construction materials in a permanent position and fastened in a permanent manner. Where excavation or demolition or removal of an existing building has been substantially begun preparatory to rebuilding, such excavation or demolition or rebuilding shall be deemed to be actual construction, provided that the work shall be carried on diligently.

7.01.02. *Nonconforming lots of record.*

(a)  In any district in which single-family dwellings are permitted, a single-family dwellings and customary accessory buildings may be erected on any lot of record at the effective date of the ordinance from which this LDC is derived, notwithstanding limitations imposed by other provisions of this LDC. Such lot must be in separate ownership and not of continuous frontage with other lots in the same ownership. This provision shall apply even though such lot fails to meet the requirement for area or width, or both, that are generally applicable in the district, provided that yard dimensions and requirements other than those applying to the area or width, or both, of the lot shall conform to the regulations for the district in which such lot is located. Variance of yard requirements shall be obtained only through action of the board of adjustment.

(b)  If two or more lots or combinations of lots and portions of lots with continuous frontage in single ownership are of record at the time of passage or amendment of the ordinance from which this section is derived, and if all or part of the lots do not meet the requirements for lot width and area, the lands involved shall be considered to be an undivided parcel for the purposes of this section, and no portion of said parcel shall be used or sold in a manner which diminishes compliance with the lot width and area requirements established by this section, nor shall any division of any established by this section, nor shall any division of any parcel be made which creates a lot with width or area below the requirements of this section.

7.01.03. *Nonconforming uses of land; land with minor structures only.* Where at the time of passage of the ordinance from which this LDC is derived lawful use of land exists which would not be permitted by the regulations imposed by this LDC, and where such use involves no individual structure with a replacement cost exceeding $1,000.00, the use may continue so long as it remains otherwise lawful, provided:

a.  No such nonconforming use shall be enlarged or increased, nor extended to occupy a greater area of land than was occupied at the effective date of the ordinance or amendment from which this LDC is derived.

b.  No such nonconforming use shall be moved in whole or in part to any portion of the lot or parcel other than that occupied by the use at the effective date of the ordinance or amendment from which this LDC is derived.

c.  If such nonconforming use of land ceases for any reason for a period of more than 90 days, any subsequent use of such land shall conform to the regulations specified by this LDC for the district in which such land is located, however this shall not apply to nonconforming agricultural uses when the land is used during each customary growing season.

d.  No additional structure not conforming to the requirements of this LDC shall be erected in connection with such nonconforming use of land.

7.01.04. *Nonconforming structures.* Where a lawful structure exists at the effective date of adoption or amendment of the ordinance from which this LDC is derived, that could not be built under the terms of this LDC by reason of restrictions on area, lot coverage, height, yards, its location on the lot, or other requirements concerning the structure, such structure may be continued so long as it remains otherwise lawful, subject to the following provisions:

a.  No such nonconforming structure may be enlarged or altered in any way which increases its nonconformity, but any structure or portion thereof may be altered to decrease its nonconformity.

b. Should such nonconforming structure or nonconforming portion of a structure be destroyed by any means to an extent of more than 50 percent of its replacement costs at the time of destruction, it shall not be reconstructed, except in conformance with the provisions of this LDC.

c. Should the structure be moved for any reason for any distance whatever, it shall thereafter conform to the regulations of the district in which it is located after it is moved.

7.01.05. *Nonconforming uses of structures; structures and premises in combination.* If lawful use involving individual structures with a replacement cost of $1,000 or more, or of structures and premises in combination, exists at the effective date of adoption or amendment of the ordinance from which this LDC is derived, that would not be allowed in the district under the terms of this LDC, the lawful use may be continued so long as it remains otherwise lawful, subject to the following provisions:

a. No existing structure devoted to a use not permitted by this LDC in the district in which it is located shall be enlarged, extended, constructed, reconstructed, moved or structurally altered, except in changing the use of the structure to a use permitted in the district in which it is located;

b. Any nonconforming use may be extended throughout any parts of a building which were manifestly arranged or designed for such use at the time of adoption or amendment of the ordinance form which this LDC is derived, but no such use shall be extended to occupy any land outside such building;

c. If no structural alterations are made, any nonconforming use of a structure, or structure and premises, may as a special exception be changed to another nonconforming use, provided that the board of adjustment, either by general rule or by making findings in the specific case, shall find that the proposed use is equally appropriate or more appropriate to the district than the existing nonconforming use. In permitting such change, the board of adjustment may require appropriate conditions and safeguards in accord with the provisions of this LDC.

d. Any structure, or structure and land in combination, in or on which a nonconforming use is superseded by a permitted use, shall thereafter conform to the regulations of the district, and the nonconforming use may not thereafter be resumed.

e. Where a nonconforming use of a structure, or structure and premises in combination, is discontinued or abandoned for 12 consecutive months or for 18 months during any three year period, except where government action impedes access to the premises, the structure, or structure and premises in combination, shall not thereafter be used, except in conformity with the regulations of the district in which it is located.

f. Where nonconforming uses status applies to a structure and premises in combination, removal or destruction of the structure shall eliminate the nonconforming status of the land. The term "destruction" for the purposes of this subsection is defined to damage to an extent of more than 50 percent of the replacement cost at the time of destruction.

7.01.06. *Nonconforming characteristics.* If characteristics of use, such as signs, off-street parking or off-street loading, or other matters pertaining to the use of land, structures, and premises are made nonconforming by these zoning regulations as adopted or amended, no change shall thereafter be made in the characteristic of use which increases the nonconformity with the regulations herein set out; provided that, changes may be made which do not increase, or which decrease, the nonconformity; and provided further that in all residential areas, nonconforming signs shall be removed within two years of the effective date of the ordinance from which this LDC is derived, or that within the period of two years, such signs shall be made to conform to the regulations of the districts in which they are located.

7.01.07. *Repairs and maintenance.*

(a) If a nonconforming structure, or portion of a structure containing a nonconforming use becomes physically unsafe or unlawful due to lack of repairs and maintenance, and is declared by any duly

authorized official to be unsafe or unlawful by reason of physical condition, it shall not thereafter be restored, repaired or rebuilt, except in conformance with the regulations of the district in which it is located.

(b)   If a nonconforming structure, or portion of a structure containing a nonconforming use becomes unsafe or unlawful for reasons other than lack of repairs or maintenance, nothing in this section shall be deemed to prevent the strengthening or restoring to a safe condition of any building or part thereof declared to be unsafe by any official charged with protecting the public safety, upon order of that official.

7.01.08. *Casual, temporary, or illegal use.* The casual, temporary, or illegal use of land or structures, or of land and structures in combination, shall not be sufficient to establish the existence of a nonconforming use or to create rights for the continuance of such use.

7.01.09. *Special exception provision.* Any use which is permitted as a special exception provision in a district under the terms of this LDC, other than a change through board of adjustment action from one nonconforming use to another use not generally permitted in the district, shall not be deemed a nonconforming use in such district, but shall without further action be considered a conforming use.

(Ord. No. 94-112, exh. A(7.01), 1-18-1994)

## Sec. 7.02. Variances.

7.02.01. *Generally.* The board of adjustment may, pursuant to the provisions of this section, grant variances from the provisions of this LDC as provided for herein.

7.02.02. *Variances; conditions governing applications; procedures.* To authorize upon appeal in specific cases such variance from the terms of this LDC as will not be contrary to the public interest when, owing to special conditions, a literal enforcement of the provisions of this LDC would result in unnecessary hardship. A variance from the terms of this LDC shall not be granted by the board of adjustment, unless and until:

a.   A written application for a variance is submitted to the administrative official, demonstrating that:

1.   Special conditions and circumstances exist which are peculiar to the land, structure, or building involved and which are not applicable to other lands, structures, or buildings in the same district.

2.   Literal interpretation of the provisions of this LDC would deprive the applicant of rights commonly enjoyed by other properties in the same district under the terms of this LDC and would work unnecessary and put an undue hardship on the applicant.

3.   The special conditions and circumstances did not result from the actions of the applicant.

4.   Granting the variance requested will not confer on the applicant any special privilege that is denied by this LDC to other lands, structures, or buildings in the same district.

5.   The variance requested is the minimum variance that will make possible the reasonable use of the land, building, or structure.

6.   The grant of the variance will be in harmony with the general intent and purpose of this LDC and that such variance will not be injurious to the area involved or otherwise detrimental to the public welfare.

No nonconforming use of neighboring lands, structures, or buildings in the same district, and no permitted or nonconforming use of lands, structures or buildings in other districts shall be considered grounds for the issuance of a variance.

Created: 2022-09-16 13:47:38 [EST]

b. Notice shall be given at least 15 days in advance of the public hearing. The owner of the property for which the variance is sought, or his agent shall be notified by certified mail. Notice of such hearing shall be posted on the property for which the variance is sought, at the post office, and in one other public place at least 15 days prior to the public hearing.

c. At the public hearing any party may appear in person, or by agent, or attorney.

d. The board of adjustment shall make findings that the requirements of subsection 8.02.03 have or have not been met by the applicant for a variance.

e. In granting any variance, the board of adjustment may prescribe appropriate conditions and safeguards in conformity with this LDC. Violation of such conditions and safeguards, when made a part of the terms under which the variance is granted, shall be deemed to be a violation of this section and punishable under section 8.06 of this LDC.

f. The board of adjustment may prescribe a reasonable time period within which the action for which the variance is required shall be begun, completed or both.

g. Under no circumstance shall the board of adjustment grant a variance to allow a use not permissible under the terms of this LDC in the district involved, or any use expressly or by implication prohibited by the terms of this LDC.

7.02.03. *Variances from road setbacks.* Any variance that permits encroachment upon a required setback from a road or street must be reviewed for final action by the town council.

(Ord. No. 94-112, exh. A(7.02), 1-18-1994)

## Sec. 7.03. Vested rights and takings.

7.03.01. *Vested rights.*

a. The town recognizes that development has and is taking place prior to the effective date of the ordinance from which this LDC is derived. It is the legislative intent of the town that no abrogation of vested rights is intended by this LDC. Nothing contained in this LDC shall be construed as applied to abrogating valid existing vested rights.

b. It shall be the duty and responsibility of the party alleging vested rights to affirmatively demonstrate the legal requisites to vested rights.

c. Rights shall vest under the common law upon a demonstration to the town and/or agency thereof that the applicant:

1. Has relied in good faith;

2. Upon some act or omission of the government; and

3. Has made such substantial changes in position or incurred such extensive obligations and expenses to their detriment that it would be highly inequitable to deny relief and unjust to destroy the rights acquired, *Salkosky* v. *City of Coral Gables,* 151 So.2d 433 (Fla. 1963).

d. Rights shall vest statutorily under F.S. ch. 163, for purposes of consistency with the comprehensive plan when an applicant is able to provide that:

1. A valid and unexpired final development order was issued by the town prior to the effective date of the ordinance from which this LDC is derived;

2. Substantial development shall have occurred on a significant portion of the development authorized in the final development order; and

3.   The development is completed or is continuing in good faith.

e.   Any structure on which construction has been completed pursuant to a valid building permit shall be presumptively vested for the purposes of consistency and concurrency and shall not be required to file an application to preserve vested rights.

f.   All lots of record as of the effective date of the ordinance from which this LDC is derived, whether located within a subdivision or without, but only to the extent of one single-family residence per lot, shall be presumptively vested for the purpose of density and shall not be required to file an application to preserve vested rights in this regard, provided such lots abut a public street and provided such lots are not contiguous, as of the effective date of the ordinance from which this LDC is derived, to any other lots owned by, or under contract for deed to, the persons applying for the single-family building permit.

g.   The mere existence of zoning contrary to the comprehensive plan shall not be determined to vest rights.

h.   The town shall develop application and policy procedures to implement the policies of vested rights, including additional criteria if deemed necessary.

7.03.02. *Takings.*

a.   The town recognizes that the application of the provisions of this LDC may result in a regulatory taking of private property under certain situations. It is the legislative intent of the town that no taking is intended by this LDC and that nothing contained in this LDC shall be construed as applied to constitute a temporary or permanent taking of private property.

b.   A party alleging that the application of this LDC will result in a taking shall apply for relief to the town clerk who shall decide the matter in consultation with the town attorney. Appeals from decisions of the town clerk may be made to the board of adjustment.

c.   To avoid a regulatory taking, the owner of a parcel of land may apply to the board of adjustment for a special exception permit to allow development not otherwise permitted by applicable zoning regulations, if it is determined, either administratively by the town clerk in consultation with the town attorney, or by denial of a variance by the board of adjustment, as applicable, that no building may be erected on the parcel in conformity with the applicable zoning district regulations and other requirements of this LDC. The board of adjustment may grant a special exception permit in accordance with the procedures provided in section 8.04.04 of this LDC to allow any of the permitted uses for the zoning district in which the parcel is located, provided the board makes the following findings:

1.   No development permitted within the applicable zoning district can reasonably be conducted in accordance with the provisions of this LDC;

2.   The parcel cannot be combined with a contiguous parcel under the same ownership and thereby used in conformity with the applicable zoning regulations; and

3.   The granting of a special exception permit will not result in increased flood heights, additional threats to public safety, extraordinary public expense, create nuisances, cause fraud on or victimization of the public, or conflict with other existing laws and ordinances.

In passing upon such applications, the board of adjustment shall also consider the size of the parcel, and whether it was platted as a lot suitable for development or otherwise established and recognized by the town as an individual lot suitable for development. Upon consideration of the factors in this section and the purposes of this LDC, the board of adjustment may attach such conditions and restrictions upon the special exception permit including a limitation of the extent or type of development permitted, as it deems necessary to further the purposes of this LDC. The development approved by the board of adjustment shall

be the least intense development possible to effectively avoid successful regulatory taking claims while minimizing adverse impacts resulting from the development.

(Ord. No. 94-112, exh. A(7.03), 1-18-1994)

# ARTICLE VIII. ADMINISTRATION AND ENFORCEMENT

## Sec. 8.00. Generally.

This article provides for the establishment of the administrative official, citizen boards, procedures for the administration of this LDC, fees and enforcement requirements.

(Ord. No. 94-112, exh. A(8.00), 1-18-1994; Ord. No. 2007-159, § 1(8.00), 6-14-2007)

## Sec. 8.01. Administrative official.

An administrative official, designated by the town council shall administer and enforce this LDC and may be provided with the assistance of such other persons as the town council may direct. Upon finding that any of the provisions of this article are being violated, the administrative official shall notify in writing the person responsible for such violations, indicating the nature of the violations and ordering the action necessary to correct it. The administrative official shall order the following:

a.  The discontinuance of illegal use of land, buildings, or structures;

b.  Removal of illegal buildings or structures or of illegal additions, alterations, or structural changes; discontinuance of any illegal work being done; or

c.  Shall take any other action authorized by this article to ensure compliance with or to prevent violations of its provisions.

(Ord. No. 94-112, exh. A(8.01), 1-18-1994)

## Sec. 8.02. Citizen boards.

8.02.01.  *Generally.* All citizen boards created to administer this LDC shall be governed by this section. Regardless of any other provision within this LDC any member of a citizen board may be removed from that position by a four-fifths vote of the town council.

8.02.02.  *Planning commission.* The town local planning agency is established in accordance with F.S. § 163.3174. The term planning commission shall be synonymous with the term local planning agency.

a.  *Membership.* The town local planning agency shall consist of five members appointed by the town council, none of whom shall be members of the town council, nor employees of the town. All members must be residents of the town at the time of appointment. An alternate member may be appointed and may exercise all the powers of a member of the local planning agency, but only in the absence of a regular member.

b.  *Term.* The terms of membership shall be three years. Immediately upon the adoption of the ordinance from which this LDC is derived, the members of the local planning agency, if any, shall be reappointed in the following manner:

a.  One member for one year;

b.      Two members for two years; and

c.      Two members for three years.

Upon completion of the initial term all members shall serve for three years. Any vacancies shall be appointed by the town council and such an appointment shall be before the duration of the term being filled. A majority of the local planning agency shall appoint a chairman who shall serve for one year. A secretary shall be appointed by the local planning agency who shall be a member of the local planning agency, an employee of the town, or a volunteer. The local planning agency shall keep minutes of all meetings showing the vote, indicating such fact, and keeping records of its resolutions, transactions, findings, or other determinations, all of which shall be public record and immediately filed with the town clerk.

c.      *Authority and responsibility.* The local planning agency possesses and is responsible for the duties established by the state statutes, this LDC now and as amended from time to time, as set forth herein and as otherwise directed by the town council. The local planning agency shall advise the town council on matters of zoning policy and regulation.

8.02.03. *Board of adjustment.* A board of adjustment is hereby established.

a.      *Membership.* The board of adjustment will consist of five members to be appointed by the town council or may consist of the existing members of the town council.

b.      *Term.* The terms of each membership shall be three years. Each member of the board of adjustment shall be a resident of the town at the time of appointment.

c.      *Proceedings.* The board of adjustment shall elect a chairman and a vice-chairman from among its members and shall appoint a secretary. The secretary shall be either a member of the board or an employee of the town or the town council. The board of adjustment may create and fill such other offices as it may determine to be necessary for the conduct of its duties. Terms of all such offices shall be for one year with eligibility for reelection. The board of adjustment shall adopt rules necessary to the conduct of its affairs, in keeping with the provisions of this LDC. Meetings shall be held at the call of the chairman and at such other times as the board may determine. All meetings shall be open to the public. The member upon each question, or if absent or failing to vote indicating such fact, and shall keep records of its resolutions, transactions, findings and determinations, all of which shall be a public record and shall be immediately filed in the office of the town clerk. A quorum for the transaction of business shall consist of three members. If any member of the board of adjustment shall find that his private or personal interests are involved in a matter coming from the board, he shall disqualify himself from participation in that particular matter.

d.      *Authority and responsibility.* The board of adjustment shall have the following powers and duties:

1.      *Administrative review.* To hear and decide appeals where it is alleged there is error in any order, requirement, decision, or determination made by the administrative official in the enforcement of this LDC.

2.      *Special exceptions; conditions governing applications; procedures.* To hear and decide only such special exceptions as the board of adjustment is authorized to pass on by the terms of this LDC; to decide such questions as are involved in determining whether special exceptions should be granted; and to grant special exceptions with such conditions and safeguards as are appropriate under this LDC, or to deny special exceptions when not in harmony with the purposes and intent of this LDC.

8.02.04. *Tree preservation committee.*

a.      *Established.* The tree preservation committee shall consist of three, four or five members to be appointed by the town council or may consist of the existing members of the town council. No business

of the tree preservation committee shall be conducted without the presence of a quorum consisting of at least two members if the committee has three or four members, or consisting of at least three members if the committee has five members. All decisions of the tree preservation committee shall be by an affirmative vote of at least 51 percent of the members present and voting at any meeting where a quorum exists.

b.   *Appointments.* The initial appointment to the tree preservation committee shall be as follows as determined by town council:

1.   One member appointed for a term of one year.

2.   One member appointed for a term of two years.

3.   One member appointed for a term of three years.

4.   Remaining member or members appointed for a term(s) of three years.

c.   *Authority.* The tree preservation committee shall have such authorities as provided for in section 5.08 of this LDC.

8.02.05. *Historical preservation board.* There is hereby created and established a town historical preservation board.

a.   *Composition.* The McIntosh Historical Preservation Board shall consist of three, four or five members to be appointed by the town council or may consist of the existing members of the town council.

b.   *Terms of office; officers.*

1.   The terms of each membership shall be three years. Each member of the historical preservation board shall be a resident of the town at the time of appointment.

2.   The historical preservation board shall elect from among its members a chairman, vice-chairman, and a secretary who shall serve for terms of one year and shall be eligible for reelection. The chairman shall preside over meetings and shall have the right to vote. In the absence of the chairman, the vice-chairman shall perform the duties of the chairman. In the absence of the chairman and the vice-chairman, the secretary shall perform the duties of both the chairman and the secretary. The secretary shall take the minutes of each town historical preservation board meeting and give such notice as may be required for all public meetings conducted by the board.

c.   *Meetings.*

1.   The historical preservation committee shall hold a meeting at least three times annually and at such additional times as may be necessary, by the call of the chairman. No business of the historical preservation committee shall be conducted without the presence of a quorum consisting of at least two members if the committee has three or four members, or consisting of at least three members if the committee has five members. All decisions of the historic preservation committee, including approval of the issuance of any certificate of appropriateness, shall be by an affirmative vote of at least 51 percent of the members present and voting at any meeting where a quorum exists. No member of the historical preservation committee shall vote on a matter that may materially or apparently affect the property, income, or business of that member.

2.   The historical preservation board shall adopt rules as approved by the town council for the transaction of its business. All meetings of the historical preservation board shall be open to the public, and public record shall be kept of the board's resolutions, proceedings, and actions.

8.02.06. *Road board.* There is hereby created and established a McIntosh Road Board.

Created: 2022-09-16 13:47:38 [EST]

a.  *Composition.* The road board will consist of five members to be appointed by the town council or may consist of the existing members of the local planning agency. All members of the road board shall be citizens of the town.

b.  *Duties.*

    1.  The road board will review any building permits, other than single-family residential, for traffic impacts and advise the town council on adverse effects.

    2.  The road board shall establish and maintain liaison with the state department of transportation and the county to coordinate impacts of any future developments on highways, roads, or streets within the town or the adjacent unincorporated areas of the county.

(Ord. No. 92-07, § 2, 7-23-1982; Ord. No. 95, § 2, 9-5-1985; Ord. No. 94-112, exh. A(8.02), 1-18-1994; Ord. No. 97-120, § 1-2-1997; Ord. No. 00-132, § 13, 10-12-2000; Ord. No. 2006-148, § 7, 12-12-2005; Ord. No. 2010-174, 4-8-2010)

## Sec. 8.03. Building permits; certificates of zoning compliance and site plans.

8.03.01.  *Building permits required.* No building or structure shall be erected, moved into or within the town, added to, or structurally altered without a permit therefore issued by the administrative official which shall only be issued after compliance with the requirements of this LDC and all applicable federal, state and water management district regulations is demonstrated. No building permit shall be issued by the administrative official, except in conformity with the provisions of this LDC, unless he receives a written order from the board of adjustment in the form of an administrative review, special exception, or variance as provided for by this LDC.

8.03.02.  *Application for a building permit.* All applications for building permits shall be accompanied by the following:

a.  Plans in triplicate drawn to scale, showing the actual dimensions and shape of the lot to be built upon;

b.  The legal description, exact sizes and locations on the lot of buildings already existing, if any; and

c.  The location and dimensions of the proposed building or alteration.

The application shall include:

a.  Such other information as lawfully may be required by the administrative official, including existing or proposed building or alteration;

b.  Existing or proposed uses of the building and land;

c.  The number of families, dwelling units, or rental units the building is designed to accommodate;

d.  Conditions existing on the lot;

e.  Existing and proposed groundwater drainage provisions; and

f.  Such other matters as may be necessary to determine conformance with, and provide for the enforcement of, this LDC.

One copy of the plans shall be returned to the applicant by the administrative official, after he shall have marked such copy either as approved or disapproved and attested to same by his signature on such copy. The original and one copy of the plans, similarly marked, shall be retained by the administrative official.

8.03.03.  *Certificates of zoning compliance.* It shall be unlawful to use or occupy or to permit the use of occupancy of any building or premises, or both, or part thereof hereafter created, erected, changed, converted or wholly or partly altered or enlarged in its use or structure until a certificate of zoning compliance shall have

been issued therefor by the administrative official, stating that the proposed use of the building or land conforms to the requirements of this LDC. No nonconforming structure or use shall be maintained, renewed, changed, or extended until a certificate of zoning compliance shall have been issued by the administrative official. The certificate of zoning compliance shall state specifically wherein the nonconforming use differs from the provisions of this LDC, provided that upon enactment of this LDC, owners or occupants of nonconforming uses or structures shall have three months to apply for certificates of zoning compliance. Failure to make such application within three months shall be presumptive evidence that the property was a nonconforming use at the time of enactment or amendment of this LDC. No permit for erection, alteration, moving, or repair of any building shall be issued until an application has been made for a certificate of zoning compliance, and the certificate shall be issued in conformity with the provisions of this LDC upon completion of the work. A temporary certificate of zoning compliance may be issued by the administrative official for a period not exceeding six months during alterations or partial occupancy of a building pending its completion, provided that the temporary certificate may include such safeguards as will protect the occupants and the public. The administrative official shall maintain a record of all building permits and certificates of zoning compliance, and a copy shall be furnished upon request to any person. Failure to obtain a certificate of zoning compliance shall be a violation of this LDC and shall be punishable under section 8.06 of this LDC.

8.03.04. *Expiration of building permit.* If the work described in any building permit has not begun within 12 months from the date of issuance thereof, said permit shall expire; it shall be canceled by the administrative official; and written notice thereof shall be given to the persons affected. If the work described in any building permit has not been substantially completed within two years from the date of issuance thereof, said permit shall expire and be canceled by the administrative official, and written notice thereof shall be given to the persons affected, together with notice that further work as described in the canceled permit shall not proceed, unless and until a new building permit has been obtained.

8.03.05. *Construction and use to be provided in applications, plans, permits, and certificates of zoning compliance.* Building permits or certificates of zoning compliance issued on the basis of plans and applications provided by the administrative official authorize only the use, arrangement and construction set forth in the approved plans and applications, and no other use, arrangement, or construction. Any use, arrangement, or construction at variance with that authorized shall be deemed a violation of this LDC and shall be punishable as provided for by section 8.06.

8.03.06. *Site plans.*

(1)  The fee for an application for site plan approval under this section of the Land Development Code for the historic Town of McIntosh shall be $75.00.

(2)  A site plan will be required for any permanent construction, attached structure, additional impervious surface exceeding 100 square feet including, but not limited to asphalt or concrete, or any change that alters the existing building footprint of the current site plan. Site plan approval shall not be required or include ordinary maintenance, repair, re-roofing, repainting, re-siding, remodeling, elimination or addition of doors, doorframes, windows, or window frames.

(3)  Upon completion of construction or altering change, sites for which site plans have been submitted will be inspected and reviewed during the approval process to determine if requirements have been met.

(4)  In the event that a project has commenced without the proper building permit or site plan approval, the application fee for a site plan shall be $150.00

(5)  All ordinances and/or resolutions to the extent of conflict herewith are hereby repealed.

(6)  This resolution shall take effect immediately upon its adoption.

(Ord. No. 94-112, exh. A(8.03), 1-18-1994); Res. No. 2006-03, 5-11-2006; Res. No. 2007-09, § 1, 10-11-2007; Res. No. 2009-02, 7-9-2009)

## Sec. 8.04. Procedures.

8.04.01. *State law controlling.* The procedures in this section shall be followed in amending this LDC and the comprehensive plan. This section supplements the mandatory requirements of state law, which must be adhered to in all respects.

8.04.02. *Code amendments.* The regulations, restrictions, and boundaries set forth in this LDC may from time to time be amended, supplemented, changed, or repealed. Procedures shall be as follows:

   a.   *Initiation of proposals.* A zoning amendment may be proposed by the town council, the planning commission, the board of adjustment, any other department or agency of the town, or by the petition of the owners of 51 percent or more of the area involved in the proposed change. In the latter case, the petitioners shall be required to assume all costs incidental to a zoning amendment change including, but not limited to, the cost of public notice, advertising and other costs incidental to the holdings of public hearings, attorney fees, and land planning agency professional fees. All proposals for zoning amendments shall be submitted to the administrative official in writing, accompanied by all pertinent information required by this zoning code and which may be required by the local planning agency (LPA) for proper consideration of the matter, along with payment of such fees and charges as may be required. The total fees and charges shall be estimated by the administrative official, and no application for a zoning amendment shall be heard by the LPA until such estimated fees and charges have been paid, except that the town council may waive any fee or charge for churches, nonprofit organizations or in cases of hardship. Prior to final adoption of the amendment change, the administrative official will present the petitioner with an itemized list of fees and charges incidental to the petition for zoning change, and the petitioner shall pay the balance of any unpaid fees, or if the petitioner overpaid, the town will reimburse the petitioner the overcharged amount. There will be no reimbursement to the petitioner if the amendment change is not approved. The town council shall, upon receipt of an application for amendment of this LDC, refer such application to the LPA for consideration as to the relationship of such proposal to the adopted comprehensive plan. All proposals for zoning amendments shall be considered first by the LPA, as established by the town, in the manner set out herein.

   b.   *Notice.* Before holding any public hearing as required by this LDC, the LPA or the town council shall give due public notice. In addition, where the proposed amendment would amend the official zoning map, written notice shall be mailed to the parties in interest and to all owners of property within 300 feet of the boundaries of the property for which a change in zoning is requested. Ownership of property shall be determined according to the most recent county ad valorem tax records. The mailed notices shall include a brief explanation of the proposed amendment and a location map identifying the property under consideration. The notices shall also state the actions of the LPA are strictly advisory to the town council.

   c.   *LPA hearing and report.* The LPA shall hold its public hearing within 60 days of the date on which the application for amendment was filed in the office of the administrative official. Unless a longer time period is mutually agreed upon by the town council and the LPA, the LPA shall file its recommendations with the town council within ten days after the public hearing.

   d.   *Report of the LPA when the proposed amendment pertains to a change in the zoning classification of land.* When a proposed amendment to this LDC pertains to a change in the zoning classification of land, the report and recommendations of the LPA to the town council shall show that the LPA has studied and considered, where applicable, whether or not:

      1.   The proposed change is contrary to the established land use pattern;

      2.   The proposed change would create an isolated district unrelated to adjacent and nearby districts;

3. The proposed change would materially alter the population density pattern and thereby increase or overtax the load on public facilities such as streets, utilities, etc.;

4. Existing district boundary lines are illogically drawn in relation to existing conditions on the property proposed for change;

5. The proposed change would be contrary to the future land use element of the town comprehensive plan and would have an adverse effect on the comprehensive plan;

6. Changed or changing conditions make the proposed amendment necessary;

7. The proposed change will adversely influence living conditions in the neighborhood;

8. The proposed change will create or excessively increase traffic congestion in the neighborhood;

9. The proposed change will create a drainage problem;

10. The proposed change will seriously reduce light and air to adjacent areas;

11. The proposed change will adversely affect property values in the adjacent area;

12. The proposed change will be a deterrent to the improvement or development of adjacent property in accord with existing regulations;

13. The proposed change will constitute a grant of special privilege to an individual owner as contrasted with the public welfare;

14. There are substantial reasons why the property cannot be used in accord with existing zoning;

15. The proposed change will be in scale with the needs of the neighborhood or the town; or

16. It is impossible to find other adequate sites in town for the proposed use in districts already permitting the use.

e. *Report of the LPA when the proposed amendment pertains to other matters.* When the proposed amendment to this LDC pertains to matters other than a change in the zoning classification of land, the LPA shall study and consider the need and justification for the change and the relationship of the proposed amendment to the town comprehensive plan. The LPA shall give appropriate consideration to whether the proposed change will further the purposes of this LDC and other town ordinances, regulations and actions designed to implement the comprehensive plan.

f. *Status of the LPA report and recommendation.* The report and recommendations of the LPA shall be advisory only and shall not be binding upon the town council.

g. *Action by the town council.* Upon receipt of the LPA's report and recommendations, the town council shall hold a public hearing, with notice given as set out in subsection b. of this subsection. In the case of all proposed changes and amendments, if the recommendation of the LPA is adverse to the proposal, such change or amendment shall not be adopted, except by the votes of three or more members of the town council. If the town council does not act upon the LPA recommendation regarding a proposed change or amendment within 45 days of the date of its receipt by the town council, the application upon which the report and recommendation is based shall be deemed to have been denied.

h. *Limitations on the rezoning of property.* Whenever the town council has denied an application for the rezoning of property, the applicant shall not resubmit an application to rezone any part or all of the same property for a period of 12 months from the date of such action. This time limit may be waived by the town council if the applicant can establish that the denial of the request for waiver of a time limit would work unnecessary and undue hardship on the applicant.

8.04.03. *Amending the comprehensive plan.* Applications to amend the town comprehensive plan shall be submitted in accordance with the requirements established by the town council on forms maintained by the

Created: 2022-09-16 13:47:38 [EST]

town clerk and then set for hearing before the planning commission. The planning commission shall hold a legislative hearing on each application to amend the comprehensive plan and thereafter submit to the town council a written recommendation which the town council shall thereafter hold a legislative hearing on the proposed amendment and may enact or reject the proposal, or enact a modified proposal that is within the scope of matters considered in the hearing.

8.04.04. *Duties of the administrative official, board of adjustment, town council and courts on matters of appeal.*

    a.    It is the intent of this LDC that all matters of interpretation and enforcement shall first be presented to the administrative official, and that such questions shall be presented to the board of adjustment only on appeal from the decision of the administrative official, and that the recourse from the decisions of the board of adjustment shall be to the courts.

    b.    It is further the intent of this LDC that the duties of the town council shall not include hearing and deciding questions of interpretation and enforcement that may arise. The procedure for deciding such questions shall be as stated in this section and this LDC. Under this LDC, the town council shall only have the duties of:

        1.    Considering and adopting or rejecting proposed amendments or the repeal of this LDC, as provided by law; and

        2.    Establishing a schedule of fees and charges as stated in section 8.05.

8.04.05. *Board of adjustment hearings; appeals; notice.* Appeals to the board of adjustment concerning interpretation or administration of this LDC may be taken by any person aggrieved by any officer, board, or bureau of the governing body of the town affected by any decision of the administrative official. Persons appealing to the board of adjustment may be required to assume such reasonable costs in connection with appeals as may be determined by the town council through action in setting fees to be charged for appeals. Such appeals shall be taken within a reasonable time, not to exceed 30 days after rendition of the order, requirement, decision, or determination appealed, by filing with the administrative official and with the board of adjustment a notice of appeal specifying the grounds thereof. The appeal shall be in the form prescribed by the board of adjustment. The administrative official shall forthwith transfer to the board of adjustment all plans, documents, papers, and other materials constituting the record upon which the action appealed from was taken. The board of adjustment shall fix a reasonable time for the hearing of appeal, give public notice thereof as well as due notice to the parties in interest, and decide the same within a reasonable time. At the hearing, any person may appear in person or by agent or attorney. An appeal stays all work on the premises and all proceedings in furtherance of the action appealed from, unless the administrative official from whom the appeal is taken certifies to the board of adjustment after the notice of appeal is filed with him, that by reasons of fact stated in the certificate, a stay would cause imminent peril to life or property. In such case, proceedings or work shall not be stayed other than by a restraining order which may be granted by the board of adjustment or by a court of record on application, on notice to the administrative official from whom the appeal is taken and on due cause shown.

8.04.06. *The board of adjustment special exception procedures.* A special exception shall not be granted by the board of adjustment, unless and until:

    a.    A written application for a special exception is submitted indicating the section of this LDC under which the special exception is sought and stating the grounds on which it is requested and the types of findings the board of adjustment must make under subsection e. of this subsection. The application should include material necessary to demonstrate that the granting of a special exception will be in harmony with the general intent and purposes of this LDC, will not be injurious to the neighborhood or to adjoining properties, or otherwise detrimental to the public welfare. Where applicable, such material may include, but is not limited to:

1.    Site plans at an appropriate scale showing proposed placement of structures on the property, provisions for ingress and egress, off-street parking and off-street loading areas, refuse and service areas, and required yards.

2.    Plans showing locations for utilities hook ups.

3.    Plans for screening and buffering with reference to type, dimensions, and character. Where this LDC places other requirements on specific special exceptions, the application should demonstrate that such requirements are met.

b.    Upon receipt of a completed application for a special exception, the administrative official shall promptly forward a copy thereof to the planning commission for review and consideration by the planning commission. The planning commission shall review the application for a special exception at any regular or special meeting of the planning commission subsequent to the receipt of application and shall make such recommendations to the board of adjustment as it deems appropriate. The planning commission shall not be required to give notice, nor hold a public hearing incident to review of an application for a special exception, nor shall the planning commission be required to make a recommendation to the board of adjustment on any such application. If the planning commission fails to make a written recommendation to the board of adjustment by the date the board of adjustment has set to officially act on the application, the planning commission shall be deemed to have recommended approval of the application.

c.    Notice shall be given at least 15 days in advance of the public hearing. The owner of the property for which special exception is sought or his agent shall be notified by certified mail. Notice of such hearing shall be posted on the property for which the special exception is sought, at the post office, and in one other public place at least 15 days prior to the public hearing.

d.    At the public hearing any party may appear in person, or by agent or attorney.

e.    Before any special exception shall issue, the board of adjustment shall make written findings certifying compliance with the specific rules governing individual special exceptions and that satisfactory provision and arrangement has been made concerning the following, where applicable:

1.    Ingress and egress to the property and proposed structures thereon with particular reference to automotive and pedestrian safety and convenience, traffic flow and control, and access in event of fire or catastrophe;

2.    Off-street parking and loading areas where required, with particular attention to the items in subsection a. of this section and the economic, noise, glare, or odor effects of the special exception on adjoining properties and properties generally in the district;

(Ord. No. 94-112, exh. A(8.04.06), 1-18-1994; Ord. No. 2008-166, 4-10-2008)